

ORIGINAL

FILED
08 APR 10 PM 4:02
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

Alan Himmelfarb (Cal. Bar. No. 90480)
KAMBERDELSON, LLC
2757 Leonis Blvd.
Los Angeles, CA 90058
(323) 585-8696
ahimmelfarb@kamberedelson.com

Jay Edelson
Ethan Preston
KAMBEREDELSON, LLC
The Monadnock Building
53 West Jackson, Suite 550
Chicago, IL 60604
(312) 589-6370

Karin E. Fisch
Orin Kurtz
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

*Counsel for Plaintiff*

'08 CV 0655 WQH CAB

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

JESSE MEYER, an individual, on his own behalf and on behalf of all similarly situated,

Plaintiff,

v.

QUALCOMM INCORPORATED, a Delaware corporation,

Defendant.

Civil Action No.

**CLASS ACTION COMPLAINT**

**BY FAX**

Jesse Meyer ("Plaintiff"), for his complaint, alleges as follows upon information and belief, based upon, *inter alia*, investigation conducted by and through his attorneys, except as to those allegations pertaining to Plaintiff, which are alleged upon knowledge:

## NATURE OF THE CLAIM

1. This is a national class action brought under the Sherman Act and the Cartwright Act on behalf of all persons who (1) purchased one or more cellular devices that either contain the Wideband Code Division Multiple Access ("WCDMA") technology or that are

compatible with the Universal Mobile Telecommunications System ("UMTS") standard (the "Device Class") and (2) purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices (the "Service Class").

2. This complaint arises from defendant QUALCOMM Incorporated's ("Qualcomm") illegal and anticompetitive conduct in the markets for the technology and chipsets that operate cell phones employing WCDMA, a third generation ("3G") technology that is implemented through the UMTS standard. Qualcomm, by its intentional deception of private standards-determining organizations ("SDOs") has monopolized certain markets for cellular telephone technology and components.

3. Qualcomm holds certain patents that it has asserted are "essential" to WCDMA technology and the UMTS standard. Thus, in order to maintain fair competition in the UMTS markets, international and United States SDOs only adopted UMTS as a mobile telephone standard after Qualcomm represented in writing that it would license its patents on fair, reasonable and non-discriminatory terms (that is, so-called "FRAND") terms.

4. The adoption of the UMTS standard led mobile telephone services carriers to invest billions of dollars in developing UMTS phone systems, and has led cellular device manufacturers to spend billions of dollars investing in technology compliant with the UMTS standard. After spending so much money to develop UMTS phone systems, cellular telephone services carriers and cellular device manufacturers cannot economically switch to another standard and thus are locked into the UMTS standard.

5. After the UMTS standard was adopted, Qualcomm disregarded its FRAND commitments. With the power of its WCDMA patents entrenched in the UMTS standard, Qualcomm has coerced device manufacturers and service carriers who are locked into the UMTS standard into paying supracompetitive prices to license Qualcomm's WCDMA technology.

6. Qualcomm's anticompetitive licensing practices impose enormous costs on UMTS

device manufacturers. These costs are passed on to consumers. If the participants in the UMTS standard-setting process had known that Qualcomm would not license its patents on FRAND terms, they could have and would have selected a different standard that did not implicate Qualcomm's patents, resulting in a more competitive market for UMTS devices and ultimately cheaper UMTS devices for consumers.

7. Qualcomm's licensing practices violate the Sherman Act (15 U.S.C. §§ 1, 2), California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726), and California's unfair competition law (Cal. Bus. & Prof. Code § 17200). This lawsuit seeks remedies for consumers against Qualcomm, including damages (and treble damages under the Cartwright Act), restitution, and injunctive relief restraining Qualcomm from similar anticompetitive acts in the future under the Clayton Act (15 U.S.C. §§ 15, 26), the Cartwright Act (Cal. Bus. & Prof. Code § 16750), and the unfair competition law (Cal. Bus. & Prof. Code § 17203).

**PARTIES**

8. Plaintiff Jesse Meyer ("Plaintiff") is a resident of Oakland, California.

9. Plaintiff receives cellular service from AT&T/Cingular and purchased a Motorola Razr V3xx on June 1, 2007 in an AT&T store for $121.24. AT&T subsidized the purchase of his cell phone.

10. Defendant QUALCOMM Incorporated is a Delaware corporation that maintains its headquarters at 5775 Morehouse Drive, San Diego, California. Qualcomm commercializes technology involved in cellular communications and applications. The revenues from Qualcomm's Technology Licensing Segment ("QTL"), which licenses the patents relevant to this complaint, comprised 27%, 32%, and 35% of total consolidated revenues in fiscal years 2004, 2005, and 2006, respectively. QTL's revenues for fiscal year 2006 were $2.63 billion, and were $1.84 billion and $1.33 billion in fiscal years 2005 and 2004, respectively.

**JURISDICTION AND VENUE**

11. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff

asserts a claim under the Sherman Act and seeks injunctive remedies under the Clayton Act on behalf of himself and all others similarly situated.

12. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). Defendant is a Delaware corporation headquartered in California. Plaintiff asserts claims on behalf of a proposed class whose members are scattered throughout the fifty states and the U.S. territories. On information and belief, the aggregate of these claims exceed the sum or value of $5,000,000 and the total number of class members exceeds 100. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2).

13. This Court has personal jurisdiction over Defendant pursuant to Cal. Code Civ. Proc. § 410.10 because it maintains its corporate headquarters in, and the majority of the acts alleged herein were committed in, California and, specifically, the Southern District of California. Venue is proper before this Court under 28 U.S.C. § 1391(b) and(c).

## THE STRUCTURE OF THE WIRELESS INDUSTRY

### A. Wireless Carriers, Cell Phone Manufacturers, and Chipset Manufacturers

14. Wireless carriers provide cell phone service to consumers. Carriers operate wireless systems that enable consumers to place and receive telephone calls, and send and receive data, on cell phones.

15. Many companies around the world manufacture cell phones, and the manufacturers typically sell those phones to carriers, which in turn arrange for sale of the phones to consumers.

16. Cell phones contain, among other components, one or more computer chipsets that deliver the cell phones' core ability to communicate with the wireless system.

### B. The Role of Standards Development Organizations

17. For a carrier's wireless system to function properly, all of the system's components (e.g., base stations in various geographic locations and consumers' cell phones) must seamlessly interface with each other. This means that regardless of which manufacturer makes a cell phone, regardless of which chipset manufacturer supplies the components for the cell phone, and regardless of which company manufacturers the system's

components, each cell phone must be capable of interfacing with all of the other components in a carrier's wireless system.

