EVAN R. CHESLER (*pro hac vice*)
PETER T. BARBUR (*pro hac vice*)
ELIZABETH L. GRAYER (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700

WILLIAM S. BOGGS (Bar No. 053013)
BRIAN A. FOSTER (Bar No. 110413)
TIMOTHY S. BLACKFORD (Bar No. 190900)
DLA PIPER US LLP
401 B Street, Suite 1700
San Diego, CA  92101-4297
Telephone:  (619) 699-2700
Facsimile:  (619) 699-2701

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE MEYER, an individual, on his own behalf and on behalf of all similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware corporation,<br><br>Defendant. | Case No. 08cv0655-WQH (LSP)<br><br>**QUALCOMM INCORPORATED'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT**<br><br>Date:     July 14, 2008<br>Time:     11:00 a.m.<br>Judge:    Hon. William Q. Hayes |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................. 1

II.   THE COMPLAINT'S ALLEGATIONS .................................................... 2

   A.   The Parties.............................................................................................. 2

   B.   The Wireless Industry ........................................................................... 3

   C.   The UMTS Standard .............................................................................. 4

   D.   Alleged Licensing Conduct................................................................... 5

   E.   Plaintiff's Theory of Injury .................................................................. 6

   F.   Plaintiff's Causes of Action ................................................................. 6

III.   ARGUMENT ............................................................................................ 7

   A.   Motion to Dismiss Standard.................................................................. 7

   B.   Plaintiff Lacks Standing to Prosecute Any of the Claims He Asserts. ................. 9

      1.   Plaintiff Lacks the "Antitrust Standing" to Pursue Claims Under the Sherman and Cartwright Acts. .................................................. 9

         a.   Plaintiff's Theory of Causation Is Too Indirect to Support Antitrust Standing. .......................... 11

         b.   Plaintiff Has Not Suffered Antitrust Injury................................. 14

      2.   Plaintiff Lacks Standing to Pursue a Claim Under California's Unfair Competition Law. ........................................................ 16

   C.   Plaintiff Fails to State a Claim for Relief Under Any Cause of Action Asserted.............................................................................. 17

      1.   Plaintiff Fails to State a Claim Under Sherman Act § 1 or the Cartwright Act Because He Alleges Only Unilateral Conduct................ 17

      2.   Plaintiff Cannot State a Claim Under Section 2 of the Sherman Act Because Qualcomm Does Not Sell a Product in Any Market That It Is Alleged to Have Monopolized. ....................................... 20

      3.   Plaintiff Cannot State a UCL Claim. ..................................... 22

IV.   CONCLUSION ....................................................................................... 23

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### CASES

4

*Albrecht v. Herald Co.*,
    390 U.S. 145 (1968) .................................................................................................. 18

5

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co.*,
    190 F.3d 1051 (9th Cir. 1999)................................................................................... 9, 14

6

*Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*,
    241 F.3d 696 (9th Cir. 2001).......................................................................................... 12

7

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council Carpenters*,
    459 U.S. 519 (1983).......................................................................................... passim

8

*Balistreri v. Pacifica Police Dept.*,
    901 F.2d 696 (9th Cir. 1990)........................................................................................... 7

9

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*,
    118 F.3d 178 (3d Cir. 1997)...................................................................................... 10, 14

10

*Bell Atlantic Corp. v. Twombly*,
    __ U.S. __, 127 S. Ct. 1955 (2007)........................................................................ passim

11

*Blair v. All American Bottling Corp.*,
    No. 86-CV-1426, 1988 WL 150814 (S.D. Cal. Aug. 9, 1988) ....................................... 20

12

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982)....................................................................................................... 11

13

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)..................................................................................... 1, 15

14

*Californians for Disability Rights v. Mervyn's, LLC*,
    39 Cal.4th 223 (2006) .................................................................................................. 16

15

*Cargill Inc. v. Budine*,
    No. 07-CV-349, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007) ............................... 13, 15

16

*Cellular Plus, Inc. v. Super. Court*,
    14 Cal. App. 4th 1224 (1993) ........................................................................................ 8

17

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) .................................................................................. 20, 22

18

*City of Pittsburgh v. West Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998)............................................................................ 7, 9, 10, 12

19

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
    836 F.2d 173 (3d Cir. 1988)........................................................................................... 8

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) ........................................................................................ 18

4

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
5
    491 F.3d 380 (8th Cir. 2007) ......................................................................... 21

6

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986) ................................................................ 18, 19

7

*Eagle v. Star-Kist Foods, Inc.*,
8
    812 F.2d 538 (9th Cir. 1987) ........................................................ 7, 9, 12, 16

9

*Express, LLC v. Fetish Group, Inc.*,
    464 F. Supp. 2d 965 (C.D. Cal. 2006) ......................................................... 22

10

*Forsyth v. Humana, Inc.*,
11
    114 F.3d 1467 (9th Cir. 1997) ....................................................................... 21

12

*Freeman v. San Diego Ass'n of Realtors*,
    77 Cal. App. 4th 171 (1999) ......................................................................... 19

13

*G.H.I.I. v. MTS, Inc.*,
14
    147 Cal. App. 3d 256 (1983) ........................................................ 8, 17, 18, 19

15

*Hall v. Time, Inc.*,
    158 Cal. App. 4th 847 (2008) ....................................................................... 17

16

*Illinois Brick Co. v. Illinois*,
17
    431 U.S. 720 (1977) ................................................................... 10, 11, 14, 15

18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) .................................................. passim

19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
20
    536 F. Supp. 2d 1129 (N.D. Cal. 2008) ........................................................ 15

21

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
    No. 07-CV-00043, 2007 WL 4976364 (C.D. Cal. 2007) ............................... 19

22

*Intergraph Corp. v. Intel Corp.*,
23
    195 F.3d 1346 (Fed. Cir. 1999) .................................................................... 21

24

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ................................................................... 9, 11

25

*Laster v. T-Mobile USA, Inc.*,
26
    407 F. Supp. 2d 1181 (S.D. Cal. 2005) ........................................................ 16

27

*Lowell v. Mother's Cake & Cookie Co.*,
    79 Cal. App. 3d 13 (1978) ............................................................................ 17

28

1

<u>**TABLE OF AUTHORITIES**</u>
(continued)

2

<u>**Page**</u>

3    *Lucas Automotive Engineering, Inc. v.  Bridgestone/Firestone Inc.*,
4        140 F.3d 1228 (9th Cir. 1998) ........................................................................... 10

    *Lucas v. Bechtel Corp.*,
5        800 F.2d 839 (9th Cir. 1986) .............................................................................. 14

6    *Lucas v. Citizens Commc'ns Co.*,
7        409 F. Supp. 2d 1206 (D. Haw. 2005) ............................................................... 22

    *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
8        269 F. Supp. 2d 1213 (C.D. Cal. 2003) ................................... 10, 11, 12, 14, 15

9    *Monsanto Co. v. Spray-Rite Serv. Corp.*,
        465 U.S. 752 (1984) ................................................................... 17, 18, 19
10
    *Morrison v. Viacom, Inc.*,
11        66 Cal. App. 4th 534 (1998) ............................................................................... 11

12    *Newcal Indus., Inc. v. Ikon Office Solution*,
        513 F.3d 1038 (9th Cir. 2008) ............................................................................ 21
13
    *Newport Components, Inc. v. NEC Home Elec., Inc.*,
14        671 F. Supp. 2d 1525 (C.D. Cal. 1987) ............................................................. 19

15    *O'Brien v. Camisasca Automotive Mfg., Inc.*,
        161 Cal. App. 4th 388 (2008) ............................................................................. 16
16
    *Olsen v. Breeze, Inc.*,
17        48 Cal. App. 4th 608 (1996) ............................................................................... 22

18    *Rosenbluth Int'l., Inc. v. Super. Court*,
        101 Cal. App. 4th 1073 (2002) ........................................................................... 22
19
    *Rutman Wine Co. v. E. & J. Gallo Winery*,
20        829 F.2d 729 (9th Cir. 1987) ................................................................................ 7

