Alan Himmelfarb (Cal. Bar. No. 90480)
KAMBEREDELSON, LLC
2757 Leonis Blvd.
Los Angeles, CA 90058
(323) 585-8696
ahimmelfarb@kamberedelson.com

Jay Edelson
Ethan Preston
KAMBEREDELSON, LLC
The Monadnock Building
53 West Jackson, Suite 550
Chicago, IL 60604
(312) 589-6370

Karin E. Fisch
Orin Kurtz
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

*Counsel for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JESSE MEYER, an individual, on his own behalf and on behalf of all similarly situated,

Plaintiff,

v.

QUALCOMM INCORPORATED, a Delaware corporation,

Defendant.

No. 08cv655-WQH(LSP)

**PLAINTIFF JESSE MEYER'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**NO ORAL ARGUMENT UNLESS REQUESTED BY COURT**

Date: July 28, 2008
Time: 11:00 a.m.
Judge William Q. Hayes
19 940 Front Street
Courtroom 4
San Diego, CA 92101

# Table of Contents

Page

I.    Introduction ...................................................................................................1

II.   Meyer Has Standing to Bring His Claims  ..............................................2

    A.    Meyer Has Antitrust Standing to Bring a Claim for Injunctive Relief Under Section 16 of the Clayton Act.................................................................3

        1.    Antitrust Standing for Injunctive Claims Under Section 16 Is Less Stringent Than Standing for Damages Claims Under Section 4 .............3

        2.    Meyer Has Antitrust Standing Because His Antitrust Injuries Were Inextricably Intertwined With Qualcomm's Antitrust Violation      4

        3.    Meyer Has Antitrust Standing Under Section 16 Because He Sustained Antitrust Injuries ..................................................................................8

        4.    The *In Re DRAM* Cases Are Not Applicable to Meyer's Federal Claims ..................................................................................................10

    B.    Meyer Has Standing to Bring a Cartwright Act Claim .....................................10

        1.    Meyer Alleged a Cartwright Act Claim Under California Law .............10

            a.    Meyer Alleges an Antitrust Injury Under the Cartwright Act....11

            b.    Meyer Alleges Proximate Causation.........................................13

        2.    California Law Controls Meyer's Standing Under the Cartwright Act .14

        3.    Complexities in Proving the Amount of Damages Are Not Grounds for Dismissing Meyer's Cartwright Act Claim ...........................................16

    C.    Meyer Has Standing to Bring a UCL Claim .....................................................17

III.  Meyer Properly Stated His Claims  ........................................................18

    A.    Meyer's Allegations of Involuntary Antitrust Conspiracy State Antitrust Claims.............................................................................................................19

    B.    Meyer Alleges Qualcomm's Market Power Without Alleging Its Market Share in the UMTS Device Market ...........................................................................22

    C.    Meyer Alleges a UCL Claim .............................................................................23

1

## Table of Contents

2

Page

3    **IV.    Conclusion** ..............................................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table of Authorities**

**Federal Cases** **Page**

*Alaska Teamsters Local 959 v. Atl. Richfield Co.*, 616 F. Supp. 593 (D. Alaska 1985) ....................3

*Am. Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) ......2 n.3, 3 n.4, 9, 13

*Assoc'd General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ...............................................................2 & n.2

*Ass'n of Wa. Public Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696 (9th Cir. 2001) ...........2 n.3

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ..........................................................8

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007)..............................................................21

*Black Gold, Ltd. v. Rockwool Indus., Inc.*, 732 F.2d 779 (10th Cir. 1984) .............................20 n.19

*Blair v. All Am. Bottling Corp.*, No. 86-1426, 1988 WL 150814 (S.D. Cal. Aug. 9, 1988).....20 n.18

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) .........................................2 n.3, 5, 7 n.12

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) .............................................1, 23

*California v. Am. Stores Co.*, 492 U.S. 1301 (1989).............................................................5 n.7, 15

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000) ...................................7

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003) ....................................................9

*Cargill Inc. v. Budine*, No. 07-CV-349, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007) .............2 n.3

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986)......................................................3, 8

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ......................................20

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188 (E.D.N.Y. 2003)..............9

*City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979) .......................................................3, 4

*City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361 (9th Cir. 1992)................................................20

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  497 F. Supp. 218 (C.D. Cal. 1980) .......................................................4, 8 n.13, 10

*Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380 (8th Cir. 2007) ........................22 n.21

*Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995)..............................................20

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ......................................................20 n.19

*Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986) ................................................20 n.18

*In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007) ...................................18

**Table of Authorities**

**Federal Cases**                                                                                                    **Page**

*In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006) ....................................16

*In re Dynamic Random Access Memory Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................................................................10

*In re Dynamic Random Access Memory Antitrust Litig.*,
    536 F. Supp. 2d 1129 (N.D. Cal. 2008).................................................................10, 15-16

*Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538 (9th Cir. 1987) .......................................2 n.3

*F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990)...........................23 n.22

*F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)..........................................23 n.22

*Feller v. Brock*, 802 F.2d 722 (4th Cir. 1986) ................................................................5 n.7

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992) ...................20 n.19

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) ......................9-10

*Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945) .................................................14

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) ......................................14-15

*Hosp. Blfg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738 (1976) .........................................21-22

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).....................................................5, 16

*Int'l Ass'n of Machinists and Aerospace Workers (IAM) v. OPEC*,
    477 F. Supp. 553 (C.D. Cal. 1979)................................................................................8 n.13

Isakesen v. Vermont Castings, Inc., 644 F. Supp. 1098 (W.D. Wisc. 1986) ...............19-20

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) .....................11-12 & n.15

*L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159 (C.D. Cal. 2000) ..........4

*Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) .........................................................................3-4 n.5, 10

*Lucas v. Citizens Commc'ns Co.*, 409 F. Supp. 2d 1206 (D. Haw. 2005) .....................22-23 n.21

*McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842 (3d Cir. 1996) ......................................3-4

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967 (7th Cir. 1995) ..........20 n.19

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002) ......................................16-17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    269 F. Supp. 2d 1213 (C.D. Cal. 2003)...............................................12 & n.15, 13 n.16

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)..................................18, 19

1

**Table of Authorities**

2

**Federal Cases**                                                                                           **Page**

3

*Munson v. Del Taco, Inc.*, 522 F.3d 997 (9th Cir. 2008) .........................................................15

4

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents for the Univ. of Ok.*, 468 U.S. 85 (1984)............23

5

*In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113 (N.D. Cal. 2005)..................................13

6

*Newport Components, Inc. v. NEC Home Elec. (U.S.A.), Inc.*,
    671 F. Supp. 1525 (C.D. Cal. 1987)....................................................................20 n.18

7

*In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181 (S.D.N.Y. 2000) ...............................21

8

*Ostrofe v. H. S. Crocker Co., Inc.*, 740 F.2d 739 (9th Cir. 1984) ........................................7, 10

9

*Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975) ..............22

10

*Parks v. Watson*, 716 F.2d 646 (9th Cir. 1983) ....................................................................3

11

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ......................................5 n.8

12

*Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192 (N.D. Cal. 2000) ...............................................5

13

*Salve Regina College v. Russell*, 499 U.S. 225 (1991) ...........................................................15

14

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001)............................................................................20 n.19

15

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) ...........................17

16

*In re Sugar Antitrust Litig.*, 588 F.2d 1270 (9th Cir. 1978) ...................................................15

17

*In re Sugar Industry Antitrust Litig.*,
    MDL No. 201, 1976 WL 1374 (N.D. Cal. May 21, 1976) ......................................17 n.17

18

*Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184 (N.D. Cal. 2005) ...................................21

19

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) .................................................22

20

*United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ........................................22

21

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000)..........................3, 6-7, 8-9, 11

22

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969).....................................4, 7

23

**California Cases**                                                                                        **Page**

24

*Biljac Assocs. v. First Interstate Bank*,
    218 Cal. App. 3d 1410, 267 Cal. Rptr. 819 (Cal. Ct. App. 1990) ...............................24-25

25

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
    191 Cal. App. 3d 1341, 235 Cal. Rptr. 228 (Cal. Ct. App. 1987) ........................................14

26

27

28

1

**Table of Authorities**

2

**California Cases**                                                                                          **Page**

3

*Cellular Plus, Inc. v. Superior Court,*
4      14 Cal. App. 4th 1224, 18 Cal. Rptr. 2d 308  (Cal. Ct. App. 1993)...............11, 12

*Cel-Tech Commc's, Inc. v. Los Angeles Cellular Tel. Co.,*
5      20 Cal.4th 163, 973 P.2d 527 (1999) ...............................................23, 24, 25