18. Because of this demand for interoperability, several SDOs have worked with the wireless industry to develop wireless communications standards.

19. On a worldwide basis, the International Telecommunications Union ("ITU") is the central telecommunications SDO. The ITU is an international organization comprised of governments and firms in the private sector, which coordinates the operation of telecommunications systems and services and advances the development of communications technology. The ITU's standardization activities are designed to foster the growth of new technologies, such as mobile telephony and the Internet, as well as the emerging global information infrastructure which handles a mix of voice, data and multimedia signals. The ITU develops internationally agreed technical and operating standards to foster interconnection of the world's communications systems.

20. The Telecommunications Industry Association ("TIA") is the leading U.S.-based SDO for the communications and information technology industry. The TIA is comprised of member companies that manufacture or supply products and services used in global communications. The European Telecommunications Standards Institution ("ETSI") is an SDO based in France with a leadership role in Europe. The Alliance of Telecommunications Industry Solutions ("ATIS") is an SDO based in the United States.

21. In the past several years, standards bodies specific to wireless technology standards have developed. The Third Generation Partnership Project ("3GPP") has focused on the evolution of GSM and UMTS technology.

22. The ownership of relevant intellectual property ("IP") and related IP licensing practices are critical issues in SDOs' consideration of standards proposals. If the implementation of a standard requires the use of particular IP, such as a patent, the IP owner may have the ability to prevent, delay or distort the development of technology implementing that standard (sometimes referred to as "patent hold-up") and thereby undermine the purpose of the SDO. Accordingly, SDOs typically require that their members declare whether

they believe they hold patents necessary for compliance with a particular standard, and if so whether they are willing to license such patents on fair, reasonable, and non-discriminatory ("FRAND") terms. Patents necessary to implement a particular standard are known as "essential patents" for the standard to which they relate. Each SDO relevant to this action requires that owners of essential patents agree to FRAND licensing before the SDO will agree to include the technology that depends upon those patents in any industry standard.

**C. Cellular Standards**

23. Two technology paths, or families of standards, are in widespread use today: "CDMA," which stands for "code division multiple access;" and "GSM," which stands for "global system for mobility." Among major cellular service providers in the US, Verizon Wireless and Sprint Communications operate CDMA-path networks, and Cingular (now AT&T) and T-Mobile operate GSM-path networks.

24. The CDMA and GSM paths have evolved through four generations, which reflect the evolution and improvement of these technologies over time. This complaint refers to the first generation as "1G," the second generation as "2G," and so on. The 1G standard used in the United States is the Advanced Mobile Phone System ("AMPS"). Cellular carriers are required to provide AMPS service until early 2008. See Public Mobile Services and Personal Communications Services, 67 Fed. Reg. 77,175 (Dec. 17, 2002) (codified at 47 C.F.R. 22.901(b)).

25. 2G standards reflect the advent of digital technology and the replacement of analog standards. The two primary 2G standards are 1) Code Division Multiple Access ("CDMA") and 2) Global System for Mobile communications ("GSM"). By 2000, essentially all cellular devices on the market employed either the GSM 2G standard or the CDMA 2G standard.

26. Carriers are in the process of deploying newer technologies that cannot be neatly characterized as either 2G or 3G, and may be called 2.5G or 2.75G. On the GSM branch, GSM carriers have implemented the GPRS and EDGE standards, which offer

respectively faster data speeds. Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Eleventh Report, 21 FCC Rcd 10947, ¶ 107 (Sept. 26, 2006) ("Eleventh Report"). Likewise, on the CDMA branch, CDMA carriers have deployed the CDMA2000 and the EVDO standards, again offering respectively faster data speeds. Id., ¶ 108.

27. 3G standards evolved from the specifications defined in the International Mobile Telecommunications-2000 standard ("IMT-2000"). 3G standards support greater concentrations of voice and data subscribers and higher data rates at lower incremental cost than 2G standards. The two 3G standards most widely slated for implementation in the United States are UMTS (operating on the GSM branch) and 3G CDMA (operating on the CDMA branch). UMTS allows substantially faster data transfer speeds than the GPRS or EDGE standards. Id., ¶ 107.

28. Thus, the evolution of cellular standards is as follows:

| **GENERATION** | **GSM Path** | **CDMA Path** |
|---|---|---|
| 3g | UMTS | CDMA 2000/3G CDMA |
| 2.5g/2.75g | GPRS/EDGE | CDMA 2000/EVDO |
| 2g | GSM | CDMA |
| 1g | Advanced Mobile Phone System | |

29. Contemporary cell phones primarily use 2G and 3G standards. Other standards built on top of the UMTS standard will allow still faster download speeds – for instance, High Speed Data Packet Access ("HSDPA") technology may double the download speeds of UMTS. Id.

30. The CDMA and GSM technology paths are not interoperable; equipment and technologies used in one cannot be used in the other. For this reason, each technology path has its own standard or set of standards.

31. The UMTS standard was created by the ETSI and its SDO counterparts in the United States and elsewhere after a lengthy evaluation of available alternative equipment and technologies. The UMTS standard was designed to permit economical transition from

2G GSM-based systems to a 3G standard; UMTS therefore works with WCDMA and is reverse-compatible with GPRS/EDGE operating systems and GSM operating systems.

32. An industry-wide standard necessarily eliminates previously available alternative technologies, which can no longer be used and are no longer competitive. The adoption of an industry-wide standard, therefore, confers monopoly power on the holders of patents essential to implementing that standard.

**SUBSTANTIVE ALLEGATIONS**

33. Qualcomm supplies some of the essential technology that the ETSI ultimately included in the UMTS standard, and holds intellectual property rights ("IPRs"), such as patents, in this technology.

34. Given the potential for owners of IPRs, through the exercise of their rights, to exert undue control over the implementation of industry-wide standards, the ETSI requires a commitment from vendors whose technologies are included in standards to license their technologies on FRAND terms. Neither ETSI nor the other relevant SDOs further define FRAND.

35. The ETSI included Qualcomm's proprietary technology in the UMTS standard only after, and in reliance on, Qualcomm's commitment to license UMTS technology on FRAND terms. Qualcomm's "essential" technology is called wideband CDMA ("WCDMA," which is a GSM-compatible technology and should not be confused with the CDMA technology path).