21    *SC Manufactured Homes, Inc. v. Liebert*,
        162 Cal. App. 4th 68 (2008) ............................................................................... 22
22
    *Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.*,
23        113 F.3d 405 (3d Cir. 1997) ............................................................................... 14

24    *Tanaka v. Univ. S. Cal.*,
        252 F.3d 1059 (9th Cir. 2001) ............................................................................ 21
25
    *Ticketmaster LLC v. RMG Techs., Inc.*,
26        536 F. Supp. 2d 1191 (E.D. Cal. 2008) ............................................................. 21

27    *Toscano v. PGA Tour, Inc.*,
        201 F. Supp. 2d 1106 (E.D. Cal. 2002) ............................................................. 10
28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3    *Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*,
        540 U.S. 398 (2004) .......................................................................................... 18, 21

4

5    *Vinci v. Waste Mgmt., Inc.*,
        36 Cal. App. 4th 1811 (1995) ....................................................................................... 11

6    *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*,
        178 F. Supp. 2d 1099 (C.D. Cal. 2001) ........................................................................ 22

7

8    *Western Mining Council v. Watt*,
        643 F.2d 618 (9th Cir. 1981) ......................................................................................... 7

9                                   **STATUTES**

10    Cal. Bus. & Prof. Code § 16720 ......................................................................................... 7

11    Cal. Bus. & Prof. Code § 16726 ......................................................................................... 7

12    Cal. Bus. & Prof. Code § 16750 ....................................................................................... 10

13    Cal. Bus. & Prof. Code § 17200 ................................................................................... 7, 16

14    Cal. Bus. & Prof. Code § 17204 ....................................................................................... 16

15    Clayton Act, 15 U.S.C. § 26 ............................................................................................... 6

16    Clayton Act, 15 U.S.C. § 26 ............................................................................................... 6

17    Fed. R. Civ. Proc. 12 ...................................................................................................... 1, 7

18    Sherman Act, 15 U.S.C. § 1 ..................................................................................... passim

19    Sherman Act, 15 U.S.C. § 2 ..................................................................................... 2, 6, 20, 21

20                                **MISCELLANEOUS**

21

22    7 Areeda & Hovenkamp, *Antitrust Law* ¶ 1451e (2d ed. 2004).................................. 19

23

24

25

26

27

28

1      Qualcomm Incorporated ("Qualcomm") respectfully submits this memorandum of points

2   and authorities in support of its motion to dismiss pursuant to Federal Rule of Civil Procedure

3   12(b)(6).

4   **I.     PRELIMINARY STATEMENT**

5      In July 2005, Broadcom Corporation ("Broadcom") filed an action in the United States

6   District Court for the District of New Jersey alleging anticompetitive conduct by Qualcomm in

7   alleged markets for so-called third generation ("3G") cellular technology and semiconductor

8   "chipsets". *Broadcom Corp. v. Qualcomm Inc.*, 05-CV-3350 (D.N.J.). Almost three years later,

9   on April 10, 2008, Plaintiff Jesse Meyer ("Plaintiff") filed the present action purporting to claim

10   injury from the same alleged anticompetitive conduct. His claim, however, is asserted on behalf

11   of a putative class of cell phone customers and cellular service subscribers that allegedly suffered

12   harm in markets for cell phones and cellular service. Qualcomm does not supply cell phones or

13   provide cellular service. Rather, as alleged in the complaint, Qualcomm licenses intellectual

14   property to chipset manufacturers, who in turn sell chipsets to cellular device manufacturers, who

15   then sell devices to cellular carriers and vendors, who finally sell to end users like Plaintiff, at

16   prices that are subsidized at least in part by the end users' cellular carriers. Plaintiff is neither a

17   competitor in that marketplace, nor a purchaser of any Qualcomm product (*i.e.*, Qualcomm

18   intellectual property). Plaintiff's Complaint takes aim exclusively at Qualcomm's licensing

19   practices—alleging that such practices force market participants into consenting to unfair terms—

20   but Plaintiff is not alleged ever to have taken a license from Qualcomm or to have been offered

21   one.

22      Even though Plaintiff is neither a consumer nor a competitor in any market in which

23   Qualcomm sells a product, and even though he has had almost three years to investigate how

24   Qualcomm's conduct might actually have affected him, his Complaint is little more than a

25   photocopy of Broadcom's 2005 complaint, bereft of any facts suggesting that cell phone

26   purchasers are directly injured by a company that does not supply cell phones. Specifically,

27   Plaintiff lacks standing for at least three reasons. *First*, standing under the antitrust laws is

28   limited to those who suffer a direct and proximate injury from the alleged misconduct.

1    Conceding that his injury is not direct, Plaintiff alleges an injury that is entirely derivative of at

2    least three intermediaries in the supply chain; only these intermediaries are alleged to have

3    suffered "direct" injury.  Because of this, and because Qualcomm's licensed technology is alleged

4    to be just one technology among many in the cell phone that Plaintiff ultimately purchased, any

5    alleged injury is far too remote to support standing.  *Second*, because Qualcomm is not alleged to

6    supply cell phones or offer cellular service—either directly or indirectly—Plaintiff's alleged

7    injuries in these markets cannot amount to an "antitrust injury".  This defect is also fatal to

8    Plaintiff's standing to pursue an antitrust claim.  *Third*, Plaintiff lacks standing under California's

9    Unfair Competition Law because, in light of the convoluted chain of causation that he alleges,

10   Plaintiff does not and cannot allege that he lost "money or property as a result" of Qualcomm's

11   alleged misconduct.  For these reasons alone, Plaintiff's Complaint should be dismissed.

12          Even if Plaintiff were to have standing, the Complaint fails to state a claim under any of

13   the four causes of action that it asserts.  *First*, under Section 1 of the Sherman Act and under

14   California's Cartwright Act, there can be no "combination in restraint of trade" without

15   allegations that Qualcomm did more than unilaterally decide how it was going to license its

16   intellectual property and to whom.  Because Plaintiff has alleged *no* facts—much less the specific

17   facts required under clear precedent—suggesting that Qualcomm's unilateral licensing conduct

18   coerces involuntary counterparties into a "combination", the Complaint fails to state a claim

19   under Section 1 of the Sherman Act or under the Cartwright Act.  *Second*, because Plaintiff does

20   not (and cannot truthfully) allege that Qualcomm sells cell phones, his claim that Qualcomm has

21   monopolized certain cell phone "device" markets in violation of Section 2 of the Sherman Act

22   plainly fails.  *Third*, because Plaintiff's claim under California's Unfair Competition Law must

23   rise or fall on the strength of his antitrust claims, this cause of action should be dismissed as well.

24   **II.     THE COMPLAINT'S ALLEGATIONS**

25          **A.     The Parties**

26          Plaintiff is alleged to be a cellular service subscriber and cell phone "end consumer".

27   (Compl. ¶¶ 9, 69.)  He allegedly purchased a Motorola cell phone from his cellular service

28   provider, AT&T, which subsidized the purchase.  (Compl. ¶ 9.)  He purports to represent two

classes of other "end customers":  (1) a nationwide class of persons who purchased cell phones containing "the Wideband Code Division Multiple Access ('WCDMA') technology or that are compatible with the Universal Mobile Telecommunications System ('UMTS') standard" (the so-called "Device Class"); and (2) a nationwide class of persons who "purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices" (the "Service Class").  (Compl. ¶ 1.)

Qualcomm is alleged to develop and supply technology involved in cellular communications and applications.  (Compl. ¶¶ 3, 33.)  As alleged, Qualcomm broadly licenses its intellectual property rights, including its patents, through its Qualcomm Technology Licensing ("QTL") business unit.  (Compl. ¶ 10.)  Qualcomm is not alleged to make or sell cell phones or any other mobile wireless devices, nor is it alleged to provide mobile wireless service to subscribers.