6  *In re Cipro Cases I and II,*
       121 Cal. App. 4th 402, 17 Cal. Rptr. 3d 1 (Cal. Ct. App. 2004) .............13-14, 17
7

*Crown Oil Corp. v. Superior Court,*
8      177 Cal. App. 3d 604, 223 Cal. Rptr. 164 (Cal. Ct. App. 1986) .........................13

9  *Eddins v. Redstone*, 134 Cal. App. 4th 290, 35 Cal. Rptr. 3d 863 (Cal. Ct. App. 2005) .................24

10 *GHK Assocs. v. Mayer Group, Inc.,*
       224 Cal. App. 3d 856, 274 Cal. Rptr. 168 (Cal. Ct. App. 1990) ...........................17
11
*G.H.I.I. v. MTS, Inc.*, 147 Cal. App 3d 256, 195 Cal. Rptr. 211 (Cal. Ct. App. 1983) ...................19
12
*Kiseskey v. Carpenters' Trust for S. Cal.,*
13     144 Cal. App. 3d 222 , 192 Cal. Rptr. 492 (Cal. Ct. App. 1983) ..........................13

14 *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 187 Cal. Rptr. 797 (Cal. App. Ct. 1982) .......11

15 *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 78 Cal. Rptr. 2d 133 (Cal. Ct. App. 1998) ....10, 11

16 *Overstock.com, Inc. v. Gradient Analytics, Inc.,*
       151 Cal. App. 4th 688, 61 Cal. Rptr. 3d 29 (Cal. Ct. App. 2007) ........................24
17
*Rosenbluth Int'l, Inc. v. Superior Court,*
18     101 Cal. App. 4th 1073, 124 Cal. Rptr. 2d 844 (Cal. Ct. App. 2002).....................24

19 *Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 65 Cal. Rptr. 3d 634 (Cal. Ct. App. 2007) ...18

20 *Union Carbide Corp. v. Superior Court*, 36 Cal.3d 15, 679 P.2d 14 (1984) ............................14, 16

21 *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 463 P.2d 770 (1970) ............17

22 *Vinci v. Waste Management, Inc.,*
       36 Cal. App. 4th 1811, 43 Cal. Rptr. 2d 337 (Cal. Ct. App. 1995)............................11 n.14
23

**Federal Statute**                                                                                          **Page**

24
15 U.S.C. § 15 (2008) .............................................................................................1 & n.1
25
15 U.S.C. § 26 (2008).............................................................................................1
26

**California Statutes**                                                                                        **Page**

27
Cal. Bus. & Prof. Code § 16750 (2008) .............................................................1, 13
28
Cal. Bus. & Prof. Code § 17200 (2008).............................................................23

1

**Table of Authorities**

2

**California Statutes**                                                                                          **Page**

3

Cal. Bus. & Prof. Code § 17203 (2008)............................................................................1

4

**Miscellaneous**                                                                                               **Page**

5

INFORM, Inc., Cell Phones: A Poster Child for Extended Producer Responsibility 1, at
    http://www.informinc.org/fact_cellEPR.pdf (Jan. 2004) ........................................5 n.6

6

QUALCOMM Incorporated, Form 10-K for the fiscal year ended September 30, 2007 ......6 n.9, 21

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

## I.    Introduction

Deriding Meyer's Complaint as "little more than a photocopy of Broadcom's 2005 complaint," Qualcomm argues that it is immune from antitrust liability because Meyer is too far downstream in UMTS devices supply chain to state an antitrust claim. (Def.'s Mem. 1.) *Cf. Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) (Broadcom stated a variety of antitrust claims on the facts alleged in Broadcom's 2005 complaint). In essence, Qualcomm's instant Motion to Dismiss asks the Court to rule that, while Broadcom may assert antitrust claims, the end consumers who ultimately purchase cellular devices using UMTS technology are too remote to have remedies – they do not have so much as a claim for an injunction to staunch the bleeding.

The Complaint alleges Qualcomm's licensing practices have harmed consumers of UMTS devices by causing them to pay "supracompetitive prices" and by impairing "non-price competition in the form of deterred innovation" in the UMTS cellular devices available on the market. (Compl. ¶¶ 108, 123, 128.) The Complaint explicitly alleges how "UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the vendors ultimately pass those costs on to end consumers, such as Plaintiff." (*Id.* ¶ 70.)

In its arguments that Meyer does not have standing to remedy these injuries, Qualcomm ignores the differences between claims for injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26), claims under the Cartwright Act (Cal. Bus. & Prof. Code § 16750), and claims for damages under Section 4 of the Clayton Act (15 U.S.C. § 15).[1] Indirect purchasers like Meyer have standing under Section 16 of the Clayton Act and under the Cartwright Act, as well as under California's unfair competition law (Cal. Bus. & Prof. Code § 17203) ("UCL"). Unable to rest on its standing arguments, Qualcomm moves for dismissal on the alternative grounds that the Complaint suffers from a variety of pleading defects. Qualcomm's motion to dismiss should be denied because 1) Meyer has standing to seek

---

[1]    Meyer has deliberately foregone a claim for damages under Section 4 (15 U.S.C. § 15).

injunctive relief under Section 16 of the Clayton Act, 2) the expressed intent of the California legislature is to confer standing on indirect purchasers like Meyer, and 3) Meyer has stated a cause of action each of the counts set forth in the Complaint.

## II.    Meyer Has Standing to Assert His Claims

Qualcomm asserts that Meyer's injunctive claims under the Cartwright Act and Section 16 of the Clayton Act "universally remain subject to the antitrust standing analysis" under *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983). (Def.'s Mem. 10.) However, the *AGC* antitrust standing analysis applies only to claims for damages under Section 4 of the Clayton Act – not to Meyer's claims for injunctive relief under Section 16 or under the Cartwright Act.[2] In light of the distinct tests for standing under these differing claims, Qualcomm's reliance on cases concerning claims for damages under the Clayton Act to support its argument is very telling.[3] As shown below, both Section 16 of the Clayton Act and the Cartwright Act extend standing to indirect purchasers such as Meyer.

Finally, although the portions of Qualcomm's Motion addressing Meyer's UCL claim are unclear, but neither of the arguments which Meyer can discern have any merit. If Qualcomm meant to argue that the UCL does not support restitution claims by indirect purchasers, the argument is contrary to the law. If, alternatively, Qualcomm meant to argue that tracing the overcharge Meyer sustained back to Qualcomm may be too difficult, then Qualcomm fails to recognize the difference between pleading and proving causation. Qualcomm cannot support its assertion that tracing back the overcharge will be "impossible."

---

[2]  The plaintiffs in *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) did "not seek injunctive relief under Section 16 of the Clayton Act . . . and [did] not ask [the Court] to consider whether they have standing to request such relief." *Id*. at 523. n.5.

[3]  *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) (antitrust standing analysis for Section 4 claim for damages); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) (same); *Ass'n of Wa. Public Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696 (9th Cir. 2001) (same); *Am. Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) (same); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539 -543 (9th Cir. 1987) (same); *Cargill Inc. v. Budine*, No. 07-CV-349, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007) (same).

### A. Meyer Has Standing to Bring a Claim for Injunctive Relief Under Section 16 of the Clayton Act

In the Ninth Circuit, a Section 16 claim for injunctive relief must allege "(1) a threatened loss or injury cognizable in equity (2) proximately resulting from the alleged antitrust violation." *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979). *Cf. In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (same). Despite Qualcomm's assertion that the *AGC* factors "universally" control all antitrust claims, the analysis in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) establishes the requisites for antitrust standing for such injunctive claims. (Def.'s Mem. 10.) Meyer has standing under the comparatively relaxed *Cargill* analysis, even as a indirect purchaser. Meyer has alleged both proximate causation and the type of anticompetitive injury that the Clayton Act was enacted to remedy.

### 1. Antitrust Standing for Injunctive Claims Under Section 16 Is Less Stringent Than Standing for Damages Claims Under Section 4

The analysis of antitrust standing for Section 16 injunctive claims does not involve the same factors applied in *AGC*.[4] *Cargill* states that, while antitrust injury remains an element of antitrust standing under Section 16, "many of [*AGC*'s] other factors are not relevant to the standing inquiry under [Section] 16." *Id.* at 110 n.5. *Cargill* specifically ruled out "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed" as considerations for standing for Section 16 claims. *Id.* at 111 n.6. Ninth Circuit jurisprudence recognizes the distinction between *Cargill*'s antitrust standing analysis and the *AGC* factors. "[T]he standing requirements of [S]ection 16 are broader than those of [S]ection 4." *Parks v. Watson*, 716 F. 2d 646, 662 (9th Cir. 1983); *Alaska Teamsters Local 959 v. Atl. Richfield Co.*, 616 F. Supp. 593, 608 n.84 (D. Alaska 1985) (citing cases).[5] "Section 16 has been applied more

---

[4]  The *AGC* factors are "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Am. Ad*, 190 F.3d at 1054.