36. Qualcomm's WCDMA patents are essential to the manufacture of UMTS-compliant cell phones and other UMTS-compliant devices, and are also essential for the implementation of the UMTS standard. The licensing of Qualcomm's patents therefore is a barrier to entry into the relevant product market. Certainly, Qualcomm takes that position and is heavily engaged in patent litigation to that effect. One of Qualcomm's recent 10-Ks states: "[O]ur intellectual property rights include a valuable patent portfolio that includes *patents essential to implementation of each of the 3G CDMA alternative standards* . . ." QUALCOMM Incorporated, *Form 10-K For the Fiscal Year Ended*

*September 24, 2006*, at 10-11 (emphasis added). "[A]t this time most, if not all, companies recognize that any company seeking to develop, manufacture and/or sell products that use CDMA technologies [including WCDMA] will require a patent license from us." *Id.* at 23-24.

37. **Transition to 3G Is Path-Dependent.** The CDMA and GSM standards are mutually incompatible: CDMA phones cannot be used with GSM carriers, and vice versa. Moreover, technologies built on top of the GSM standard are not compatible with technologies built on top of the CDMA standard.

38. Consequently, the transition from 2G to 3G is path-dependent: it is immensely cheaper for carriers to upgrade from CMDA to 3G CDMA and from GSM to WCDMA than it is to switch from CDMA to WCDMA or from GSM to CDMA2000. By making the transition to the next generation of the technology that a carrier has already selected – whether CDMA or GSM for 2G services — the carrier can avoid the generally insurmountable expense entailed in switching between technologies.

39. In Qualcomm's own words, "the CDMA2000 mode enables a direct and more economical conversion for current cdmaOne networks. . . . [The WCDMA] infrastructure network has been specifically designed to be compatible with the GSM network, which is why it is expected that most GSM operators will migrate to WCDMA rather than to CDMA2000." *Id.* at 10.

40. **Lock-in Effect.** Due to the high cost of switching between the two major technology paths, carriers (and cellular device manufacturers) face a substantial "lock-in" effect after implementation of the UMTS standard. Qualcomm's technology is not interchangeable with or substitutable for other technologies.

41. **SDOs and Commitments to FRAND Licensing.** To guard against anticompetitive patent hold-up, most SDOs (including all SDOs relevant to this Action) require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies on FRAND terms. The absence of irrevocable FRAND assurances may cause an SDO to withhold approval of standards known to incorporate

essential, proprietary technologies. The FRAND commitments, or lack thereof, are therefore key indicators of the cost of implementing a potential technology. In this case, due to the "lock in" effect associated with a carrier's choice operating standard, industry participants' mutual representation and commitment to license any intellectual property applicable to the UMTS standard on FRAND terms was an essential part of the formulation and adoption of the UMTS standard.

42. **Qualcomm's Representations of FRAND Licensing to SDOs.** Upon information and belief, Qualcomm made repeated and express written representations to SDOs, including the ITU, ETSI, and 3GPP, that Qualcomm would license any of its essential WCDMA patents on FRAND terms prior to the adoption of the UMTS standard. Essentially, Qualcomm monopolized markets for WCDMA technology by inducing the relevant SDOs to include Qualcomm's patented technology as an essential element of the UMTS standard. On information and belief, Qualcomm made these representations from its headquarters, located in California.

43. Qualcomm's WCDMA technology was incorporated into the UMTS standard only after, and in reliance on, Qualcomm's commitment to license the patents for the WCDMA technology on FRAND terms. The selection of Qualcomm's technology excluded other patent holders competing to have their patents incorporated into the standard which would have licensed their patents on FRAND terms. However, even if Qualcomm's WCDMA technology was the only candidate for inclusion in the UMTS standard, it still would not have been selected by the relevant SDOs absent a FRAND commitment. This is because each SDO relevant to this action requires that owners of essential patents agree to FRAND licensing terms before the SDO will agree to include the technology that depends upon those patents in any industry standard.

44. Qualcomm's false commitments to license its patents on FRAND terms were intended to, and did, cause the SDOs to adopt the UMTS standard. Qualcomm's misrepresentations conferred an unfair advantage and bias in the competitive process in favor of WCDMA's inclusion in the UMTS standard. By distorting choices through

deception, Qualcomm obscured the relative merits of alternatives and prevented an efficient selection process. Qualcomm also obscured the costs of including its proprietary technology in the standard. Qualcomm has taken advantage of industry participants who now are locked into the UMTS standard by violating its FRAND commitments, thus extracting supracompetitive royalties for the licensing of its WCDMA patents.

**QUALCOMM'S UMTS LICENSING PRACTICES ARE ANTICOMPETITIVE**

45. Qualcomm never intended to offer its patent portfolio on FRAND terms. Qualcomm's commitment to FRAND licensing to the relevant SDOs was intentionally false.

46. After the widespread adoption of the UMTS standard, Qualcomm reneged on its FRAND commitments to the ETSI and other SDOs as alleged in more detail below. Qualcomm's licensing of the UMTS patents ("UMTS Licensing Practices" or "UMTS Licensing") have not been fair or reasonable, nor have they been non-discriminatory.

47. Qualcomm has used its monopoly power in the WCDMA market, as well as its false commitment to license its WCDMA patents of FRAND terms, to force industry participants into accepting Qualcomm's UMTS Licensing Practices. Qualcomm has unnaturally prolonged high prices for UMTS chipsets and UMTS devices, and has significantly deterred non-price competition (improved products and functionality). Consequently, prices for UMTS chipsets are supracompetitive, and innovation in, e.g., enhanced functionality has been undermined.

48. Qualcomm's Acquisition of Market Power. As any other patentee, Qualcomm exercises exclusive control over the market for its WCDMA-related patents. Qualcomm derives its market power in the UMTS market from the incorporation of WCDMA-related patents into the UMTS standard and the widespread adoption of that standard. Qualcomm's deceptive conduct, in the context of a consensus-driven private standard-setting environment, harmed (and continues to harm) competition and provides Qualcomm with monopoly power over the UMTS chipset market.

49. Qualcomm communicates with its licensees and potential licensees, and its UMTS

Licensing Practices emanate, from its headquarters in California. Qualcomm's UMTS Licensing Practices include, but are not limited to, the following:

50. **Discrimination Against Non-Qualcomm UMTS Chipsets via WCDMA Patent Royalty Rates.** On information and belief, UMTS Licensing requires cellular manufacturers to pay multi-million dollar fees, which may be waived, but only on a discriminatory basis – for example, if cell phone manufacturers agree to purchase Qualcomm's UMTS chipsets exclusively. No legitimate relationship exists between licensing of cell phone technology and the purchase of chipsets.