**B.    The Wireless Industry**

According to the Complaint, the wireless industry is made up of carriers, wireless device manufacturers, chipset manufacturers and technology suppliers such as Qualcomm.  Wireless carriers are alleged to provide cell phone service to consumers.  (Compl. ¶ 14.)  These carriers, according to the Complaint, operate wireless systems that enable consumers to place and receive telephone calls and send and receive data on cellular devices.  (Compl. ¶ 14.)  Carriers allegedly bundle their services with cell phones compatible with that carrier's cellular service.  (Compl. ¶ 71.)  In offering this bundle, carriers are alleged to subsidize their subscribers' cell phone purchases, as is alleged to have been the case with Plaintiff's purchase.  (Compl. ¶¶ 70-72.)  Cell phone manufacturers, which produce these wireless devices, typically sell the phones to wireless carriers.  (Compl. ¶ 15.)  A cell phone allegedly contains a number of components including one or more computer "chipsets" that allow the wireless device to communicate with the wireless system and other devices.  (Compl. ¶ 16.)  As alleged in the Complaint, Qualcomm "commercializes technology involved in cellular communications and applications", including by licensing its patents to manufacturers of these chipsets.  (Compl. ¶¶ 10, 33.)

/////

1    To ensure the interoperability of wireless products made by different manufacturers, the

2    industry has formed certain "standards determining organizations", or "SDOs", primarily made

3    up of representatives from the industry.  (Compl. ¶¶ 17-18, 20.)  SDOs allegedly take varying

4    approaches to proprietary intellectual property rights ("IPR"), such as patents, that cover

5    technology incorporated into a standard.  According to the Complaint, SDOs typically require

6    their members to declare whether they believe they hold patents necessary for compliance with

7    the particular standard, and if so, require them to agree that they will license such patents on so-

8    called "fair, reasonable, and non-discriminatory" ("FRAND") terms.  (Compl. ¶ 22.)  The

9    relevant SDOs, as alleged, do not further define the concept of FRAND.  (Compl. ¶ 34.)

10    The two cellular standards alleged in the Complaint to be widely used are referred to as

11    Global System for Mobility ("GSM") and Code Division Multiple Access ("CDMA").  (Compl.

12    ¶ 23.)  In the United States, the Complaint alleges that cellular carriers such as Verizon Wireless

13    and Sprint Communications operate CDMA-path networks while others, such as AT&T and T-

14    Mobile, operate GSM-path networks.  (Compl. ¶ 23.)  According to the Complaint, equipment

15    and technology typically are designed for use with one of these particular standards; thus, the

16    equipment and technology used in GSM-path networks typically cannot be used in a CDMA-

17    based system.  (Compl. ¶ 30.)

18    The Complaint refers to GSM and CDMA as "second generation" or "2G" cell phone

19    technologies.  (Compl. ¶ 23.)  As alleged, the industry now is in the process of migrating to cell

20    phone technologies known as "third generation" or "3G" technologies.  (Compl. ¶ 27.)  Operators

21    on the GSM branch allegedly are upgrading their systems to be compliant with a 3G standard

22    known as "UMTS".  (Compl. ¶ 28.)  According to the Complaint, this standard uses an air

23    interface technology called wideband-CDMA or "WCDMA".  (Compl. ¶ 31.)  The 3G

24    technologies allegedly used most often by CDMA carriers are referred to as "CDMA2000" and

25    "3G CDMA".  (Compl. ¶¶ 27-28.)

26    **C.    The UMTS Standard**

27    Plaintiff's Complaint centers on Qualcomm's alleged conduct in the standardization

28    process for UMTS.  The UMTS standard is alleged to have been created by a European SDO

1  known as "ETSI" (the European Telecommunications Standards Institute), along with its United

2  States counterparts. (Compl. ¶¶ 20, 31.) Qualcomm allegedly supplies some of the "essential"

3  technology that ETSI ultimately included in the UMTS standard, including patents relating to the

4  WCDMA air interface technology. (Compl. ¶¶ 33, 35-36.) According to the Complaint,

5  Qualcomm committed to ETSI that it would license its "essential" technology on so-called

6  "FRAND" terms. (Compl. ¶ 35.) In alleged reliance on that commitment, ETSI then included

7  Qualcomm's proprietary technology in the UMTS standard. (Compl. ¶ 35.) The Complaint

8  alleges that, after the adoption and implementation of the UMTS standard, industry participants

9  were forced to use Qualcomm technology due to a "lock-in" effect that allegedly made

10  Qualcomm's technology non-interchangeable with other technologies. (Compl. ¶ 40.)

11       **D.    Alleged Licensing Conduct**

12       In alleged violation of its commitments to ETSI, Qualcomm is alleged to have engaged in

13  licensing practices (so-called "UMTS Licensing") that allegedly have not been fair, reasonable or

14  non-discriminatory. (Compl. ¶ 46.) Specifically, Qualcomm is accused of: (1) allegedly

15  discriminating among licensees of the essential WCDMA technology by charging more and

16  higher fees to those who do not use Qualcomm's UMTS chipsets (Compl. ¶¶ 50-55); (2) allegedly

17  demanding royalties on parts of UMTS chipsets for which it did not own patents (Compl. ¶ 58);

18  (3) allegedly demanding that UMTS licensees grant back to Qualcomm licenses for their own

19  proprietary technologies on terms much more favorable to Qualcomm (Compl. ¶ 63); (4)

20  allegedly charging double royalties to UMTS cell phone manufacturers who use non-Qualcomm

21  UMTS chipsets (Compl. ¶¶ 55-57); (5) allegedly discouraging price competition by demanding

22  sensitive sales and pricing information from Qualcomm's UMTS chipset licensees (Compl. ¶ 64);

23  and (6) allegedly providing discounts, incentives and payments to cell phone manufacturers who

24  use only Qualcomm UMTS chipsets (Compl. ¶ 65).[1]

25       The Complaint does not allege which companies have accepted these licensing terms or

26  whether any industry participants have refused the terms. Instead, Plaintiff alleges generally that

---

[1]  These, along with many of the other allegations in Plaintiff's Complaint, are lifted wholesale from the Second Amended Complaint filed by Broadcom in the NJ Action. *See* Qualcomm's Memorandum in Support of Transfer (Dkt. 20) at 2-4.

27

28

1  industry participants were forced into accepting Qualcomm's UMTS Licensing Practices because

2  of Qualcomm's "exclusive control over the market for its WCDMA-related patents". (Compl.

3  ¶¶ 47-48.)

4       **E.    Plaintiff's Theory of Injury**

5       Plaintiff is an alleged "end-consumer" cell phone purchaser and cellular service

6  subscriber. (Compl. ¶¶ 9, 69.) The Complaint does not allege that Qualcomm makes, supplies,

7  markets or sells consumer cell phones, or that Qualcomm provides cellular service to subscribers.

8  Plaintiff is not alleged to have requested or taken a license from Qualcomm or otherwise to have

9  purchased any product or service from Qualcomm. The Complaint instead alleges that certain

10 "UMTS chipset and UMTS device manufacturers" license the relevant Qualcomm technology,

11 and thereby suffer "direct anticompetitive harm from Qualcomm's UMTS Licensing Practices".

12 (Compl. ¶ 70.) According to the Complaint, these unnamed UMTS chipset manufacturers then

13 "pass UMTS Licensing costs down to UMTS device manufacturers". (Compl. ¶ 70.) UMTS

14 device manufacturers allegedly then "pass those costs down to their vendors, and the vendors

15 ultimately pass those costs on to end customers, such as Plaintiff". (Compl. ¶ 70.)

16      **F.    Plaintiff's Causes of Action**

17      On the basis of the foregoing allegations, conclusions and theories, Plaintiff asserts four

18 causes of action.

19      *First*, Plaintiff asserts a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, on the

20 ground that Qualcomm's UMTS Licensing constitutes a combination in restraint of trade.

21 (Compl. ¶ 107.) Under this cause of action, Plaintiff seeks an injunction, attorneys' fees and costs

22 under Section 16 of the Clayton Act, 15 U.S.C. § 26. (Compl. ¶ 109.)