[5]  Qualcomm cites *Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F. 3d 1228, 1235 (9th Cir. 1998), for the proposition that "even when seeking only equitable relief under the Sherman Act, a plaintiff still must satisfy the AGC factors to have standing, and in particular must allege a cognizable antitrust injury proximately traceable to the

expansively [than Section 4], both because its language is less restrictive . . . and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996) (cited and followed by *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998)).

The purpose of injunctive remedies under Section 16 is "not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) (citation omitted).

> Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. Its availability should be 'conditioned by the necessities of the public interest which Congress has sought to protect.

*Id*. Critically, "a bar against suits for injunctive relief by indirect purchasers would leave a significant gap in antitrust enforcement where the federal government or direct purchasers are unwilling to bring suit." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 497 F. Supp. 218, 229 (C.D. Cal. 1980).

### 2. Meyer Has Antitrust Standing Because His Antitrust Injuries Were Inextricably Intertwined With Qualcomm's Antitrust Violation

Meyer's allegation of proximate causation is sufficient for standing under *Rohnert Park. Rohnert Park*, 601 F.2d at 1044. *Rohnert Park*'s proximate causation element examines whether the requested "injunctive relief is necessary to prevent injury to [the plaintiff's] interests rather than those of others." *L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1170 (C.D. Cal. 2000) (quoted by *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1200 (S.D. Cal. 2002)). The potential benefits of injunctive relief to Meyer and the

alleged misconduct." (Def.'s Mem. 10-11.) In fact, *Lucas Automotive* reversed the district court dismissal of an injunctive antitrust claim because it failed to distinguish between the standing for an injunctive claim and the standing for a damages claim: while the plaintiff, as indirect purchaser, did not have standing for a damages claim, it did have standing for an injunctive claim. *Id*. at 1235-37. *See also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998) ("a party who lacks standing under [Section] 4 may still have standing to seek injunctive relief under [Section] 16").

class are evident. Meyer will likely need to replace his cellular phone within the year[6] and has a legally cognizable interest in a competitive retail market for UMTS devices when he replaces his current device. *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1195 (N.D. Cal. 2000) (consumer of newspapers had sufficient interest in competition in local newspaper market to claim injunctive relief under Clayton Act).[7] Qualcomm's conduct has caused higher prices throughout the supply chain of the UMTS market and has deterred investment in production throughout the supply chain for UMTS devices.[8] If the Court prohibits the anticompetitive licensing practices at issue, it will ensure a competitive supply chain for the UMTS devices that Meyer will purchase – eliminating supracompetitive overcharges from the purchase price of Meyer's next UMTS device.

Qualcomm concedes Meyer's Section 16 claim avoids the bar against indirect purchaser claims for damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), but argues that Meyer's claim fails under the "'analytically distinct' aspect[] of antitrust standing" at issue in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982). (Def.'s Mem. 10, 11, quoting *McCready*, 457 U.S. at 474-78.) This aspect of antitrust standing is best understood as a proxy for proximate cause. *McCready*, 457 U.S. at 477 & n.13. *McCready* found the plaintiff had antitrust standing where her injury was "foreseeable" and "inextricably intertwined with the injury the conspirators sought to inflict" on their competitors. *Id.* at 479, 484.

Meyer's antitrust injuries – "supracompetitive prices" and "impaired non-price competition" for UMTS cellular devices – were also eminently foreseeable and inextricably intertwined with the injury Qualcomm sought to cause. (Compl. ¶¶ 108, 123, 128.) Qualcomm

---

[6] Meyer purchased his phone in June 2007. (Compl. ¶ 9.) Cellular phones have an average lifespan of eighteen months. INFORM, Inc., Cell Phones: A Poster Child for Extended Producer Responsibility 1, at http://www.informinc.org/fact_cellEPR.pdf (Jan. 2004).

[7] Injury to competition "is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent." *California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989). *See also Feller v. Brock*, 802 F.2d 722, 730 (4th Cir. 1986) (citing *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135-36 (1967) for proposition that impact on competition is a sufficient interest for intervention).

[8] *Cf. Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995) (noting "'chilling' effect of [antitrust violators'] prior predatory behavior" erected barriers to entry for new competitors).

makes the false claim that there are "at least three intermediaries between" it and Meyer to support the argument that Meyer is too far removed from Qualcomm to have standing to assert antitrust claims. In fact, there are only two intermediaries between Meyer and Qualcomm – the device's manufacturer and its vendor (Motorola and AT&T, respectively).[9] Qualcomm does not bother explaining why indirect purchasers one or two intermediaries removed from the defendant should have antitrust standing, while purchasers three intermediaries away should not.[10] More importantly, *In re Warfarin* rejected essentially the precise argument Qualcomm advances here.[11] In that case, the defendant (DuPont) caused the FDA to delay the market entry of a generic drug competitive with its own drug, Coumadin. The plaintiffs were a class of Coumadin users with the same attributes that Qualcomm argues bar Meyer from asserting he has antitrust standing: they were "'third' position in the chain of distribution from [the defendant] to [the] user." *In re Warfarin*, 214 F.3d at 400. *In re Warfarin* found that even these indirect purchasers had standing to assert a Section 16 claim, because their antitrust injury (increased prices) was inextricably intertwined with the defendant's antitrust violation:

> The class members here [are] "foreseeable and necessary victims" of DuPont's efforts to exclude the generic drug from the market. . . . Coumadin consumers clearly suffer[ed] antitrust injury. Coumadin purchasers were the target of DuPont's antitrust violation. ***Regardless of the existence of the various links of middlemen, if there were no ultimate consumer of Coumadin, prices charged for the drug by DuPont to distributors, pharmacies, etc., would be irrelevant.*** The excess amount paid by Coumadin users . . . is "inextricably intertwined" with the injury DuPont aimed to inflict . . . ***It is difficult to***

---

[9]  While Qualcomm is a major chipset manufacturer, it characterizes itself as merely "licens[ing] intellectual property to chipset manufacturers." (*Cf.* Def.'s Mem. 2 *with* Compl. ¶¶ 52-54). As it states in its own SEC filings, Qualcomm has "developed integrated circuits for manufacturers and operators deploying the WCDMA version of 3G. More than 30 device manufacturers have selected our WCDMA products that support . . . WCDMA . . . for their devices." QUALCOMM Incorporated, Form 10-K for the fiscal year ended September 30, 2007, at 9.

[10]  Although Qualcomm cites cases finding that indirect purchasers have standing to assert injunctive claims under Section 16, it makes no attempt to draw the distinction between indirect purchasers who have standing to assert Section 16 claims or Cartwright Act claims and those that do not.

[11]  Qualcomm asserts that "Ninth Circuit and Third Circuit case law . . . are consistent in all respects material to [Qualcomm's] motion." (Def.'s Mem. 7 n.2.) Meyer's position remains that this case should proceed in this Court and should be governed by Ninth Circuit law, but otherwise takes no position with respect to this assertion. However, the result in *In re Warfarin* is correct and would be persuasive with the Ninth Circuit.

*imagine a more formidable demonstration of antitrust injury.*

*In re Warfarin*, 214 F.3d at 400 (emphasis supplied). Ninth Circuit law is in accord. *Cf. Ostrofe v. H. S. Crocker Co., Inc.*, 740 F.2d 739, 746 (9th Cir. 1984) (plaintiff had antitrust standing where his injury was "an integral part of the scheme to eliminate competition"). Here, there would be no market for UMTS components without end user's demand for UMTS devices. Qualcomm cannot credibly claim surprise that its conduct injured the millions of purchasers of UMTS devices like Meyer.[12] Meyer's injury was foreseeable, if not inevitable.