51. Qualcomm's royalty rate discrimination furthers no legitimate competitive interest or business need. Rather, Qualcomm's royalty rate discrimination is intended to harm, and has the effect of harming, competition in the UMTS chipset market.

52. **Discrimination Against Non-Qualcomm UMTS Chipsets via WCDMA Patent Royalty Calculations: Price Netting.** Qualcomm's UMTS Licensing also discriminates through a form of tying products together, called "price netting." The royalty paid under UMTS Licensing is based on the end-user price for the entire UMTS device, if the cell phone uses a chipset made by a competitor of Qualcomm. However, if licensees use a Qualcomm chipset, they may deduct (or "net out") the price paid to Qualcomm for the Qualcomm chipset from the end-user price of the UMTS device before calculating the royalty. "Price-netting" explicitly ties the patent royalty (fees paid on a license for Qualcomm's WCDMA patents) to UMTS chipsets manufactured by Qualcomm. "Price-netting" does not further any legitimate business interest, but rather is intended to harm competition. This UMTS Licensing Practice ensures that every non-Qualcomm UMTS chipset purchased by a device manufacturer carries a hefty financial penalty.

53. UMTS Licensing's discrimination against non-Qualcomm UMTS chipsets does not reflect any legitimate competitive interest or business need, but is intended to and does harm competition in the UMTS chipset market.

54. Qualcomm executives have publicly confirmed that UMTS Licensing involves price discrimination. Qualcomm's President, Steve Altman, stated in the earnings call for

Qualcomm's 2005 fourth quarter: "We have provided a small discount for using our chips to companies currently selling WCDMA handsets in Europe, which we believe to be nothing more than legitimate and lawful price examination [sic]." *Full Transcript of Qualcomm's 4Q05 Conference Call — Prepared Remarks (QCOM), at* http://seekingalpha.com/article/4317-full-transcript-of-qualcomms-4q05-conference-call-prepared-remarks-qcom (November 16, 2005).

55. **UMTS Licensing Requires Unfair and Discriminatory Double Royalty Payments.** Upon information and belief, Qualcomm requires licenses from both chipset manufacturers and cell phone manufacturers. This UMTS Licensing Practice requires that cellular device manufacturers pay a royalty rate based on the sales price of each UMTS cell phone sold: chipset manufacturers cannot sell UMTS chipsets to cell phone manufacturers without a Qualcomm license, and UMTS device manufacturers cannot buy UMTS chipsets from manufacturers without a Qualcomm license. Further, device manufacturers pay the same royalty regardless of whether they purchased the UMTS chipset or manufactured it themselves – although (as alleged above) manufacturers do receive a discount if they purchase the chipsets directly from Qualcomm. Hence, Qualcomm's royalty scheme enables it to collect royalties at two levels of the UMTS device market.

56. By requiring an individual license from each chipset supplier and UMTS device manufacturer, Qualcomm has also gained control over the interactions between suppliers and manufacturers, which is used to discriminate between customers depending on whether they use Qualcomm or non-Qualcomm chipsets.

57. On information and belief, Qualcomm has threatened UMTS device manufacturers with termination of their licenses and patent and/or breach of contract litigation if they purchase UMTS chipsets from any company that does not have its own license from Qualcomm. Qualcomm has made these threats notwithstanding its knowledge that at least some of those cell phone manufacturers have paid a royalty on UMTS chipsets and are licensed to sell UMTS cell phones incorporating UMTS chipsets. None of the other

patent owners with patents essential to the UMTS standard require this double royalty. This double royalty violates Qualcomm's FRAND obligations, not only because it is unfair and unreasonable, but also because it imposes different effective royalty rates (for the same bundle of rights) on UMTS device manufacturers that use third party UMTS chipsets than on those that use self-manufactured chipsets. This exacerbates the effect of UMTS Licensing's discrimination against manufacturers that use non-Qualcomm UMTS chipsets and increases costs to consumers.

58. **UMTS Licensing Extends Royalty Payments to Unpatented Components of UMTS Chipsets.** Upon information and belief, UMTS Licensing requires royalty payments on certain components of a UMTS chipset that are not covered by Qualcomm's WCDMA patents. This UMTS Licensing Practice discriminates against other UMTS chipset manufacturers who may seek to improve and enhance the functionality of their UMTS chipsets. This UMTS Licensing Practice is unreasonable, unfair, and anticompetitive, because it dampens the economic incentives of UMTS licensees to improve and add functionality to UMTS chipsets.

59. **UMTS Licensing Requires Unreasonable Royalty Demands Contrary to FRAND Commitments.** The royalty rates charged by Qualcomm to UMTS chipset manufacturers for Qualcomm's WCDMA technology are far greater than the rates charged by any other company proclaiming to be an essential WCDMA patent holder.

60. In addition, Qualcomm publicly represents that it charges the same royalty rate for licensing its WCDMA patents as it does for its 3G CDMA patents, even though its patents cover a much smaller proportion of the UMTS standard than the 3G CDMA standard. Thus, *Qualcomm's patents add far less value to the 3G UMTS standard than to the 3G CDMA standard, though Qualcomm charges the same license rate for both.* This UMTS Licensing Practice lessens competition in the UMTS market and encourages competition in the 3G CDMA market. Using this UMTS Licensing Practice as leverage, Qualcomm has increased its market power over the entire market for 3G cellular devices.

61. Steve Altman stated at Qualcomm's May 5, 2005 Spring Analyst Meeting that Qualcomm's licensees are obliged to pay the same royalty rates regardless of whether any of its patents expire and regardless of the number or percentage of WCDMA essential patents held, provided that at least "one claim of one patent applies." Qualcomm's 2006 10-K states:

> Generally, we have licensed substantially all of our patents to our CDMA licensees. Under each of our existing license agreements covering multiple CDMA standards, the royalty rate paid to us for sales of licensed 3G CDMA (regardless of whether it is CDMA2000, WCDMA, TD-CDMA or TD-SCDMA) subscriber products *is no less than the rate that such licensee pays for its licensed second generation cdmaOne* [2G CDMA] *subscriber products.*

QUALCOMM Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006*, at 10-11 (emphasis added).