23      *Second*, Plaintiff asserts a claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, on the

24 theory that Qualcomm willfully acquired monopoly power in the alleged market for UMTS-

25 compliant cell phones and leveraged that power to acquire monopoly power over the entire

26 alleged 3G cell phone market. (Compl. ¶¶ 110-24.) As relief for this claim, Plaintiff requests an

27 injunction, attorneys' fees and costs under Section 16 of the Clayton Act, 15 U.S.C. § 26.

28 (Compl. ¶ 124.)

1    *Third*, Plaintiff asserts a claim under California's Cartwright Act, Cal. Bus. & Prof. Code

2    §§ 16720, 16726, on the basis of an alleged "combination of capital, skill and/or acts by two or

3    more persons for the purpose of creating restrictions and preventing competition in

4    manufacturing, making, sale and/or purchase of UMTS devices". (Compl. ¶ 126.) Under this

5    cause of action, Plaintiff seeks treble damages (with interest), injunctive relief, attorneys' fees and

6    costs. (Compl. ¶ 129.)

7        *Fourth*, Plaintiff asserts a claim under California's Unfair Competition Law ("UCL"), Cal.

8    Bus. & Prof. Code § 17200, contending that Qualcomm's UMTS licensing practices are unlawful,

9    unfair and deceptive business acts or practices within the meaning of the UCL. (Compl.

10   ¶¶ 130-33.) Plaintiff seeks equitable relief, including an accounting, a constructive trust and

11   restitution, as well as attorneys' fees. (Compl. ¶ 129.)

12   **III.    ARGUMENT**

13       **A.    Motion to Dismiss Standard.**

14       Dismissal is proper under Rule 12(b)(6) when a plaintiff lacks standing to bring the causes

15   of action asserted in the Complaint. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256,

16   264 (3d Cir. 1998); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir. 1987).[2] A Rule

17   12(b)(6) motion also must be granted when, on the face of a complaint, there is a "lack of a

18   cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory".

19   *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). Although factual

20   allegations are assumed true for purposes of a 12(b)(6) motion and reasonable inferences

21   construed in a plaintiff's favor, a court need not accept as true unreasonable inferences or

22   conclusory allegations cast in the form of factual allegations. *Western Mining Council v. Watt*,

23   643 F.2d 618, 624 (9th Cir. 1981). An obvious corollary to this rule is that a plaintiff must plead

24   more than "magic words" or antitrust jargon to avoid dismissal; any such legal conclusions must

25   be supported by allegations of fact. *See Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729,

26   736 (9th Cir. 1987) ("The pleader may not evade [antitrust] requirements by merely alleging a

27   _____

28   [2]    In light of Qualcomm's pending motion to transfer this action to the United States District Court for the District of New Jersey (Dkt. 20), this memorandum relies on both Ninth Circuit and Third Circuit case law, which are consistent in all respects material to this motion.

1   bare legal conclusion." (citations omitted)); *see also Com. of Pa. ex rel. Zimmerman v. PepsiCo,*

2   *Inc.*, 836 F.2d 173, 182 (3d Cir. 1988) ("[T]he pleader may not evade the requirements of proper

3   pleading by merely alleging a bare legal conclusion." (quotations and citation omitted)).

4           The Supreme Court recently reaffirmed this basic principle, holding it particularly

5   applicable to antitrust claims, in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955,

6   1964-65 (2007). Observing that "antitrust discovery can be expensive", the Court cautioned that

7   "'a district court must retain the power to insist upon some specificity in pleading before allowing

8   a potentially massive factual controversy to proceed'". *Id.* at 1967 (*quoting Assoc. Gen.*

9   *Contractors of Cal., Inc. v. Cal. State Council Carpenters*, 459 U.S. 519, 528 n.17 (1983)

10  ("*AGC*")). Against this standard, "a plaintiff's obligation to provide the 'grounds' of 'his

11  entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the

12  elements of a cause of action will not do". *Id.* at 1964-65 (internal citations omitted). Instead, as

13  the Court held, plaintiffs asserting antitrust claims must set forth enough "factual matter" to

14  "nudge[] their claims across the line from conceivable to plausible". *Id.* at 1965, 1974; *see also*

15  *PepsiCo*, 836 F.2d at 182 ("[T]he costs of modern federal antitrust litigation and the increasing

16  caseload of the federal courts counsel against sending the parties into discovery when there is no

17  reasonable likelihood that the plaintiffs can construct a claim from the events related in the

18  complaint." (internal quotation marks omitted)).

19          Similarly, California courts demand a "high degree of particularity in the pleading of

20  Cartwright Act violations". *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265 (1983) (internal

21  citations omitted). "[G]eneralized allegations of civil antitrust violations are usually insufficient

22  and the unlawful combination or conspiracy must be alleged with specificity." *Id.* (citation

23  omitted); *see also Cellular Plus, Inc. v. Super. Court*, 14 Cal. App. 4th 1224, 1236 (1993)

24  ("[P]laintiff cannot merely restate the elements of a Cartwright Act violation. Rather, in order to

25  sufficiently state a cause of action, the plaintiff must allege in its complaint certain facts in

26  addition to the elements of the alleged unlawful act so that the defendant can understand the

27  nature of the alleged wrong and discovery is not merely a blind 'fishing expedition' for some

28  unknown wrongful acts.").

1  **B.     Plaintiff Lacks Standing to Prosecute Any of the Claims He Asserts.**

2           Plaintiff's claims should be dismissed because Plaintiff lacks standing. *First*, Plaintiff

3   lacks the "antitrust standing" necessary to pursue claims under the Sherman and Cartwright Acts

4   because (a) antitrust standing requires that any injury flow "directly" from the alleged

5   misconduct, and the Complaint utterly fails to assert a coherent theory of proximate cause to

6   connect any alleged anticompetitive conduct to Plaintiff's alleged injury; and (b) Plaintiff has not

7   alleged and cannot allege the "antitrust injury" necessary to prosecute his antitrust claims when,

8   as an end consumer of cell phones and service, he does not compete with Qualcomm in the sale of

9   relevant technology and has not purchased any such technology from Qualcomm. *Second*,

10  Plaintiff has no standing to prosecute a suit under California's UCL because he cannot trace any

11  "lost money or property" formerly in his possession to money or property that Qualcomm now

12  possesses "as a result of" its alleged misconduct.

13  **1.     Plaintiff Lacks the "Antitrust Standing" to Pursue Claims Under the**

14  **Sherman and Cartwright Acts.**

15          "Antitrust standing" is a threshold requirement that every plaintiff must satisfy to bring a

16  private suit under the federal and state antitrust statutes, including Sections 1 and 2 of the

17  Sherman Act and California's Cartwright Act. *See West Penn Power*, 147 F.3d at 264 (Sherman

18  Act claims require antitrust standing); *Eagle*, 812 F.2d at 540 (same); *Knevelbaard Dairies v.

19  Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) ("[A]ntitrust standing is required under the

20  Cartwright Act."). Standing under these laws is more restrictive than standing under Article III of

21  the U.S. Constitution because, in passing the Sherman Act, Congress expressly did not intend to

22  afford a private remedy to anyone injured by an antitrust violation simply upon a showing of

23  but-for causation. *See Assoc. Gen. Contractors*, 459 U.S. at 530-32. Instead, standing under the

24  antitrust laws requires a "further determination whether the plaintiff is a proper party to bring a

25  private antitrust action". *Id.* at 535 n.31. The touchstones of this inquiry are "plaintiff's harm,

26  the alleged wrongdoing of the defendants, and the relationship between them". *Am. Ad. Mgmt.,

27  Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (citation omitted).

28  /////

In *Associated General Contractors of California* ("*AGC*"), the Supreme Court identified certain factors that inform the standing analysis, including (1) the causal directness of the alleged injury; (2) whether the injury is an "antitrust injury" (*i.e.*, "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"); (3) "the existence of more direct victims" of the alleged antitrust injury; and (4) "problems of identifying damages and apportioning them" among those directly and indirectly harmed. *AGC*, 459 U.S. at 538-45. The two most important factors are proximate causation and antitrust injury. *See Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) ("Antitrust injury is a necessary but insufficient condition of antitrust standing."); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1116-17 (E.D. Cal. 2002) ("A plaintiff who complains of an injury that is too remote from the alleged restraint or that is derivative of an injury suffered by a third party absent from the suit is generally unable to establish antitrust standing.").