Qualcomm attempts to supports its assertion that Meyer's claims are "far too attenuated to support standing" with a series of flawed arguments. (Def.'s Mem. 12.) First, Qualcomm urges that the final price of each UMTS device depends on other patent licenses "any of which might impact the final price actually paid" by Meyer, so "the cost of any alleged antitrust violation is [not plausibly] traceable" to Qualcomm. (Def.'s Mem. 12.) Even when an antitrust claimant *proves* (rather than merely alleges) damages stemming from a Section 4 claim "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith Radio*, 395 U.S. at 114 n.9. *Zenith*'s holding recognizes "requir[ing] proof that the illegal conduct was the *exclusive* cause of the plaintiff's injury would effectively deny private remedies, for multiple causes always affect everyone." *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 649 (E.D. Mich. 2000) (citation omitted, emphasis in original). Accordingly, *In re Warfarin* found end users had standing despite the district court's holding that the prices end users paid for Coumadin were subject to the "influence of managed care." *In re Warfarin*, 214 F.3d at 400.

*Cargill* specifically rejected Qualcomm's remaining assertions regarding Meyer's standing under Section 16. Qualcomm urges it will be "difficult, if not impossible, to trace

---

[12] Whether Qualcomm had the "specific intent" to injure Meyer is irrelevant. *McCready*, 457 U.S. at 479. *McCready* recognized antitrust violations create standing for consumers in "that area of the economy . . . endangered by [the] breakdown of competitive conditions," and specifically rejected the argument that "the sector of the economy [where an antitrust violation had] its most direct anticompetitive effects" were not in the violation's "proximate range." *Id.* at 480. While Qualcomm's antitrust violation's most direct effects might be limited to the market for UMTS components, competitive conditions have broken down throughout the entire supply chain for UMTS devices.

any alleged price inflation back to Qualcomm" and that "a variety of other entities besides himself all would have greater motivation than Plaintiff to enforce the antitrust laws in the form of a private right of action." (Def.'s Mem. 13.) These objections might have traction in a Section 4 case, but they have none here. *Cargill* held that "the complexity of apportioning damages . . . and the existence of other parties that have been more directly harmed" are simply not relevant to a Section 16 plaintiff's antitrust standing. *Cargill*, 479 U.S. at 111 n.6.[13]

### 3.    Meyer Has Antitrust Standing Under Section 16 Because He Sustained Antitrust Injuries

*Cargill* clarified that a Section 16 plaintiff must still allege antitrust injury – an injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Cargill*, 479 U.S. at 113 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). *Cargill* found that the plaintiffs did not have standing with respect to their claim that the defendant's entry into their market would reduce their profits by lowering prices:

> The loss of profits to the competitors in *Brunswick* was not of concern under the antitrust laws, since it resulted only from continued competition. . . . The logic of *Brunswick* compels the conclusion that the threat of loss of profits due to possible price competition following a merger does not constitute a threat of antitrust injury.

*Cargill*, 479 U.S. at 116-17. In short, the "antitrust injury" that *Cargill* was concerned with merely "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original).

Meyer's Complaint alleges the type of injury that the antitrust laws were intended to remedy: "supracompetitive prices" for UMTS cellular devices. (Compl. ¶¶ 108, 123, 128.) Supracompetitive prices paid by indirect purchasers constitute antitrust injury. *See In re*

---

[13] In "a suit for injunctive relief the plaintiff does not have to quantify his injury and therefore complex economic analysis is not necessary." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 497 F. Supp. 218, 229 (C.D. Cal. 1980). "[A]n injunction does not give rise to recovery of a fund from which a Court would have . . . to apportion the recovery among a long line of indirect purchasers on a chain of distribution." *Int'l Ass'n of Machinists and Aerospace Workers (IAM) v. OPEC*, 477 F. Supp. 553, 564 (C.D. Cal. 1979).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Warfarin*, 214 F.3d at 400; *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 211-12 (E.D.N.Y. 2003) (where drug consumers alleged defendants' conduct delayed competition and "caus[ed] plaintiffs to pay inflated prices," those "allegations of antitrust injury [were] equally formidable" to those in *In re Warfarin*). *See also In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910 (6th Cir. 2003) (delay of cheaper generic drugs from anticompetitive conduct was the "kind of injury [that] was undoubtedly a *raison d'etre* of the Sherman Act").

Qualcomm takes *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051 (9th Cir. 1999) out of context when it quotes it for the proposition that "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." (Def.'s Mem. 14, quoting *Am. Ad Mgmt.*, 190 F.3d at 1057.) *American Ad* was careful to explain that "parties whose injuries are 'inextricably intertwined' with the injuries of market participants" fall into an "exception to the market participant requirement." *Am. Ad*, 190 F.3d at 1057 n.5 (citing *McCready*). Here, where UMTS components have no economic value absent demand for UMTS devices, Meyer's injury was inextricably intertwined with the injury Qualcomm sought to cause. *Cf. In re Warfarin*, 214 F.3d at 400 (end users' antitrust injury "inextricably intertwined" with defendant's antitrust violation, where Coumadin had no economic value absent demand of "ultimate consumer"). Qualcomm's selective quotation from *American Ad* obscures its actual holding that, while "[a] number of our opinions do use the phrase 'competitor or consumer' as a rough gloss on the . . . 'market participant' test," "it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Id.* at 1058.

Meyer does not need to be either Qualcom's direct consumer or its competitor to bring his Section 16. (It is significant that *American Ad* is a Section 4 case – not a Section 16 case.) Many cases in this Circuit have recognized that indirect purchasers sustain sufficient antitrust injury to pursue injunctive claims, even where they may not have standing to assert damages claims. *See, e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir.

2003); *Lucas Auto.*, 140 F.3d at 1235; *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 497 F. Supp. at 229. In *Lucas*, the Ninth Circuit found that an indirect purchaser "was an active participant" in the relevant market, and had standing "as a customer in a market controlled by a monopolist" to bring a injunctive antitrust claim. *Lucas Auto.*, 140 F.3d at 1237. *Cf. Ostrofe*, 740 F.2d at 746 739 (employee that was fired as part of antitrust violation "was not a competitor or consumer" but still had standing). These cases contradict Qualcomm's characterization of the market participation requirement.

### 4.    The *In Re DRAM* Cases Are Not Applicable to Meyer's Federal Claims

Qualcomm relies heavily on *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 516 F. Supp. 2d 1072 (N.D. Cal. 2007) ("*In re DRAM I*") and *In re Dynamic Random Access Memory Antitrust Litigation*, 536 F. Supp. 2d 1129 (N.D. Cal. 2008) ("*In re DRAM II*"). (Def.'s Mem. 11 n. 3, 12-13, 14.) Although the court in *In re DRAM I* applied the *AGC* factors to state law antitrust claims, the *In Re DRAM* court did not rule on the plaintiff's *federal* claims. *Cf. In re DRAM I*, 516 F. Supp. 2d at 1120-21. As shown above, the *AGC* factors do not apply to Section 16 claims. Hence, Qualcomm's reliance on *In re DRAM* to foreclose Meyer's federal claims is misplaced.

### B.    Meyer Has Standing to Bring a Cartwright Act Claim

Qualcomm's argument against Meyer's California antitrust claim also fails. The California legislature specifically expanded the Cartwright Act to provide standing to indirect purchasers in reaction to the United States Supreme Court's decision in *Illinois Brick*. Application of the *AGC* antitrust standing analysis to Meyer's Cartwright Act claim would violate California's antitrust policy.

### 1.    Meyer Alleges a Cartwright Act Claim Under California Law

Meyer alleges the necessary elements to state a claim under the Cartwright Act. A Cartwright Act plaintiff must demonstrate "an antitrust violation was the proximate cause of his injuries" and "antitrust injury." *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 548, 78 Cal. Rptr. 2d 133, 141 (Cal. Ct. App. 1998) (quoting *Kolling v. Dow Jones & Co.*, 137 Cal.

App. 3d 709, 723, 187 Cal. Rptr. 797, 807 (Cal. App. Ct. 1982)). Despite its assertion that Cartwright Act claims are "universally . . . subject to the *AGC* requirements for standing," Qualcomm concedes that the elements of a Cartwright Act claim are simply "antitrust injury and proximate causation." (Def.'s Mem. 10, 11.)