62. Similarly, Qualcomm has rejected attempts by other WCDMA essential patent holders to set up a government-or-SDO-approved ceiling on the royalty rate at which all WCDMA technology for cell phones would be licensed in order to encourage adoption and proliferation of the technology.

63. **UMTS Licensing Requires Unfair Grant-back Provisions.** Upon information and belief, Qualcomm demands that UMTS licensees grant back to Qualcomm licenses for their own patents on terms much more favorable to Qualcomm. This UMTS Licensing Practice requires UMTS licensees to provide to Qualcomm substantially broader licenses for their own patents than what Qualcomm grants to the UMTS licensees. This UMTS Licensing Practice violates Qualcomm's FRAND commitments because the grant-back provisions are not reciprocal, but are overly broad. Qualcomm's insistence on an asymmetrical grant-back has the additional anticompetitive effect of discouraging innovation by Qualcomm's licensee-competitors and thus, undermines competition for UMTS chipsets and technology. This UMTS Licensing Practice is anticompetitive, because it creates an imbalance of power between Qualcomm and its competitors that threatens to seriously hamper those competitors over the long-term. It is also discriminatory in that it affects licensees with extensive relevant patent portfolios more

than it affects those without such a portfolio.

64. **Pricing Data Exchange Under UMTS Licensing Is Anticompetitive.** Upon information and belief, UMTS Licensing requires UMTS chipset licensees to provide to Qualcomm sensitive sales and pricing information, even when those licensees are competing directly with Qualcomm. This UMTS Licensing Practice discourages price competition and lacks any legitimate business justification. The effect is to prevent competition to the detriment of consumers.

65. **Qualcomm Offers Incentives to Device Manufacturers to Foreclose Competition in the UMTS Chipset Market.** Upon information and belief, Qualcomm provides discounts, marketing incentives, payments and/or other rewards to cell phone manufacturers who use Qualcomm UMTS chipsets exclusively. These inducements undermine competition from other UMTS chipset manufacturers by increasing the costs of firms who seek to sell UMTS chipsets to device manufacturers relative to Qualcomm's costs, and by defeating competition that would expand UMTS chipset output, improve quality and reduce the price of UMTS cell phones. These inducements may amount to tens of millions of dollars per cell phone manufacturer licensee.

66. **UMTS Licensing Harms Competition.** Collectively and individually, Qualcomm's UMTS Licensing Practices have restrained, eliminated, curbed, and reduced competition and undermined innovation in the UMTS chipset market, as well as the market for UMTS-capable devices. Competition could accelerate the decline in prices in the UMTS device market and facilitate other non-price competition, including advances in functionality and quality. Qualcomm intended to restrain competition when it implemented the UMTS Licensing Practices, to protect itself from competition on the merits.

67. The anticompetitive impact of UMTS Licensing can be inferred from Qualcomm's own statements. For instance, out of 36 HSDPA-capable devices on the market, only two use non-Qualcomm chipsets. Qualcomm, *QUALCOMM Press Conference*, at 18 (Feb. 12, 2007), at http://www.qualcomm.com/press/PDF/3gsm07_pressbriefing.pdf. Qualcomm

provides manufacturers with the chipset for all 41 laptops with HSDPA-embedded chipsets. *Id.* at 19. Qualcomm has over 80 UMTS vendor licensees. *Id.* at 20. Indeed, revenue from UMTS Licensing composes more and more of Qualcomm's overall income: Qualcomm estimates that "the ratio of WCDMA reported royalties to total reported royalties was 49% [in fiscal year 2006], up from 41% reported in [fiscal year 2004]." QUALCOMM Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006*, at 45.

## THE RELEVANT PRODUCT MARKETS

68. **Device Market.** The relevant product market ("Device Market") is the global market for UMTS-capable devices.

69. Plaintiff is an end consumer in the UMTS device market: Plaintiff purchased a Motorola Razr V3xx on June 1, 2007.

70. Plaintiff has suffered harm from Qualcomm's anticompetitive UMTS Licensing Practices. Both UMTS chipset and UMTS device manufacturers suffer direct anticompetitive harm from Qualcomm's UMTS Licensing Practices. This anticompetitive harm includes supracompetitive prices and impaired non-price competition in innovation of UMTS functionality. Because the entire UMTS chipset and device industries are uniformly subject to the effects of UMTS Licensing, no individual competitor in those markets has any economic incentive to absorb these costs. Instead, UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the vendors ultimately pass those costs on to end consumers, such as Plaintiff.

71. Since the inception of cellular service in the United States, cellular carriers have competed not only through their cellular service, but have also bundled their services with cellular devices compatible with (and necessary to use) that cellular service. Carriers have subsidized the cost of these bundled devices for over fifteen years.

72. Despite these subsidies, end consumers who purchase their devices through cellular carriers pay more for UMTS devices than they would in the absence of the

anticompetitive effects of Qualcomm's UMTS Licensing. Indeed, the carriers' ability to offer subsidies on UMTS devices is curtailed and limited by those same anticompetitive effects. Further, end consumers pay sales tax on the entire cost of the device – notwithstanding the carriers' subsidy. UMTS devices are no longer a niche market, but now constitute a burgeoning new consumer technology, and are well on their way to becoming the next ubiquitous consumer standard in cellular technology. Qualcomm executives estimated in a 2006 earnings conference call that approximately 96 million WCDMA units shipped in 2006, up from 50 million units in 2005. *QUALCOMM Inc. F2Q06 (Quarter ending Mar 26, 2006) Earnings Conference Call Transcript (QCOM), at* http://seekingalpha.com/article/9210-qualcomm-inc-f2q06-quarter-ending-mar-26-2006-earnings-conference-call-transcript-qcom (Apr. 20, 2006). Qualcomm's recent estimate for UMTS sales in 2007 is 180 million units. *QUALCOMM F3Q07 (Qtr End 6/30/07) Earnings Call Transcript, at* http://seekingalpha.com/article/42372-qualcomm-f3q07-qtr-end-6-30-07-earnings-call-transcript (July 20, 2007).

73. **Alternative Device Market.** Qualcomm has leveraged its market power over UMTS devices and chipsets to increase its market power over the entire market for cellular devices using any 3G standard.

74. Qualcomm exercises exclusive control over the patents needed to use the 3G CDMA standard, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm substantially controls the patent portfolio needed to manufacture 3G CDMA devices.

75. The market for 3G CDMA-related patents is significant because of the adoption of the 3G CDMA standard by, among others, Verizon Wireless and Sprint Communications. Qualcomm therefore derives significant market power from its 3G CDMA patents.