In *Illinois Brick*, the Supreme Court announced a bright-line rule prohibiting indirect purchasers from maintaining an action for damages under the Sherman Act. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728-29 (1977). Plaintiff has avoided bringing an action for damages under the Sherman Act and instead seeks only injunctive relief for the alleged Sherman Act violations. Plaintiff also seeks treble damages under California's Cartwright Act, which departs from *Illinois Brick* insofar as it allows a plaintiff to sue "regardless whether such injured person dealt directly or indirectly with the defendant". Cal. Bus. & Prof. Code § 16750(a) (West 2008). Plaintiff's antitrust causes of action, however—whether they seek equitable relief only or whether they are asserted under California's Cartwright Act—universally remain subject to the *AGC* requirements for standing.

*First*, it is well-established that, even when seeking only equitable relief under the Sherman Act, a plaintiff still must satisfy the *AGC* factors to have standing, and in particular must allege a cognizable antitrust injury proximately traceable to the alleged misconduct. *See West Penn Power*, 147 F.3d at 264 (holding that the standing requirements for equitable relief mirror those for damages, except that "the complainant need only demonstrate a significant threat of injury from an impending violation of the antitrust laws"); *Lucas Automotive Engineering, Inc. v.*

1    *Bridgestone/Firestone Inc.*, 140 F.3d 1228, 1234 (9th Cir. 1998) (holding that "threatened

2    antitrust injury was a prerequisite to equitable relief").

3         *Second*, California law is clear that the Cartwright Act's more expansive standing

4    provision does not dispense with the requirement that an antitrust plaintiff allege an antitrust

5    injury and proximate causation.  *See Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 548 (1998)

6    (requiring plaintiffs to plead a cognizable antitrust injury to bring a Cartwright Act claim); *Vinci*

7    *v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814-16 (1995) (applying *AGC* factors to assess

8    standing under the Cartwright Act).  This is because, as the Supreme Court has recognized, *AGC*

9    and *Illinois Brick* address two "analytically distinct" aspects of antitrust standing.  *Blue Shield of*

10   *Virginia v. McCready*, 457 U.S. 465, 474-78 (1982).  The *Illinois Brick* rule was motivated by the

11   risk in indirect purchaser suits of duplicative recovery and the potential for overly-complex

12   damages apportionment.  *Id.* at 474.  The *AGC* Court, by contrast, was concerned with the more

13   basic issue of whether a particular plaintiff's injury is sufficiently direct and sufficiently related to

14   the goals of the antitrust laws to warrant standing.  *AGC*, 459 U.S. at 543-45.  As *AGC* makes

15   clear, this is the minimum required of all antitrust plaintiffs.  *Id.* at 544-45.  The Cartwright Act's

16   liberalized standing provision addresses *Illinois Brick* only, and therefore by no means guarantees

17   that a plaintiff can satisfy the tests for remoteness and antitrust injury demanded under *AGC*.  *See*

18   *Knevelbaard*, 232 F.3d at 987 ("Antitrust standing is required under the Cartwright Act.").[3]

19        As set forth below, Plaintiff lacks antitrust standing.

20              **a.    *Plaintiff's Theory of Causation Is Too Indirect to Support***

21                     ***Antitrust Standing.***

22        Plaintiff's attempts to trace his alleged injury back to Qualcomm fail to meet the

23   proximate cause requirements of antitrust standing.  To have standing under either the Cartwright

24   Act or Sherman Act, the plaintiff's injury must be the direct and proximate result of the

25   ___

     [3]   *See also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d
26   1072, 1091 (N.D. Cal. 2007) ("[W]hile the Cartwright Act directly contradicts federal law insofar
     as indirect purchaser standing is generally concerned, it does not follow from this either that
27   indirect purchaser status is itself sufficient under California law to establish antitrust standing, or
     that California law necessarily eschews the general test for antitrust standing as set for in *AGC*");
28   *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1221 (C.D. Cal.
     2003) (same).

1    defendant's alleged anticompetitive conduct.  *See id*. at 989 (standing under the Cartwright Act

2    requires "not a mere causal link, but a direct effect.") (quotations and citation omitted); *West*

3    *Penn Power*, 147 F.3d at 265 (same under the Sherman Act).  "A direct relationship between the

4    injury and the alleged wrongdoing has been one of the 'central elements' of the proximate

5    causation determination, and a plaintiff who complained of harm flowing merely from the

6    misfortunes visited upon a third person by the defendant's acts generally has been said to stand at

7    too remote a distance to recover."  *Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*, 241

8    F.3d 696, 701 (9th Cir. 2001) (internal quotation marks omitted); *see also Eagle*, 812 F.2d at 541

9    ("The chain of causation between the injury and the alleged restraint in the market should lead

10   directly to the 'immediate victims' of any alleged antitrust violation.").

11          Plaintiff's theory of causation is far too attenuated to support standing.  On the face of the

12   Complaint, there are at least three intermediaries between Plaintiff and any alleged antitrust

13   violation:  "UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device

14   manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the

15   vendors ultimately pass those costs on to end consumers, such as Plaintiff".  (Compl. ¶ 70.)

16   Plaintiff additionally alleges that Qualcomm supplies only "some" of the technology essential to

17   UMTS (Compl. ¶ 33), representing a "smaller proportion of the UMTS standard than the 3G

18   CDMA standard" (Compl. ¶ 60).  This means that each device allegedly containing Qualcomm

19   technology also contains numerous other technologies, any of which might impact the final price

20   actually paid by Plaintiff.  The Complaint contains no allegations plausibly suggesting that,

21   within the final purchase price of a given device, the cost of any alleged antitrust violation is

22   traceable or somehow distinguishable from this multitude of other factors.

23          These allegations are insufficient under well-established law.  For example, in *In re*

24   *Dynamic Random Access Memory (DRAM) Antitrust Litigation*, retail computer purchasers

25   sought to assert antitrust claims against the manufacturers of DRAM, a computer component.  *See*

26   516 F. Supp. 2d 1072, 1091 (N.D. Cal. 2007) ("*DRAM I*").  There, as here, the challenged product

27   (DRAM computer memory) was a "ubiquitous component in all manner of personal electronic

28   /////

1  devices that are purchased for end use". *Id.* at 1091.  Determining that plaintiffs' injury was too

2  remote to support standing, the court observed:

3            "[E]ach product in which DRAM is a component, contains
          numerous other components, all of which *collectively* determine the

4            final price actually paid by plaintiffs for the final product.  In other
          words, the price for the actual product paid by plaintiffs is reflective

5            of much more than just the component price for DRAM.  Yet
          plaintiffs' complaint sets forth no allegations that demonstrate that,

6            within the final purchase price of a given product purchased by
          plaintiffs for 'end use,' the ultimate cost of the DRAM component

7            is somehow directly traceable and/or distinguishable.  Seen from
          this viewpoint, the directness of plaintiffs' injury—with respect to

8            those who purchased DRAM as a component product—is too
          remote to warrant tipping this factor in favor of standing."

9

10  *Id.* at 1092 (emphasis in original).  Plaintiff's theory of causation here is even more attenuated

11  than that in *DRAM*.  As Plaintiff concedes, cell phone service providers subsidize the price of

12  devices for their subscribers.  (Compl. ¶ 72.)  This alone would make it difficult, if not

13  impossible, to trace any alleged price inflation back to Qualcomm.