> **a.    Meyer Alleges an Antitrust Injury Under the Cartwright Act**

As discussed in Section II.A.3, *supra*, Meyer sustained an antitrust injury when Qualcomm reduced and restrained competition. Under the Cartwright Act, an antitrust injury is "the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful." *Morrison*, 66 Cal. App. 4th at 548, 78 Cal. Rptr. 2d at 141. *See also Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1234, 1235, 18 Cal. Rptr. 2d 308, 313 (Cal. Ct. App. 1993). In *Cellular Plus*, one of the defendants' independent sales agents had standing to recover lost sales resulting from inflated prices due to the defendants' price fixing – they were deemed to have standing because they "were directly involved in [the defendant's] chain of distribution." *Cellular Plus*, 14 Cal. App. 4th at 1234, 18 Cal. Rptr. 2d at 314. In *Kolling*, a newspaper distributor had standing under the Cartwright Act when the defendant terminated his territory when he failed to participate in anticompetitive practices, because the termination "resulted directly from [antitrust] scheme and the publisher's attempts to further it." *Kolling*, 137 Cal. App. 3d at 724, 187 Cal. Rptr. at 808.[14] Meyer's injuries here are consistent with those in *Cellular Plus* and *Kolling* because they are "inextricably intertwined" with Qualcomm's antitrust violation: absent demand by end consumers for UMTS devices, UMTS components would be "[i]rrelevant." *In re Warfarin*, 214 F.3d at 400.

California courts have refused to adopt a market participant requirement for antitrust injury and have found the Cartwright Act applies to anyone injured by the reduction of competition from a Cartwright Act violation. While "the exact parameters of 'antitrust injury'

---

[14] It is helpful to contrast the ruling in *Vinci v. Waste Management, Inc.*, 36 Cal. App. 4th 1811, 43 Cal. Rptr. 2d 337 (Cal. Ct. App. 1995) which found that a plaintiff did not have standing without an allegation that "he was so essential to the anti-competitive scheme that his discharge was itself an anti-competitive act." *Id.*, 36 Cal. App. 4th at 1817, 43 Cal. Rptr. 2d at 340 (distinguishing *Ostrofe*, 740 F.2d at 742).

under section 16750 have not yet been established[,] . . . the scope of that term is broader than under federal law." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000) (quoting *Cellular Plus*, 14 Cal. App. 4th at 1234, 18 Cal. Rptr. 2d at 313, punctuation omitted).[15] The *Cellular Plus* court expressly declined to apply the defendants' authorities which "merely define[d] the term 'antitrust injury' for purposes of federal antitrust laws, such as the Clayton Act." *Cellular Plus*, 14 Cal. App. 4th at 1234, 18 Cal. Rptr. 2d at 313. "[T]he more restrictive definition of 'antitrust injury' under federal law does not apply to section 16750." *Knevelbaard*, 232 F.3d at 991 (quoting *Cellular Plus*, 14 Cal. App. 4th at 1234, 18 Cal. Rptr. 2d at 313); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1223-24 (C.D. Cal. 2003). The Cartwright Act is "designed to protect *the public, as well as more immediate victims*, from a restraint of trade or monopolistic practice which has an anticompetitive impact on the market." *Cellular Plus*, 14 Cal. App. 4th at 1232, 18 Cal. Rptr. 2d at 312 (quoting *Kolling*, 137 Cal. App. 3d at 724, 187 Cal. Rptr. at 807) (emphasis supplied). "***The statute does not confine its protection to consumers, or to purchasers, or to competitors***, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Id.*, 14 Cal. App. 4th at 1233, 18 Cal. Rptr. 2d at 312 (citation, punctuation omitted) (emphasis in original).

Some federal courts have imputed a market participation requirement to antitrust injury under the Cartwright Act, despite the categorical language from *Cellular Plus* quoted

---

[15] Qualcomm misstates *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) as holding that "standing under the Cartwright Act requires 'not a mere causal link, but a direct effect.'" (Def.'s Mem. 11-12, quoting *Knevelbaard*, 232 F.3d at 989.) In fact, the full sentence from *Knevelbaard* makes it clear that this language applies to an antitrust claim "[***u***]*nder federal law*." *Knevelbaard*, 232 F.3d at 989 (emphasis supplied).
Conversely, Qualcomm attaches a parenthetical to its citation of *Grokster* that misleadingly suggests that *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003) interpreted the Cartwright Act in the same way as the *In re DRAM* cases. (Def.'s Mem. 11 n.3.) In fact, *Grokster* neither used the *AGC* factors to determine standing under the Cartwright Act, nor did it hold "that indirect purchaser status [was not] itself sufficient under California law to establish antitrust standing." (*Id.*) Rather, *Grokster* concerned the standing of a potential competitor's business partner, not an indirect purchaser. *Grokster*, 269 F. Supp. 2d at 1224.

above.[16] However, even these courts recognize that "under California law, an indirect purchaser of goods or services is deemed to participate as a customer in the relevant market and thus may suffer a cognizable antitrust injury." *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1125 (N.D. Cal. 2005) (citing *Grokster*, 269 F. Supp. 2d at 1224; investor in file-sharing software company had standing with respect to "exercise of dominion and control over" company but did not with respect to "unidentified future investments in the online music distribution market"). Even if the market participation requirement were applicable to Meyer's Cartwright Act claim, "it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Am. Ad*, 190 F.3d at 1058.

### b.     Meyer Alleges Proximate Causation

As discussed in Section II.A.2, *supra*, Meyer alleges proximate cause because his injury was reasonably foreseeable. In California, proximate cause is a question of fact that cannot be determined on a motion to dismiss or a demurrer "[u]nless there are only undisputed facts from which only one conclusion can be drawn." *Kiseskey v. Carpenters' Trust for S. Cal.*, 144 Cal. App. 3d 222, 233, 192 Cal. Rptr. 492, 498 (Cal. Ct. App. 1983) (intentional tort). In 1978, the California legislature "immediate[l]y" responded to the *Illinois Brick* decision by adding "the following paragraph[:] 'Such action may be brought by any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless of whether such injured person dealt directly or indirectly with the defendant.*'" *Crown Oil Corp. v. Superior Court*, 177 Cal. App. 3d 604, 609, 223 Cal. Rptr. 164, 166 (Cal. Ct. App. 1986) (quoting Cal. Bus. & Prof. Code § 16750) (emphasis in original). Accordingly, California courts have endorsed many indirect purchaser suits. *Id*. (class action by users of industrial gas purchased indirectly); *In re Cipro Cases I and*

---

[16] *Grokster* holds that the Cartwright Act's antitrust injury element requires market participation. *Grokster, Ltd.*, 269 F. Supp. 2d at 1224. *Grokster*'s support for this proposition is a citation to *Knevelbaard*. *Id*. (citing *Knevelbaard*, 232 F.3d at 987-89). The portion of *Knevelbaard* which *Grokster* cites is an undifferentiated standing analysis under both federal and California law, and does not hold that antitrust injury under the Cartwright Act has a market participation requirement. *Knevelbaard*, 232 F.3d at 987-89.

*II*, 121 Cal. App. 4th 402, 17 Cal. Rptr. 3d 1 (Cal. Ct. App. 2004) (class of indirect purchasers of prescription drug); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 235 Cal. Rptr. 228 (Cal. Ct. App. 1987) (class of indirect purchasers of glass containers); *Crown Oil* (class of indirect purchasers of coconut oil).

Qualcomm concedes that Meyer's Cartwright Act claim avoids the bar against indirect purchaser claims under *Illinois Brick* but still falls short on the "'analytically distinct' aspect[] of antitrust standing" discussed in *McCready*. (Def.'s Mem. 10, 11.) Qualcomm is effectively asking the Court to circumvent or frustrate the California legislature's intent to provide indirect purchasers with a remedy under the Cartwright Act. The California Supreme Court has held that courts "must take care to avoid . . . thwart[ing] the legislative intent [to] retain the availability of indirect-purchaser suits as a viable and effective means of enforcing California's antitrust laws." *Union Carbide Corp. v. Superior Court*, 36 Cal.3d 15, 21, 679 P. 2d 14, 17-18 (1984). *Union Carbide* found that the 1978 amendment implied "a mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of California antitrust suits." *Id.*, 36 Cal.3d at 21, 679 P.2d at 18. The 1978 amendments to the Cartwright Act necessarily apply to those aspects of antitrust standing at issue in *McCready*, as well as those at issue in *Illinois Brick*. Nothing would be accomplished by eliminating the *Illinois Brick* bar against indirect purchaser claims if the same claims nonetheless floundered under *AGC*'s general standing rules because they were too "remote."

## 2.     California Law Controls Meyer's Standing Under the Cartwright Act

Basic principles of federalism mandate that the Court apply California law, not a federal court's interpretation of the same.

> The source of substantive rights enforced by a federal court under diversity jurisdiction, it cannot be said too often, is the law of the States. Whenever that law is authoritatively declared by a State, whether its voice be the legislature or its highest court, such law ought to govern in litigation founded on that law, whether the forum of application is a State or a federal court

*Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 112 (1945). If a state's highest court has not answered a question of that state's law, "federal courts must predict how the state's highest

court would resolve it . . . look[ing] to existing state law without predicting potential changes in that law." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203 (9th Cir. 2002). "[I]n the absence of a pronouncement by the highest court of a state, [we] must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently." *Munson v. Del Taco, Inc.*, 522 F.3d 997, 1002 (9th Cir. 2008) (citation, punctuation omitted). This Court does not owe any other district court's interpretation of California law any particular deference because that court sits in California. *See Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (court of appeals must review district court's determination of state law *de novo*).