76. The UMTS Licensing Practices undermine competition between UMTS device and chipset manufacturers and the manufacturers of 3G CDMA devices and chipsets. Through the UMTS Licensing Practices, Qualcomm imposes an anticompetitive penalty on competitors seeking to manufacture UMTS devices and chipsets. Qualcomm uses its

market power over the IPRs necessary to use the 3G CDMA standard to eliminate, limit, or mitigate this penalty for manufacturers of 3G CDMA devices and chipsets. Consequently, the UMTS Licensing Practices make 3G CDMA device and chipsets a more attractive market than UMTS devices and chipsets, while deterring investment in the UMTS standard.

77. Because UMTS and 3G CDMA are the only standards that current 3G chipset and device manufacturers can use, the UMTS Licensing Practices can reasonably be expected to drive chipset and device manufacturers from investing and competing in the UMTS standard to investing and competing in the 3G CDMA standard. The 3G CDMA standard benefits from the network effects of increased investment, making it more attractive relative to the UMTS standard (or any other possible alternative cellular standard). Because there are relatively fewer IPR owners with an interest in the 3G CDMA standard, additional investments in the 3G CDMA standard and additional competition in the market for 3G CDMA devices increases Qualcomm's market power over the entire 3G cellular device market.

78. Qualcomm uses its market power over UMTS devices and chipsets to increase its market power over the entire 3G cellular device market by deterring investment in the UMTS standard (or any other possible alternative standard to the 3G CDMA standard) and driving investment into the 3G CDMA standard. Qualcomm's leveraging of its market power comes at the expense of competition in the market for UMTS devices and chipsets: the UMTS Licensing Practices have the effect of prolonging high prices for and undermining innovation in UMTS chipsets and UMTS devices.

79. In addition and/or in the alternative to the Device Market, the relevant product market is the global market for 3G cellular devices ("Alternate Device Market").

**THE RELEVANT SERVICE MARKET**

80. The subsidies that cellular carriers provide to their subscribers are not costless, and some portion of the carriers' cellular service fees is attributable to these subsidies. In effect, the carriers distribute the cost of these subsidies to each and every one of their

subscribers (regardless of whether these subscribers used or purchased a subsidized cellular device).

81. Some portion of carriers' costs of subsidizing the purchase of UMTS-compliant devices is attributable to Qualcomm's anticompetitive conduct. Carriers pay supracompetitive prices to purchase UMTS devices that can be sold to their cellular service customers at subsidized prices. These supracompetitive fees are passed on to the carriers' consumers.

82. On information and belief, however, the supracompetitive fees attributable to Qualcomm's anticompetitive conduct are not distinctly allocated to the price of the UMTS devices sold through the carriers to their cellular subscribers. Rather, these supracompetitive fees are effectively distributed through carriers' service fees to all their customers. Plaintiff and the other cellular service subscribers have paid higher prices for their cellular service because of Qualcomm's anticompetitive conduct.

83. Plaintiff does not seek to determine whether cellular carriers' rates are reasonable, but rather to eliminate and redress the anticompetitive impact of Qualcomm's conduct – which impact may be measured, in part, by cellular carriers' fees.

84. The relevant service market ("Service Market") is the cellular service of every carrier which bundles its cellular service with subsidized UMTS-compliant devices in the United States.

## CLASS CERTIFICATION ALLEGATIONS

85. Plaintiff seeks certification of a Device Class and a Service Class. The Device Class seeks injunctive relief under federal and state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased a UMTS-capable cellular device. The Service Class seeks injunctive relief under federal and state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased cellular service from a carrier that bundled its cellular services with subsidized UMTS-capable devices.

86. Plaintiff seeks certification under Rule 23(a), Rule 23(b)(2) and Rule 23(b)(3).

**Allegations for Certification of Device Class Pursuant to Rule 23(a)**

87. **Definition of the Device Class.** Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased a UMTS-capable cellular device (the "Device Class"). Excluded from the Device Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

88. **Device Class Numerosity.** Joinder of all Device Class members is impracticable. Qualcomm itself estimates some 326 million UMTS devices were sold globally in the last three years. Qualcomm estimates that UMTS-based phone sales represented approximately 41% of all manufacturer handset sales in Western Europe during the period from April 2006 through June 2006. *QUALCOMM Incorporated, Form 10-K For the Fiscal Year Ended September 24, 2006*, at 45. There were an estimated 2.3 million 3G cellular handsets and more than 2.3 million HSDPA-capable PC cards in service in the United States at the end of 2005. *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Eleventh Report*, 21 FCC Rcd 10947, ¶ 165 (Sept. 26, 2006) ("*Eleventh Report*").

89. **Device Class Commonality.** Common questions of fact and law exist as to all Device Class members and predominate over the questions affecting only individual Class members. These common questions include:

(a) Whether Qualcomm's patents are essential to manufacturing UMTS chipsets or UMTS devices;

(b) Whether Qualcomm has represented its patents are essential to manufacturing UMTS chipsets or UMTS devices to relevant manufacturers, and said manufacturers have relied on those representations;

(c) Whether Qualcomm represented or committed that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

(d) Whether Qualcomm intentionally misrepresented that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

(e) Whether Qualcomm has committed the UMTS Licensing Practices alleged above;

(f) Whether the UMTS Licensing Practices alleged above are fair, reasonable and non-discriminatory;

(g) Whether Qualcomm reneged on its commitments to license its UMTS patents on FRAND terms;

(h) Whether the UMTS Licensing Practices have anticompetitive effects, including supracompetitive pricing and impair non-price competition in the form of deterred innovation;

(i) Whether Qualcomm's UMTS Licensing Practices violate the Section 1 of the Sherman Act;

(j) Whether Qualcomm's UMTS Licensing Practices violate the Section 2 of the Sherman Act;

(k) Whether the UMTS Licensing Practices' anticompetitive effects are passed on to end consumers of UMTS devices;

(l) What portion of end-user prices for UMTS devices are attributable to Qualcomm's anticompetitive conduct alleged herein;

(m) Whether UMTS Licensing creates a trust in violation of the California Cartwright Act;

(n) Whether Qualcomm's UMTS Licensing Practices are unlawful and otherwise unfair, and thereby constitutes a violation of California's unfair competition law; and

(o) Whether Plaintiff and the Device Class are entitled to relief, and the nature of such relief.