14        The remoteness of Plaintiff's injury is underscored by the allegation that, in contrast to the

15  purported class of end-user purchasers, "UMTS chipset and UMTS device manufacturers suffer

16  *direct* anticompetitive harm from Qualcomm's UMTS Licensing Practices".  (Compl. ¶ 70

17  (emphasis added).)  This allegation concedes that Plaintiff's supposed injury is entirely derivative

18  of injuries allegedly suffered by other parties.  As the Supreme Court held in *AGC*, "[t]he

19  existence of an identifiable class of persons whose self interest would normally motivate them to

20  vindicate the public interest in antitrust enforcement diminishes the justification for allowing a

21  more remote party ... to perform the office of a private attorney general".  459 U.S. at 542.  Under

22  Plaintiff's own theory of the supply chain, a variety of other entities besides himself all would

23  have greater motivation than Plaintiff to enforce the antitrust laws in the form of a private right of

24  action—as vividly confirmed by Plaintiff's attempt to ride the coat tails of an identical action filed

25  three years ago by Broadcom, a provider of wireless chipsets.  Accordingly, Plaintiff is the wrong

26  person to enforce the antitrust laws.  *See Cargill Inc. v. Budine*, No. 07-CV-349, 2007 WL

27  2506451, at *6 (E.D. Cal. Aug. 30, 2007) (holding that, because "both the competitors and

28  purchasers [were] in the better legal position to raise antitrust claims", the plaintiff's injury "was

1    too remote"); *Grokster*, 269 F. Supp. 2d at 1222 (dismissing for lack of standing because another

2    entity was "the primary target of the conduct alleged and would suffer the principal injury").

3                    **b.    *Plaintiff Has Not Suffered Antitrust Injury.***

4         Antitrust injury is critical in the standing analysis.  *See Lucas v. Bechtel Corp.*, 800 F.2d

5    839, 844 (9th Cir. 1986) ("The [antitrust injury] factor is of tremendous significance."); *see also*

6    *Barton & Pittinos*, 118 F.3d at 182 ("Antitrust injury is a necessary but insufficient condition of

7    antitrust standing.").  It requires the plaintiff to plead an "injury of the type the antitrust laws were

8    designed to prevent and that flows from that which makes defendant's acts unlawful".  *Am. Ad.*

9    *Mgmt.*, 190 F.3d at 1056 (citations and quotations omitted).  Critically, in order to plead antitrust

10   injury, a plaintiff must be either "a consumer []or a competitor in the market in which trade was

11   restrained".  *AGC*, 459 U.S. at 539; *see Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.*,

12   113 F.3d 405, 415 (3d Cir. 1997) ("A plaintiff who is neither a competitor nor a consumer in the

13   relevant market does not suffer antitrust injury."); *see also Am. Ad. Mgmt.*, 190 F.3d at 1057

14   ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful,

15   are experienced in another market do not suffer antitrust injury.").  In light of this requirement,

16   indirect purchasers—even when *Illinois Brick* does not apply—lack standing "where the ultimate

17   goods they purchased—and which were the alleged source of artificially raised prices—were part

18   of a market that was secondary to the allegedly [relevant] market".  *DRAM I*, 516 F. Supp. 2d at

19   1090.

20         Plaintiff fails to allege antitrust injury here because neither he nor the class that he purports

21   to represent is alleged to have purchased any product that Qualcomm sells.  The putative class

22   consists of "end consumers" in the market for cell phones (the alleged "device market") or in the

23   market for cellular service (the alleged "service market").  (Compl. ¶¶ 68-84.)  Qualcomm is not

24   alleged to sell cell phones or cellular service or otherwise to participate in either of these markets.

25   Instead, the Complaint challenges Qualcomm's "UMTS Licensing" which allegedly occurs in

26   completely different markets, including "the market for its WCDMA-related patents" (Compl.

27   ¶ 48), "markets for WCDMA technology" (Compl. ¶ 42), and the "UMTS chipset market"

28   (Compl. ¶¶ 48, 51, 53, 65-66).  No members of the putative class are alleged to have licensed

1    "WCDMA-related patents", "WCDMA technology" or to have purchased a "UMTS chipset".

2    Rather, these "end consumers" buy cell phones and cell service in markets that, although allegedly

3    affected by Qualcomm, are entirely separate from any market in which Qualcomm is alleged to

4    sell a product.

5         Courts routinely dismiss complaints brought by consumers that, as here, allege

6    anticompetitive conduct in a market in which they have not purchased a product. Again, the

7    *DRAM* case is instructive. Notwithstanding that plaintiffs in that case had brought claims under

8    California's Cartwright Act—and thus were not barred by *Illinois Brick* from seeking damages—

9    the court dismissed the complaint for lack of standing. Determining that the DRAM purchasers

10   had not suffered antitrust injury, the court held that "plaintiffs who are purchasing products in

11   which DRAM is a component, rather than DRAM itself, are participating in a secondary market

12   that is incidental to the primary price-fixed market (*i.e.*, the market for DRAM modules

13   themselves)". *DRAM I*, 516 F. Supp. 2d at 1091. Even after plaintiffs in that case added new

14   allegations that the DRAM components had no free-standing use, that increases in prices of

15   DRAM led to corresponding increases in the cost of computers, and that demand for DRAM was

16   determined by computer end-buyers, the court still dismissed for lack of standing. *In re Dynamic*

17   *Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1134-35 (N.D. Cal.

18   2008) ("*DRAM II*"); *accord Cargill*, 2007 WL 2506451, at *5 (dismissing antitrust claims for lack

19   of standing because the plaintiff was not a participant in the market where the alleged

20   anticompetitive conduct took place); *Grokster*, 269 F. Supp. 2d at 1221 ("As [plaintiff] is neither a

21   competitor nor customer in the restrained market, and because its injury is incidental, and not

22   integral, to the alleged anticompetitive scheme, [plaintiff] does not have standing.").[4]

23

24   _____

     [4]  Similarly, in Broadcom's antitrust suit against Qualcomm, the Third Circuit Court of Appeals
25   affirmed, on standing grounds, the district court's dismissal of Broadcom's claim that Qualcomm
     monopolized the alleged markets for 3G CDMA technology and chipsets. The court held that
     Broadcom failed both of the key *AGC* factors. *First*, the court noted that Broadcom had not
26   alleged an antitrust injury because "Broadcom d[id] not allege that it sells goods in the same
     relevant market [*i.e.*, CDMA] as Qualcomm". *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297,
27   321 (3d Cir. 2007). *Second*, the court observed that "[a]ny causal connection, moreover, is highly
     speculative. Injury to Broadcom is extremely remote, and there is no apparent reason why
28   Qualcomm's competitors in the CDMA markets could not assert a monopoly maintenance
     claim". *Id.*

1    As in *DRAM I* and the other cases cited above, any purchases made here by the putative

2    class occur at best in "a secondary market that is incidental to the primary price-fixed market"

3    alleged (*i.e.*, the market for licenses to Qualcomm's patented technology). *DRAM I*, 516 F. Supp.

4    2d at 1091. Although Plaintiff alleges that he might benefit consequentially from an injunction

5    against Qualcomm's licensing practices, not every party with a but-for injury is entitled to bring

6    suit as a private attorney general to enforce the antitrust laws. *See Eagle*, 812 F.2d at 540 ("The

7    class of persons entitled to obtain such damages has been limited by the Supreme Court . . .

8    through the doctrine of antitrust standing." (internal quotation marks omitted)). Rather, Plaintiff

9    must have suffered *antitrust injury*, and because Qualcomm is not alleged to sell any product that

10   Plaintiff purchased, either directly or indirectly, Plaintiff lacks standing to bring an antitrust

11   claim.

12        **2.    Plaintiff Lacks Standing to Pursue a Claim Under California's Unfair**

13              **Competition Law.**

14        Plaintiff also lacks standing to prosecute a claim under California's Unfair Competition

15   Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* The UCL, which prohibits practices that

16   are either "unfair", or "unlawful", or "fraudulent", once had a standing provision that permitted

17   "any person acting for the general public to sue for relief from unfair competition". *Californians*

18   *for Disability Rights v. Mervyn's, LLC*, 39 Cal.4th 223, 227 (2006). In November 2004, however,

19   California voters passed Proposition 64, which eliminated such "private attorney general" suits.

20   *See O'Brien v. Camisasca Automotive Mfg., Inc.*, 161 Cal. App. 4th 388, 398 (2008) ("The former

21   law, the voters determined, had been misused by some private attorneys who file frivolous

22   lawsuits as a means of generating attorney's fees without creating a corresponding public

23   benefit." (internal quotations and alterations omitted)). Now, after the passage of Proposition 64,

24   standing for UCL suits is restricted to persons "who ha[ve] suffered injury-in-fact and ha[ve] lost

25   money or property *as a result of* such unfair competition". Cal. Bus. & Prof. Code § 17204

26   (emphasis added). Accordingly, "a showing of causation is required as to each representative

27   plaintiff". *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005); *O'Brien*,

28   161 Cal. App. 4th at 400 ("as a result of" language "unavoidably implicates causation").