Federal law does not prevent California from providing indirect purchasers a claim for damages under the Cartwright Act. "It is one thing to consider the congressional policies identified in *Illinois Brick* . . . in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law." *California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989). "[N]othing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *Id*. States' freedom to define their own antitrust law follows the usual rule that "state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *Id*. at 105. California must be free to set its own policy and define its own antitrust laws. *In re Sugar Antitrust Litig.*, 588 F. 2d 1270, 1273 (9th Cir. 1978) (California legal system "should be free to settle the question" of whether indirect purchasers have standing to bring Cartwright Act claim).

The Court cannot apply the *In re DRAM* cases to Meyer's Cartwright Act claim without violating the legislative intent of the 1978 amendment to the Cartwright Act. Although Qualcomm characterizes the *In re DRAM* cases as "well-established law," they are in fact Qualcomm's only authority for the proposition that Meyer lacks standing under the Cartwright Act. (Def.'s Mem. 12.) There are ample grounds to doubt the correctness of this holding: the *In re DRAM* court itself "acknowledge[d] [that its] ruling . . . is not without

1   controversy or uncertainty, given the state of the law on the issues raised herein with respect

2   to antitrust injury. *Indeed, the court does not expect to be the last word on this issue.*" *In re*

3   *DRAM II*, 536 F. Supp. 2d at 1142 (emphasis added). If the Court follows *In re DRAM* and

4   applies the *AGC* factors to Meyer's claim, it will frustrate the legislative intent behind the

5   1978 amendment to the Cartwright Act providing for indirect purchaser claims.

6                    **3.    Complexities in Proving the Amount of Damages Are Not Grounds
7                           for Dismissing Meyer's Cartwright Act Claim**

8          Qualcomm's assertion that it will be "difficult, if not impossible, [for Meyer] to trace

9   any alleged price inflation back to Qualcomm" cannot justify stripping Meyer of standing

10  under the Cartwright Act. (Def.'s Mem. 13.) *Illinois Brick*'s primary concern in denying

11  indirect purchasers standing was the complexity of proving damages. *Illinois Brick*, 431 U.S.

12  at 737-746. The California legislature plainly considered and rejected this concern when it

13  provided indirect purchasers standing. The California Supreme Court has found that the 1978

14  amendment was an "implie[d] legislative endorsement of" the dissent in *Illinois Brick*, which

15  held that the bar against indirect purchaser claims "weakens the effectiveness of the private

16  treble-damages action as a deterrent to antitrust violations by, in most cases, precluding

17  consumers from recovering for antitrust injuries." *Union Carbide*, 36 Cal.3d at 21, 679 P.2d at

18  18. Denying indirect purchasers standing under the Cartwright Act because the calculation of

19  damages was too difficult would frustrate the 1978 amendment.

20         The difficulty in proving Meyer's damages that Qualcomm perceives does not make

21  pleading the fact that Meyer was damaged more difficult. "[T]he liberal pleading

22  requirements of Rule 8(a)" apply to causation allegations; Meyer is not obliged to plead

23  causation with particularity. *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1022

24  (S.D. Cal. 2006) (on remand from *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)). The

25  allegation that Qualcomm's conduct caused supracompetitive retail prices for UMTS devices

26  "is a claim at least plausible enough to survive a motion to dismiss, whatever difficulty might

27  arise in establishing" the amount of the supracompetitive overcharge passed on to end

28  consumers. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (RICO

damages).

Any anticipated complexities and burdens entailed by calculating Meyer's Cartwright Act damages do not strip Meyer of the claim altogether. At the outset, Meyer seeks injunctive relief under the Cartwright Act. Moreover, California law places the "select[ion of] the formula most appropriate to compensate the injured party" for all proximately caused damages within the Court's discretion. *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 599, 463 P.2d 770, 778 (1970) (citing Cal. Civ. Code 3333.) When the "fact of damages is certain, the amount of damages need not be calculated with absolute certainty." *GHK Assocs. v. Mayer Group, Inc.*, 224 Cal. App. 3d 856, 873, 274 Cal. Rptr. 168, 179 (Cal. Ct. App. 1990) (citation omitted). Hence, the Court is free to determine "the total amount of overcharges to the class as a whole . . . based on a standard economic formula described in" expert testimony. *In re Cipro Cases I and II*, 121 Cal. App. 4th at 409-418, 17 Cal. Rptr. 3d at 7. "The use of such a formula is an accepted method of proving aggregate damages to the class. In many cases such an aggregate calculation will be far more accurate than summing all individual claims." *Id.*[17] "The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. This is especially true where, as here, it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits." *GHK*, 224 Cal. App. 3d at 873-74, 274 Cal. Rptr. at 179. *Accord Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (competitor antitrust claim). The Court has sufficient flexibility in managing the calculation of damages to avoid the pitfalls Qualcomm claims to foresee.

### C.    Meyer Has Standing to Bring a UCL Claim

Qualcomm's argument with respect to Meyer's UCL claim is not entirely clear. The Complaint notes that Qualcomm's licensing practices result in supracompetitive prices for

---

[17] *Cf. In re Sugar Industry Antitrust Litig.*, MDL No. 201, 1976 WL 1374, at *27 (N.D. Cal. May 21, 1976) ("[t]he only requirement under the federal antitrust laws for the utilization of [proof of damages from formula presented by economists or through scientifically sound statistical techniques] is that any statistics or techniques employed must produce a reasonable estimate of total damages").

UMTS components in a variety of ways and, as Qualcomm notes, these "'supracompetitive prices . . . are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services.'" (*Cf.* Compl. ¶¶ 50-67, 70 *with* Def.'s Mem. 17.) Despite this clear allegation of causation, Qualcomm cavils that the Complaint does not allege "a coherent chain of causation" because the supracompetitive overcharge Meyer paid for his UMTS phone "is impossible to trace back to Qualcomm's alleged misconduct." (*Id.*) If Qualcomm means that Meyer's allegation fails to establish causation under the UCL as a matter of law because he is an indirect purchaser, its argument is contrary to well-established law. In *Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 65 Cal. Rptr. 3d 634 (Cal. Ct. App. 2007), the court found that the UCL supports a claim for restitution arising from a manufacturers' false representations about its product which the plaintiffs purchased from a retailer. *Cf. id.*, 154 Cal. App. 4th 1500, 65 Cal. Rptr. 3d at 640 (comparing to restitution claim by property owners against bank that charged plaintiff's escrow and title companies improper fees that were "passed on to consumers as higher fees for separate services or higher fees for escrow services generally"). *In re Ditropan XL Antitrust Litigation*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007) found that indirect purchasers stated a UCL claim against a prescription drug manufacturer where that manufacturer caused indirect purchasers to pay supracompetitive prices for its drug. *Id.* at 1102-05. Meyer's status as an indirect purchaser does not impair his ability to identify the sums subject to restitution under his UCL claim.

## III.   Meyer Properly Stated His Claims

Perhaps aware that its standing arguments withstand scrutiny, Qualcomm advances a variety of alternate reasons why Meyer cannot bring his claims. These alternate reasons fare no better than Qualcomm's standing arguments. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), upon which Qualcomm relies heavily, does not bar antitrust claims for involuntary conspiracies, and it is beyond cavil that such a conspiracy exists – and has been pled – here. Qualcomm has monopoly power because it has the ability to raise prices and reduce competition: market share is merely a proxy for market power, and Qualcomm's lack

1    of market share in the relevant market is irrelevant. Lastly, the Third Circuit already held that

2    Qualcomm's alleged conduct violated the antitrust law. Meyer's complaint alleges unlawful

3    acts and therefore states a claim under the UCL.

4

5         **A.**     **Meyer's Allegations of Involuntary Antitrust Conspiracy State Antitrust Claims**

6         Meyer's Section 1 Sherman Act and Cartwright Act claims allege involuntary

7    restraints of trade where Qualcomm's licensees unwillingly adhere to the restraints of trade

8    embodied in Qualcomm's UMTS licenses. (Compl. ¶¶ 107, 126.) Qualcomm erroneously

9    asserts *Monsanto* forecloses involuntary conspiracy claims. (*Cf.* Def.'s Mem. 18-19.)