90. **Device Class Typicality.** Plaintiff's claims are typical of the claims of other Device Class members, as the wrongful conduct of Defendant threatens the Plaintiff and other Device Class members with the same injury and/or damages arising out of and based upon the same transactions, made uniformly to the Plaintiff and the public.

**Allegations for Certification of Service Class Pursuant to Rule 23(a)**

91. **Definition of the Service Class.** Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased cellular service from any carrier in the United States which bundles its

cellular service with subsidized UMTS-compliant devices (the "Service Class"). Excluded from the Service Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

92. **Service Class Numerosity.** Joinder of all Service Class members is impracticable. In December 2005, the two largest GSM-based carriers collectively had roughly 76 million subscribers. *See Eleventh Report*, Table 4. Both these carriers subsidize their subscribers' purchase of UMTS devices, and the size of their subscriber base is sufficient for numerosity without considering any regional cellular carriers.

93. **Service Class Commonality.** Common questions of fact and law exist as to all Service Class members and predominate over the questions affecting only individual Class members. In addition to the common questions raised by the Device Class, these common questions include:

(a) Whether the UMTS Licensing Practices' anticompetitive effects are passed on to cellular subscribers of carriers which subsidize their subscribers' purchase of UMTS devices;

(b) What portion of prices for cellular service are attributable to Qualcomm's anticompetitive conduct alleged herein;

(c) Whether Plaintiff and the Service Class are entitled to relief, and the nature of such relief.

94. **Service Class Typicality.** Plaintiff's claims are typical of the claims of other Service Class members, as the wrongful conduct of Defendant threatens the Plaintiff and other Service Class members with the same injury and/or damages arising out of and based upon the same transactions, made uniformly to the Plaintiff and the public.

**Allegations Common to the Device Class and Service Class**

95. **Adequate Representation.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Device and Service Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to the members of either Class, and Defendant has no defenses unique to

Plaintiff.

96. **Predominance and Superiority.** This class action is appropriate for certification, because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Classes is impracticable. The damages suffered by each individual member of the respective Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the actions of Defendant. It would be virtually impossible for the Class or Subclass members individually to obtain effective relief from the misconduct of Defendant. Even if members of the Class or Subclass themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

97. **Policies Generally Applicable to the Classes.** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the members of both Classes, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Classes as a whole. The policies of the Defendant challenged herein apply and affect the Classes uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct, not on facts or law applicable only to Plaintiff.

98. **Market Power.** Qualcomm acquired market power – the power to raise prices and restrict output – in the Relevant Markets through the incorporation of its WCDMA patents in the UMTS standard and the widespread adoption of the UMTS standard by cellular carriers.

99. **Willful Acquisition of Monopoly Power Through Intentional Misrepresentation.**

Qualcomm acquired monopoly power by intentionally misrepresenting to the relevant SDOs and their members that Qualcomm would license its WCDMA patents on fair, reasonable, and non-discriminatory terms.

100. **SDOs' Adoption of UMTS Standard.** The UMTS standard was adopted in a consensus-oriented, private standard-setting environment. Every relevant SDO and all of their members relied on Qualcomm's intentional misrepresentations about its commitment to license its WCDMA patents on FRAND terms.

101. **Qualcomm Reneged on its FRAND Commitments.** Qualcomm has reneged on its commitments to licensing under FRAND terms. Qualcomm's UMTS Licensing is unfair, unreasonable, and discriminatory – and has serious anticompetitive effects.

102. **Leveraging Monopoly Power.** Qualcomm exercises exclusive control over its 3G CDMA-related patents, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm uses its market power over UMTS devices and chipsets as a leverage to increase its market power over the entire 3G cellular device market by deterring investment in the UMTS standard (or any other possible alternative cellular standard) and driving investment into the 3G CDMA standard.

103. **Causal Antitrust Injury.** Defendant's actions have injured Plaintiff and the Device and Service Class members and threaten them with additional antitrust injury in the form of more expensive UMTS cellular devices, reduced selection, and lessened non-price competition. Plaintiff and the Class Members have sustained antitrust injuries from the Defendant's actions in the form of increased costs for UMTS cellular devices than they would have otherwise.

**Count I: Violation of the Sherman Act, 15 U.S.C. § 1**

104. Plaintiff incorporates the above allegations by reference.

105. Qualcomm committed to the relevant SDOs that it would license its WCDMA patents, which are essential to the UMTS standard, on FRAND terms. This commitment was an intentional misrepresentation.

106. The relevant SDOs and their members relied on Qualcomm's false commitment to license its WCDMA patents essential to the UMTS standard, and adopted and implemented the UMTS standard.

107. Qualcomm's UMTS Licensing constitutes a contract, combination in the form of trust or otherwise in restraint of trade or commerce and violates Section 1 of the Sherman Act (15 U.S.C. § 1). Qualcomm imposes the UMTS Licensing on its licenses through deceptive and coercive conduct, and Qualcomm's licensees adhere to those restraints involuntarily.

108. The UMTS Licensing has caused antitrust injury to Plaintiff and the other members of the Device and Service Classes and threatens additional antitrust injury if it is allowed to continue. This antitrust injury consists of supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation.

109. Plaintiff, on his own behalf and on behalf of the members of the Device and Service Class, seeks injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein, and the cost of this suit, including reasonable attorneys' fees, under the Clayton Act (15 U.S.C. § 26).

**Count II: Violation of the Sherman Act, 15 U.S.C. § 2**

110. Plaintiff incorporates the above allegations by reference.

111. Qualcomm committed to the relevant SDOs that it would license its WCDMA patents, which are essential to the UMTS standard, on FRAND terms. This commitment was an intentional misrepresentation.

112. The relevant SDOs and their members relied on Qualcomm's false commitment to license its WCDMA patents essential to the UMTS standard, and adopted and implemented the UMTS standard.

113. Through this intentional misrepresentation, Qualcomm willfully acquired monopoly power over the Device Market.

114. Qualcomm's anticompetitive acts violate Section 2 of the Sherman Act (15 U.S.C. § 2).

115. In addition, Qualcomm has leveraged its monopoly power over UMTS devices and chipsets to acquire monopoly power over the Alternate Device Market.

116. The investment required to adopt a particular cellular standard effectively prevents cellular carriers from switching standards. Switching standards would be prohibitively expensive for cellular carriers. Cellular carriers have adopted one of two 3G cellular standards: UMTS or 3G CDMA.