1    In light of Proposition 64, Plaintiff cannot have standing to prosecute a UCL claim.  For

2    all the same reasons that proximate cause is absent in the context of Plaintiff's antitrust standing

3    (*see supra* Section III.B.1.a.), Plaintiff similarly cannot allege in support of his UCL claim a

4    coherent chain of causation suggesting that any "money or property" was somehow lost "as a

5    result of" Qualcomm's alleged misconduct.  Indeed, the Complaint fails even to mention this

6    critical language of Proposition 64.  Instead, in support of his UCL claim, Plaintiff relies on the

7    same theory of causation alleged in support of his antitrust claims, namely that "supracompetitive

8    prices . . . are passed down from Qualcomm's licensees to UMTS vendors, including cellular

9    carriers, to end consumers of UMTS devices and cellular services".  (Compl. ¶ 70.)  On the face

10   of this allegation, any "money or property" that Plaintiff allegedly has "lost" is impossible to

11   trace back to Qualcomm's alleged misconduct.  Accordingly, Plaintiff's UCL cause of action

12   must be dismissed.  *See Hall v. Time, Inc.*, 158 Cal. App. 4th 847, 852-53 (2008) (no standing

13   where, even if plaintiff were to suffer injury in fact, plaintiff made no causation showing).

14      **C.      Plaintiff Fails to State a Claim for Relief Under Any Cause of Action**

15              **Asserted.**

16      Even if Plaintiff were to have standing, his Complaint should be dismissed because it does

17   not state a claim under the Sherman Act, the Cartwright Act or the UCL.

18          **1.      Plaintiff Fails to State a Claim Under Sherman Act § 1 or the**

19                  **Cartwright Act Because He Alleges Only Unilateral Conduct.**

20      Section 1 of the Sherman Act prohibits contracts, combinations or conspiracies in restraint

21   of trade.  15 U.S.C. § 1.  The Cartwright Act similarly "prohibits the combination of resources of

22   two or more independent interests for the purpose of restraining commerce and preventing market

23   competition".  *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. App. 3d 13, 23 (1978); *see also*

24   *G.H.I.I.*, 147 Cal. App. 3d at 265 ("The Cartwright Act is patterned after the federal Sherman

25   Anti-Trust Act and decisions under the latter act are applicable to the former." (internal citation

26   omitted)).

27      To state a claim under either law, a plaintiff must allege joint conduct or concerted action;

28   "[i]ndependent action is not proscribed".  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752,

1    761 (1984).  It is well-settled that the federal antitrust laws do not preclude a trader from

2    unilaterally determining the parties with whom it will deal and the terms on which it will transact

3    business.  *Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408

4    (2004).  Similarly, the Cartwright Act reaches only single-firm conduct.  *Dimidowich v. Bell &*

5    *Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (holding that a challenge to unilateral conduct is

6    "not cognizable under the Cartwright Act, for it fails to allege any combination").  A claim under

7    either Section 1 of the Sherman Act or the Cartwright Act therefore must be based upon

8    conspiratorial rather than unilateral practices.  *Id.; see also Copperweld Corp. v. Independence*

9    *Tube Corp.*, 467 U.S. 752, 767-69 (1984); *Monsanto*, 465 U.S. at 761.

10        The alleged "UMTS Licensing Practices", which represent the sum total of Qualcomm's

11   alleged anticompetitive conduct, consist entirely of Qualcomm's unilateral choices in determining

12   with whom it will deal and the terms on which it will transact business.  The Complaint nowhere

13   alleges that Qualcomm conspired with any counterparty to restrain trade.  Nor does the Complaint

14   attribute to any party other than Qualcomm any intent to restrain trade.  In an attempt to

15   overcome these deficiencies, Plaintiff tries to manufacture concerted action by alleging—in

16   conclusory fashion—that "Qualcomm's licensing constitutes a contract" because "Qualcomm

17   imposes the UMTS Licensing . . . through deceptive and coercive conduct, and Qualcomm's

18   licenses [sic] adhere to those restraints involuntarily".  (Compl. ¶¶ 107, 126.)  In short, Plaintiff's

19   entire theory of liability under Section 1 of the Sherman Act and the Cartwright Act rests on the

20   conclusory assertion of an "involuntary conspiracy".

21        These allegations fail to state a claim for at least two reasons.

22        *First*, Plaintiff's theory of "involuntary conspiracy" is foreclosed by the Supreme Court's

23   decision in *Monsanto*.  465 U.S at 761.  Before that decision, several cases had held that conduct

24   by a single party at times might constitute an actionable "combination" if such conduct "procures

25   the unwilling cooperation of another" through "coercion, threats or intimidation".  *See, e.g.*,

26   *G.H.I.I.*, 147 Cal. App. 3d at 268 (Cartwright Act); *Albrecht v. Herald Co.*, 390 U.S. 145, 149-50

27   (1968) (Sherman Act § 1).  In *Monsanto*, however, the Supreme Court held that any allegedly

28   conspiring parties must possess "a conscious commitment to a common scheme designed to

1    achieve an unlawful objective". 465 U.S. at 764 (internal quotation marks omitted). The

2    Supreme Court's requirement of a "common scheme" is directly inconsistent with the notion of a

3    coerced conspiracy, and therefore "even the most circumscribed reading [of *Monsanto*] does not

4    permit finding an agreement on the basis of unwilling compliance". 7 Areeda & Hovenkamp,

5    *Antitrust Law* ¶ 1451e (2d ed. 2004); *see also Dimidowich*, 803 F.2d at 1478 (noting that,

6    although "there is a line of cases that supports the proposition that a manufacturer may form a

7    'conspiracy' or 'combination' under the antitrust laws if it imposes restraints on dealers or

8    customers by coercive conduct and they involuntarily adhere to those restraints . . . [,] the

9    precedential value of this line of cases has been cast into some doubt by *Monsanto*"); *Newport*

10   *Components, Inc. v. NEC Home Elec., Inc.*, 671 F. Supp. 2d 1525, 1546 (C.D. Cal. 1987) (same;

11   dismissing "Plaintiff's claim of 'involuntary' conspiracy"). Indeed, we have found no case

12   decided since *Monsanto* in which a Court found an antitrust violation based on Plaintiff's

13   "involuntary conspiracy" theory. For this reason alone, Plaintiff cannot state a plausible antitrust

14   claim under the Cartwright Act or Section 1 of the Sherman Act.

15            *Second*, even assuming that Plaintiff's legal theory were cognizable, Plaintiff's allegations

16   are insufficient. Even when courts entertain such a theory, they hold that charges of antitrust

17   coercion cannot rest solely on allegations that the defendant used its economic leverage, market

18   power or position to force an agreement from alleged victims. *See, e.g.*, *Freeman v. San Diego*

19   *Ass'n of Realtors*, 77 Cal. App. 4th 171, 197 (1999) (holding insufficient allegations that

20   defendants somehow "used their 'market power and position'" to cause an alleged boycott by

21   involuntary participants). Otherwise, every contract involving a powerful market participant

22   could give rise to a "conspiracy" under Section 1 or the Cartwright Act. Instead, courts require a

23   plaintiff to plead *facts* describing the particular conduct or acts comprising the alleged

24   compulsion or coercion. *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No.