10        *Monsanto* cannot foreclose Meyer's Cartwright Act claim. Qualcomm concedes

11   California courts have already found that involuntary conspiracies can violate the Cartwright

12   Act. *See, e.g., G.H.I.I. v. MTS, Inc.*, 147 Cal. App 3d 256, 265-70, 195 Cal. Rptr. 211, 216-20

13   (Cal. Ct. App. 1983). (*Cf.* Def.'s Mem. 18.) The use of federal precedent to foreclose a

14   California claim contradicts one of federalism's bright-line rules: when predicting the

15   development of state law, "federal courts look to existing state law without predicting

16   potential changes in that law." *Hemmings*, 285 F.3d at 1203. California law has not changed

17   since *G.H.I.I.*, and it is not the role of this Court to change California law.

18        More to the point, *Monsanto* did not end involuntary conspiracy claims. It merely

19   applied the standard of a "conscious commitment to a common scheme designed to achieve an

20   unlawful objective" to a Section 1 claim arising from a dealer's termination for deviating

21   from a resale price-fixing scheme. *Monsanto*, 465 U.S. at 764. Its holding was purely

22   evidentiary – to demonstrate such a "conscious commitment," one had to prove not only that a

23   dealer conformed to a suggested price, but that the manufacturer solicited a communication

24   from the dealer in which the dealer committed to the set price, and that the dealer complied.

25   *Id.* at 764 n.9 (proof of a conspiracy "means . . . ***that evidence must be presented*** both that the

26   distributor communicated its acquiescence or agreement, and that this was sought by the

27   manufacturer") (emphasis added). *Cf. Isakesen v. Vermont Castings, Inc.*, 644 F. Supp. 1098,

28   1100-01 (W.D. Wisc. 1986) (*Monsanto* defines "evidentiary standard" for Section 1 claims),

*rev'd on other grounds*, 825 F.2d 1158 (7th Cir. 1987).

If the Ninth Circuit once doubted that *Monsanto* barred involuntary conspiracy cases, it has since dispelled that doubt: "a conspiracy to monopolize may exist even where one of the conspirators participates involuntarily or under coercion."[18] *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992). *See also Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 917 (9th Cir. 2008) (same). The Ninth Circuit's continuing acceptance of involuntary conspiracies is in accord with the consensus of post-*Monsanto* authorities from other Circuits on the issue.[19]

Formal contracts between Qualcomm and its licensees with the anticompetitive terms alleged in Meyer's Complaint satisfy *Monsanto*'s evidentiary standard for conspiracy, even where the contracts were coerced. *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426-27 (9th Cir. 1995). The antitrust violations Meyer alleges are embodied in the licenses themselves: if there is enough factual detail about the licenses to survive *Twombly* (discussed below), then factual detail about the coercive tactics Qualcomm used to achieve the licenses is irrelevant. There can be little doubt that these licenses exist (or that the threat of patent

---

[18] Qualcomm's reliance on the *dicta* in *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478-79 (9th Cir. 1986) and *Newport Components, Inc. v. NEC Home Electronics (U.S.A.), Inc.*, 671 F. Supp. 1525, 1546 (C.D. Cal. 1987) is misplaced. ***Although both cases expressed doubt about involuntary conspiracies after* Monsanto, *neither case was decided on those grounds*.** *Dimidowich*, 803 F.2d at 1478 ("we need not decide whether [involuntary conspiracies survive *Monsanto*," as plaintiff "failed to show that he was coerced into adhering to [defendant's] policy or that he acquiesced in it"); *Newport*, 671 F. Supp. at 1546 (plaintiff did not allege it "assented to or participated in the alleged price-fixing conspiracy"); *Blair v. All Am. Bottling Corp.*, No. 86-1426, 1988 WL 150814, at *3 (S.D. Cal. Aug. 9, 1988) (laundry list of basic pleading defects).

[19] "[T]he "combination or conspiracy" element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 974-75 (7th Cir. 1995) (reversing dismissal of antitrust claim alleging involuntary conspiracy; citing 12 cases). *See also Dickson v. Microsoft Corp.*, 309 F.3d 193, 204-05 (4th Cir. 2002) (following *MCM Partners*); *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001) (same; "there can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive"); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 214, 215 (3d Cir. 1992) (reversing directed verdict; agreement actionable antitrust could be result of "a persuasive or coercive co-conspirator"; "co-conspirators must share a commitment to a common scheme which has an anticompetitive objective, [but] they need not share an identical motive for engaging in concerted action"); *Black Gold, Ltd. v. Rockwool Indus., Inc.*, 732 F.2d 779, 780 (10th Cir. 1984).

1  litigation played a role in the licensees decision to accept the same). Broadcom's allegations

2  and its litigation of those allegations for three years should be sufficient substantiation on that

3  count. If it is not, then the Court should take judicial notice of the statements in Qualcomm's

4  most recent 10-K that:

5
6      *[M]ost, if not all, companies recognize that any company seeking to develop,*
       *manufacture and/or sell products that use [the UMTS standard] will require*
       *a patent license from [Qualcomm.]* . . . [As part of] continu[ing] to vigorously
7      defend [its] intellectual property rights [over the UMTS standard] and [its]
       right to continue to receive a fair return for our innovations[,] [Qualcomm]
8      [p]olic[es] unauthorized use of [its]. . . technologies [including its patents on
       the UMTS standard.]

9  QUALCOMM Incorporated, Form 10-K for the fiscal year ended September 30, 2007, at 8,

10 15, 20. *See also id.* at 37 (arbitration against Nokia over Nokia's UMTS license).

11      Nevertheless, Qualcomm asserts that Meyer has not alleged the coercion of its

12 licensees in detail. Meyer is an ordinary consumer and he is neither privy to communications

13 between Qualcomm and its licensees nor in a position to allege "who specifically was

14 coerced, when the coercion took place, and how the coercion was effectuated" without

15 discovery. (Def.'s Mem. at 20.) "Consumer antitrust plaintiffs like [Meyer] have less ability

16 to determine the details of this alleged conspiracy than would competitors." *In re Nine West*

17 *Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 191 (S.D.N.Y. 2000). Meyer has alleged "enough

18 fact to raise a reasonable expectation that discovery will reveal evidence" to support his

19 claim. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). *Twombly* does not mean

20 Meyer has to meet an arbitrary level of detail defined by Qualcomm. Moreover, Qualcomm's

21 argument here is disingenuous, because it required its licensees to enter into non-disclosure

22 agreements which, for instance, prevented Broadcom from alleging Qualcomm's licensing

23 practices in detail. *Broadcom Corp. v. Qualcomm Inc.*, Case. No. 05-03350 (D.N.J.), Dkt. No

24 14 at ¶ 13. Where the details of an antitrust violation are in the defendants' exclusive

25 knowledge, the plaintiff is not required to plead those details. *See Tele Atlas N.V. v. Navteq*

26 *Corp.*, 397 F. Supp. 2d 1184, 1189-90 (N.D. Cal. 2005). *See also Hosp. Blfg. Co. v. Trs. of*

27 *Rex Hosp.*, 425 U.S. 738, 746 (1976) (in antitrust cases, "dismissals prior to giving the

28 plaintiff ample opportunity for discovery should be granted very sparingly" because "the

1  proof is largely in the [defendants'] hands"). Meyer's allegations are sufficient to withstand a

2  Rule 12(b)(6) attack: the longevity of the proceeding between Broadcom and Qualcomm

3  leaves little doubt that the events alleged by Meyer occurred and that Qualcomm is on full

4  notice of those allegations.[20]

5        **B.    Meyer Alleges Qualcomm's Market Power Without Alleging Its Market**

6              **Share in the UMTS Device Market**

7        Qualcomm urges that Meyer's Section 2 claim fails because "Qualcomm is not alleged

8  to manufacture, market or sell cell phones." (Def.'s Mem. 20.) If this argument is merely a

9  variation on Qualcomm's market participation/antitrust standing argument, it fails for the

10 same reasons discussed in Section II.A.2, *supra*. If Qualcomm is arguing that Meyer cannot

11 allege Qualcomm has market *power* without alleging market *share*, it is mistaken.

12 Qualcomm's involvement in the UMTS device market is not an essential part of establishing

13 Qualcomm's market power in that market, because market power is the "power to control

14 prices or exclude competition." *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S.

15 377, 391 (1956). Qualcomm's ability to influence prices and restrict competition in the

16 relevant markets (3G cell phones and cell service) is amply alleged in Meyer's Complaint.