117. Cellular devices that do not use cellular standards supported by the carriers cannot be competitive (or economically successful), because their utility is nil or extremely limited. The commercial reality is that 3G device and chipset manufacturers must use either the UMTS standard or the 3G CDMA standard. Hence, if Qualcomm deters investment by device and chipset manufacturers in the UMTS standard, it effectively diverts investment into the 3G CDMA standard.

118. Qualcomm exercises exclusive control over the patents needed to use the UMTS standard, and derives significant market power over the market for UMTS devices through the incorporation of its WCDMA patents in the UMTS standard and the widespread adoption of the UMTS standard by cellular carriers.

119. Qualcomm exercises exclusive control over the patents needed to use the 3G CDMA standard, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm also derives significant revenue from its 3G CDMA-related patents.

120. Qualcomm substantially controls the patent portfolio needed to manufacture 3G CDMA devices. To the extent Qualcomm has the power to force cellular device and chipset manufacturers to adopt the 3G CDMA standard, it is increasing its market power over the Alternate Device Market.

121. Qualcomm's UMTS Licensing deters investment in the UMTS standard, and forces, diverts, and induces investment in the 3G CDMA standard.

122. Qualcomm willfully acquired monopoly power over the entire Alternate Device Market

by leveraging its monopoly power over UMTS devices and chipsets through the UMTS Licensing Practices. The UMTS Licensing Practices deter investment in the UMTS standard (or any other possible alternative standard to the 3G CDMA standard) by device and chipset manufacturers and divert investment into the 3G CDMA standard.

123. Qualcomm has caused antitrust injury to Plaintiff and the other members of the Device and Service Classes and threatens additional antitrust injury if it is allowed to continue. This antitrust injury consists of supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation.

124. Plaintiff, on his own behalf and on behalf of the members of the Device and Service Class, seeks injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein, and the cost of this suit, including reasonable attorneys' fees, under the Clayton Act (15 U.S.C. § 26).

**Count III: Violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16726**

125. Plaintiff incorporates the above allegations by reference.

126. Through the UMTS Licensing, Qualcomm and its various licensees formed a combination of capital, skill and/or acts by two or more persons for the purpose of creating restrictions and preventing competition in manufacturing, making, sale and/or purchase of UMTS devices. Qualcomm used (and continues to use) coercive and deceptive tactics to impose restraints upon otherwise uncooperative licensees, and procured (and continues to procure) the unwilling cooperation of these licensees through threats and intimidation. The UMTS Licensing therefore creates a trust prohibited by California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726).

127. In addition or in the alternative to the foregoing allegations, the UMTS Licensing Practices constitute a trust in violation of the Cartwright Act, even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and

Qualcomm created a trust by simply reneging on its commitment to FRAND licensing for the UMTS patents and engaging in the UMTS Licensing Practices.

128. The UMTS Licensing has caused antitrust injury to Plaintiff and the other members of the Device and Service Classes and threatens additional antitrust injury if it is allowed to continue. This antitrust injury consists of damages from supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation.

129. Plaintiff, on his own behalf and on behalf of the other Device and Service Class members, seeks treble damages (with interest), injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein, and the cost of this suit, including reasonable attorneys' fees, under the Cartwright Act (Cal. Bus. & Prof. Code § 16750).

**Count IV: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**

130. Plaintiff incorporates the above allegations by reference.

131. Qualcomm's UMTS Licensing Practices, as alleged above, are unlawful business acts or practices.

132. The UMTS Licensing Practices are unfair business acts or practices. In addition or in the alternative to the foregoing allegations, the UMTS Licensing Practices are unfair or deceptive business acts or practices even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm committed an unfair or deceptive business act or practice by simply reneging on its commitment to FRAND licensing for the UMTS patents.

133. The UMTS Licensing has damaged Plaintiff and the other members of the Device and Service Classes and threatens damage if it is allowed to continue. This damage consists of supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred

innovation.

134. Plaintiff, on his own behalf and on behalf of the members of the Device and Service Classes, seeks injunctive relief, including restitution of all supracompetitive fees, under California's unfair competition law (Cal. Bus. & Prof. Code § 17203).

WHEREFORE, Plaintiff prays that the Court enter judgment and orders in their favor and against Defendant as follows:

(a) Certifying the action as a class action and designating Plaintiff and his counsel as representatives of the Device Class and the Service Class;

(b) With respect to Count III, treble damages in an amount to be determined at trial against Qualcomm and in favor of the Device Class and the Service Class;

(c) With respect to Counts I, II, III, and IV an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees, against Qualcomm and in favor of the Device Class and the Service Class;

(d) With respect to Count IV, equitable relief including an accounting, a constructive trust and restitution, in an amount to be determined at trial, and attorneys' fees, against Qualcomm and in favor of the Injunctive Class;

(e) Awarding pre- and post-judgment interest; and

(f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

The Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: April 9, 2007

By: ______________________

Alan Himmelfarb (Cal. Bar. No. 90480)
KAMBEREDELSON, LLC
2757 Leonis Blvd.
Los Angeles, CA 90058
(323) 585-8696
ahimmelfarb@kamberedelson.com

Jay Edelson
Ethan Preston
KAMBEREDELSON, LLC
53 West Jackson Ave., Suite 550
Chicago, IL 60604



(312) 589-6370
jedelson@kamberedelson.com
epreston@kamberedelson.com

Karin E. Fisch
Orin Kurtz
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

ORIGINAL

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Jessie Meyer

**(b)** County of Residence of First Listed Plaintiff: Alameda

(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Alan Himmelfarb, KamberEdelson LLC, 2757 Leonis Blvd., Los Angeles, CA 90058, (323) 585-8696

**DEFENDANTS**

QUALCOMM Incorporated

08 APR 10 PM 4:01

CLERK, U.S. DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA

BY: DEPUTY

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

'08 CV 0655 WQH CAB

BY FAX

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**): 15 U.S.C. 26

Brief description of cause: Antitrust violation

**VII. REQUESTED IN COMPLAINT:** ☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** 5,000,000.00

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☑ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE Rudi Brewster DOCKET NUMBER 05cv1958

DATE 04/09/2008 SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 149633 AMOUNT $350 APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

SM 4/10/08

UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 149633 - SH

April 10, 2008
15:56:05

Civ Fil Non-Pris
USAO #.: 08CV0655
Judge..: WILLIAM Q HAYES
Amount.: $350.00 CK
Check#.: BC3015552

Total-> $350.00

FROM: MEYER V. QUALCOMM