25   07-CV-00043, 2007 WL 4976364, at *9, *10 (C.D. Cal. 2007) (dismissing Sherman Act § 1

26   claim because "[plaintiff] did not allege any facts regarding the alleged compulsion and

27   coercion—for example, *who* coerced *whom*, *when* the coercion took place, *how* the coercion was

28   effected, and *what* comprised the conspiracy" (emphasis in original)); *G.H.I.I.*, 147 Cal. App. 3d

1    at 269 ("[W]e agree with [defendants] that the Cartwright Act causes of action against [two

2    defendants] contain no specific allegations of coercion; rather, it is claimed that these two

3    [defendants] employed economic leverage to convince distributors to grant them price discounts

4    and other beneficial terms.  The lack of any averment of coercion or a combination renders these

5    causes of action defective.").

6        Because Plaintiff does not allege *any* facts regarding the supposed coercion—for example,

7    who specifically was coerced, when the coercion took place, and how the coercion was

8    effectuated—his Complaint fails to state a plausible claim under the Cartwright Act or Section 1.

9    *See Twombly*, 127 S.Ct. at 1971 n.10 (references to "specific time, place or person" are important

10   elements in providing notice to defendant); *see also Blair v. All American Bottling Corp.*, No. 86-

11   CV-1426, 1988 WL 150814, at *3 (S.D. Cal. Aug. 9, 1988) (dismissing allegations of involuntary

12   combination where complaint "failed to identify the alleged unnamed co-conspirators"); *Chavez*

13   *v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 373 (2001) (dismissing Cartwright Act claim and

14   holding insufficient "unspecified 'threats, coercion, intimidation and boycott' to cause the dealers

15   to comply").

16        **2.    Plaintiff Cannot State a Claim Under Section 2 of the Sherman Act**

17        **Because Qualcomm Does Not Sell a Product in Any Market That It Is**

18        **Alleged to Have Monopolized.**

19        The Complaint fails to state a claim for monopolization of alleged markets for cell phones

20   because Qualcomm is not alleged to manufacture, market or sell cell phones.  Plaintiff asserts two

21   theories in support of his Section 2 claim:  (1) a monopolization theory, under which Qualcomm

22   is alleged to have "willfully acquired monopoly power over the Device Market" (Compl. ¶ 113);

23   and (2) a monopoly leveraging theory, according to which Qualcomm supposedly "leveraged its

24   monopoly power over UMTS devices and chipsets to acquire monopoly power over the

25   Alternative Device Market" (Compl. ¶ 115).

26        Both theories fail absent a showing of monopoly power in a relevant market.  A claim of

27   monopolization under Section 2 of the Sherman Act requires a plaintiff to demonstrate, among

28   other things, possession of monopoly power in the relevant market and willful acquisition or

1   maintenance of that power. *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997). Similarly, a

2   claim for monopoly leveraging—*i.e.,* using monopoly power in one market to monopolize

3   another market—requires a dangerous probability that the defendant will monopolize the second

4   market. *Trinko*, 540 U.S. at 415 n.4 ("To the extent the Court of Appeals dispensed with a

5   requirement that there be a 'dangerous probability of success' in monopolizing a second market,

6   it erred."). The "relevant market" for purposes of a Section 2 claim is defined geographically

7   based on "where buyers can turn for alternative sources of supply" and by product based on "the

8   reasonable interchangeability of use or the cross-elasticity of demand between the product itself

9   and substitutes for it". *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir.

10  2008); *see Tanaka v. Univ. S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (same). Attempting to

11  allege a relevant market without reference to these factors or alleging a market that is "facially

12  unsustainable" constitutes grounds for dismissal. *Ticketmaster LLC v. RMG Techs., Inc.*, 536 F.

13  Supp. 2d 1191, 1195 (E.D. Cal. 2008).

14         Because Plaintiff has alleged no facts suggesting that Qualcomm even sells a product in

15  the markets it allegedly monopolized, much less possesses any monopoly power in those markets,

16  Plaintiff's Sherman Act Section 2 claim must be dismissed. As stated in its second paragraph,

17  Plaintiff's "complaint arises from [Qualcomm's] illegal and anticompetitive conduct in the

18  markets for the technology and chipsets that *operate* cell phones", not in the markets for cell

19  phones themselves (Compl. ¶ 2 (emphasis added).) "Firms do not compete in the same market

20  unless . . . they have the actual or potential ability to take significant business away from each

21  other." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1355 (Fed. Cir. 1999). The Complaint

22  nowhere alleges that Qualcomm's products are reasonably interchangeable with cell phones or

23  that Qualcomm competes with the manufacturers of cell phones for the same customers. At most,

24  Plaintiff has alleged that Qualcomm has market power in some market for technology that is

25  licensed to make cell phones. This is directly inconsistent with a theory that Qualcomm

26  somehow has monopoly power in a market for the cell phones themselves. Because cell phone

27  markets are the only markets that Qualcomm is alleged to have monopolized or attempted to

28  monopolize, Plaintiff does not state a claim under Section 2. *See Craftsmen Limousine, Inc. v.*

1    *Ford Motor Co.*, 491 F.3d 380, 391 (8th Cir. 2007) (holding that defendant did not "wield power

2    in the limousine market" because it "does not sell limousines"); *Lucas v. Citizens Commc'ns Co.*,

3    409 F. Supp. 2d 1206, 1222 (D. Haw. 2005) (granting summary judgment on claim for

4    monopolization and attempted monopolization where defendant did not sell, or have any intent to

5    sell, a product in the relevant market).

6                    **3.      Plaintiff Cannot State a UCL Claim.**

7            For the same reasons that Plaintiff does not state a claim under the federal and California

8    antitrust laws, Plaintiff's claims under the "unfair" and "unlawful" prongs of the UCL also fail.

9    "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or

10   practice for the same reason . . . the determination that the conduct is not an unreasonable

11   restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez*

12   *v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001); *see also SC Manufactured Homes, Inc. v.*

13   *Liebert*, 162 Cal. App. 4th 68, 93 (2008) ("In that plaintiff cannot allege a Cartwright Act

14   violation . . . , the cause of action for a violation of the UCL also cannot stand.").

15          Nor can Plaintiff state a claim under the UCL's "fraudulent" prong.  In the UCL context,

16   "fraudulent" is a term of art that refers only to practices that are likely to deceive the public; it is

17   not synonymous with common-law fraud.  *See Olsen v. Breeze, Inc.*, 48 Cal. App. 4th 608, 618

18   (1996).  Consequently, it is "necessary under the 'fraudulent' prong to show deception to some

19   members of the public".  *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099,

20   1121 (C.D. Cal. 2001).  The Complaint does not allege any deception of the public.  Instead, it is

21   alleged that "Qualcomm committed an unfair and deceptive business act or practice by simply

22   reneging on its commitment to FRAND licensing".  (Compl. ¶ 132.)  On the face of the

23   Complaint, this supposed commitment was made to ETSI, not to the public, and accordingly

24   cannot be deemed "fraudulent" within the meaning of the UCL.  *Rosenbluth Int'l., Inc. v. Super.*

25   *Court*, 101 Cal. App. 4th 1073, 1077 (2002) (holding that "sophisticated" entities receive no

26   protection under the UCL's "fraudulent" prong); *see also Express, LLC v. Fetish Group, Inc.*, 464

27   F. Supp. 2d 965, 980 (C.D. Cal. 2006) (dismissing claim under fraudulent prong because plaintiff

28   /////

1  "d[id] not point to any evidence suggesting that the representations concerning the copyright were

2  disseminated to the public, let alone likely to deceive the public").

3  **IV.     CONCLUSION**

4         For the foregoing reasons, Qualcomm respectfully asks this Court to grant Qualcomm's

5  motion to dismiss.

6

7  Dated:  June 2, 2008                    DLA PIPER US LLP

8                                          By /s/ William S. Boggs

9                                             william.boggs@dlapiper.com

10                                         CRAVATH, SWAINE & MOORE LLP
                                           Evan R. Chesler
11                                         Peter T. Barbur
                                           Elizabeth L. Grayer
12
                                           Attorneys for Defendant
13                                         QUALCOMM INCORPORATED

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28