17 (Compl. ¶¶ 66, 70, 78, 81-82, 98, 103, 108, 123, 128, 133.) Market share is only a *proxy* for

18 market power, not its definition. *Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526

19 F.2d 1196, 1204 (9th Cir. 1975) ("market share . . . does not alone determine the presence or

20 absence of monopoly power"); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d

21 Cir. 1998) (market power "may be proven directly by evidence of the control of prices or the

22 exclusion of competition, *or* it may be inferred from [the] share of the relevant market")

23 (emphasis added).[21]

24  [20] If the Court nonetheless finds that Meyer still has not plead sufficient detail, Meyer asks

25  that he be granted access to discovery already produced by Qualcomm to Broadcom under
    an appropriate protective order, so that he can replead his claim in sufficient detail without

26  burdening Qualcomm with his own discovery. Manual for Complex Litigation § 20.2 (4th
    ed. 2004) (in related cases, "[r]elevant discovery already completed should ordinarily be

27  made available to litigants in the other cases").
    [21] Qualcomm's authorities are not the contrary. *Craftsmen Limousine, Inc. v. Ford Motor Co.*,

28  491 F.3d 380, (8th Cir. 2007) held that the defendant did not have market power not simply
    because it did not sell limousines, but because it simply did not have the ability to raise the
    prices on its pre-conversion vehicles without being undercut by competition. *Id.* at 391. In

Meyer's Complaint alleges market power, and does not need to allege market share. In *National Collegiate Athletic Association v. Board of Regents for the University of Oklahoma*, 468 U.S. 85 (1984), the Supreme Court found that the defendant exercised market power with respect to college football broadcasts through its control of intercollegiate athletic competition, even though it was not a direct competitor in that market. *See id.* at 112. "When a product is controlled by one interest . . . there is monopoly power." *Id.* (quoting *Du Pont de Nemours & Co.*, 351 U.S. at 392).[22] Thus, the inquiry is not whether the defendant competes in the relevant market, but rather whether the product is controlled by one interest. Plaintiff has alleged that the relevant markets are both controlled by Qualcomm given the nature of those markets and the facts presented in this particular case.

## C.    Meyer Alleges a UCL Claim

Even if Qualcomm's arguments that Meyer did not allege unfair or deceptive acts were valid, it would not foreclose Meyer's UCL claim. Meyer also alleges that Qualcomm's acts were unlawful. (Compl. ¶ 131.) The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200 (2008). The UCL is "written in the disjunctive"; unlawful acts violate the UCL just as much as fraudulent or unfair acts. *Cel-Tech Commc's, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180, 973 P.2d 527, 540 (1999) (citation, punctuation omitted). The UCL "borrows violations of other laws and treats them as unlawful practices" which are "independently actionable" under the UCL. *Id.*, 20 Cal. 4th at 180, 973 P.2d at 539-40 (punctuation, citation omitted). The Third Circuit found that Broadcom's 2005 complaint alleged a variety of antitrust violations. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007). As Meyer's Complaint is supposedly "little more than a photocopy of Broadcom's 2005 complaint," Meyer necessarily alleges those same

---

*Lucas v. Citizens Commc'ns Co.*, 409 F. Supp. 2d 1206 (D. Haw. 2005), the defendant power company offered a rebate program for solar water heaters; the plaintiff's claim failed at summary judgment for lack of evidence that the defendant intended to acquire monopoly power over the solar water heater market. *Id.* at 1222.

[22] Indeed, this same logic applies to any number of cases where an association of competitors implements anticompetitive rules which restrict competition between the competitors' members. *Cf., e.g., F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 449-450 (1986).

unlawful acts with sufficient detail to support his UCL claim. (Def.'s Mem. 1.)

However, Qualcomm's arguments that Meyer has failed to state a UCL claim are unfounded. Deceptive statements to third parties that cause a UCL plaintiff to lose "money or property" are grounds for a UCL claim. *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 716, 61 Cal. Rptr. 3d 29, 51-52 (Cal. Ct. App. 2007) (upholding a UCL claim for asserting that false stock analysis was intended to decrease plaintiff's stock price). Qualcomm's cases on this point are wholly distinguishable. *Cf.*, *e.g.*, *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App. 4th 1073, 124 Cal. Rptr. 2d 844 (Cal. Ct. App. 2002) (finding that equity principles precluded private individual who "personally did not suffer any injury as the result" of a travel agency's alleged acts against its corporate clients could not bring representative claim under pre-Proposition 64 UCL).

Likewise, Meyer alleges a UCL claim under its unfairness prong. It is true that the UCL's "unfairness" prong requires a competitive injury, but Meyer has alleged "supracompetitive prices" and "impaired non-price competition." (Compl. ¶ 133.) *Cf. Cel-Tech*, 20 Cal.4th at 189, 973 P.2d at 545-47 (competitor's lowered prices were only actionable under UCL if those prices were predatory and intended to eliminate, rather than foster, competition). However, even if Meyer's antitrust claims failed for whatever reason, the UCL has even broader application than the Cartwright Act. The UCL applies to "conduct that . . . violates the policy *or spirit* of [the antitrust laws] because its effects *are comparable to* or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal.4th at 187, 973 P.2d at 544 (UCL broader than Unfair Practices Act) (emphasis added). Even if Meyer's antitrust claims falter because Qualcomm's licensing practices were not found to be an actionable antitrust conspiracy, Meyer would still have his UCL claim. *Eddins v. Redstone*, 134 Cal. App. 4th 290, 344, 35 Cal. Rptr. 3d 863, 909 (Cal. Ct. App. 2005) (affirming summary judgment against Cartwright Act claim for lack of evidence of conspiracy affirmed, but reversing summary judgment against UCL for related acts); *Biljac Assocs. v. First Interstate Bank*, 218 Cal. App. 3d 1410, 1422, 267 Cal. Rptr. 819, 825 (Cal. Ct. App. 1990) ("it is not generally necessary to show a trust or conspiracy in

[a] [UCL claim] as opposed to one brought under the Cartwright Act"). If the Cartwright Act certainly does not expressly permit Qualcomm's conduct, it does not foreclose Meyer's UCL claim. "[M]erely because some other statute . . . does not, itself, provide for the action or prohibit the challenged conduct" does not foreclose a UCL claim. *Cel-Tech*, 20 Cal.4th at 182-83, 973 P.2d at 541.

**IV.      Conclusion**

Meyer has standing to pursue his antitrust claims. Meyer has suffered antitrust injury and such injury is inextricably intertwined with Qualcom's anticompetitive conduct. Because he is seeking injunctive relief, Meyer need not calculate his damages.

In addition, all of Meyer's causes of action against Qualcomm are sufficiently pleaded. Federal law recognizes involuntary conspiracies and California is in accord. Meyer need not allege market share because he has alleged the existence of market power. Finally, even if Meyer is found to lack standing to pursue his antitrust claims, he has alleged a cause of action under the UCL.

The motion to dismiss should be denied in its entirety.

Date:          July 14, 2008

                                    By: s/Alan Himmelfarb

Alan Himmelfarb (Cal. Bar. No. 90480)
KAMBEREDELSON, LLC
2757 Leonis Blvd.
Los Angeles, CA 90058
(323) 585-8696
ahimmelfarb@kamberedelson.com

Jay Edelson
Ethan Preston
KAMBEREDELSON, LLC
The Monadnock Building
53 West Jackson, Suite 550
Chicago, IL 60604
(312) 589-6370

Karin E. Fisch
Orin Kurtz
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

1
2

**CERTIFICATE OF SERVICE**

Pursuant to 28 U.S.C.§ 1746, I hereby certify that I served Plaintiff's Opposition to

Defendant's Motion to Dismiss in the foregoing case upon the parties listed below by causing

the foregoing document to be transmitted to the Electronic Filing System in the manner

prescribed by the Court's Electronic Case Filing Administrative Policies and Procedures

Manual on July 14, 2008:

| | |
|---|---|
| William S Boggs | Karl C. Huth |
| Brian A Foster | Duane L Loft |
| Christopher James Beal | Elizabeth L. Grayer |
| Timothy Scott Blackford | Evan R Chesler |
| DLA Piper Rudnick Gray Cary | Peter T. Barbur |
| 401 B Street, Suite 1700 | Cravath, Swaine & Moore LLP |
| San Diego, CA 92101-4297 | 825 Eighth Avenue |
| | New York, NY 10019 |

*Attorneys for QUALCOMM Incorporated*          *Attorneys for QUALCOMM Incorporated*

Date:          July 14, 2008

                                         By: s/Alan Himmelfarb
                                              ALAN HIMMELFARB