# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE MEYER, an individual, on his own behalf and on behalf of all similarly situated,<br><br>                        Plaintiff,<br>  vs.<br>QUALCOMM INCORPORATED, a Delaware corporation,<br><br>                        Defendant. | CASE NO. 08cv655 WQH (LSP)<br><br>**ORDER** |

HAYES, Judge:

       The matter before the Court is the Motion to Dismiss (Doc. # 23) filed by Defendant Qualcomm Incorporated.

## Factual Allegations in the Complaint

    A.    <u>The Parties</u>

       On April 10, 2008, Plaintiff Jesse Meyer initiated this action by filing the Class Action Complaint (Doc. # 1). Plaintiff is a resident of Oakland, CA. *Complaint*, ¶ 8. Plaintiff purchased a subsidized Motorola Razr V3xx from AT&T and receives cellular phone service from AT&T. *Id.,* ¶ 9. Defendant Qualcomm Incorporated ("Qualcomm") is a Delaware corporation headquartered in San Diego, California. *Id.,* ¶ 10. Qualcomm "commercializes technology involved in cellular communications and applications," and owns patents significant in the wireless communications industry. *Id.* Qualcomm generates billions of dollars in revenues by licensing its patents. *Id.*

### B.     The Wireless Industry

The wireless communications industry consists of many components, including wireless carriers providing cell phone service to consumers, cell phone manufacturers manufacturing cell phones, and cell phone component manufacturers manufacturing parts of cell phones. *Id.,* ¶¶ 14-16. In order "[f]or a carrier's wireless system to function properly, all of the system's components (e.g. base stations in various geographic locations and consumers' cell phones) must seamlessly interface with each other." *Id.,* ¶ 17. This means that "regardless of which manufacturer makes a cell phone, regardless of which chipset manufacturer supplies the components for the cell phone, and regardless of which company manufacturers the system's components, each cell phone must be capable of interfacing with all of the other components in a carrier's wireless system." *Id.*

Because of this "demand for interoperability," telecommunication standards determining organizations ("SDOs") have created industry and global-wide standards for wireless carriers, cell phone manufacturers and component makers. *Id.,* ¶ 18. "Two technology paths, or families of standards, are in widespread use today: 'CDMA,' which stands for 'code division multiple access;' and 'GSM,' which stands for 'global system for mobility.'" *Id.,* ¶ 23. The CDMA and GSM paths have evolved through four generations, and carriers are in the process of deploying "newer technologies that cannot neatly be characterized as either [second generation] or [third generation]." *Id.,* ¶ 24-26. "The CDMA and GSM standards are mutually incompatible." *Id.,* ¶ 37. Thus, the transition from second generation to third generation standards is "path-dependent." *Id.,* ¶ 38.

The Universal Mobile Telecommunications System ("UMTS") standard was "designed to permit economical transition from [second generation] GSM-based systems to a [third generation] standard." *Id.,* ¶ 31. An industry-wide standard, such as the UMTS, "necessarily eliminates previously available alternative technologies," and "confers monopoly power on the holders of patents essential to implementing that standard." *Id.,* ¶ 32.

1  When telecommunication SDOs consider implementing new standards, "[t]he ownership of relevant intellectual property (IP) and related IP licensing practices are critical issues." *Id.,* ¶ 22. "If the implementation of a standard requires the use of particular [intellectual property], such as a patent, the [intellectual property] owner may have the ability to prevent, delay or distort the development of technology implementing that standard (sometimes referred to as 'patent hold-up') and thereby undermine the purpose of the SDO." *Id.* "Accordingly, SDOs typically require that their members declare whether they believe they hold patents necessary for compliance with a particular standard, and if so whether they are willing to license such patents on fair, reasonable, and non-discriminatory (FRAND) terms." *Id.* "Patents necessary to implement a particular standard are known as 'essential patents' for the standard to which they relate," and "[e]ach SDO relevant to this action requires that owners of essential patents agree to FRAND licensing before the SDO will agree to include the technology that depends upon those patents in any industry standard." *Id.*

C.   Qualcomm's Patents and Licensing Practices

Qualcomm holds certain patents that are "essential" to Wideband Code Division Multiple Access ("WCDMA") technology. *Id.,* ¶¶ 1, 3. WCDMA is a third generation technology that is implemented through the UMTS standard. *Id.,* ¶ 3. Qualcomm's "WCDMA patents are essential to the manufacture of UMTS-compliant cell phones and other UMTS-compliant devices, and are also essential for the implementation of the UMTS standard." *Id.,* ¶ 36. "The licensing of Qualcomm's patents therefore is a barrier to entry into the relevant product market." *Id.*

Before the relevant SDOs included Qualcomm's technology and intellectual property in the UMTS standard, "Qualcomm made repeated and express written representations to SDOs . . . that Qualcomm would license any of its essential WCDMA patents on FRAND terms prior to the adoption of the UMTS standard." *Id.,* ¶ 42. Qualcomm's WCDMA technology was incorporated into the UMTS standard only after, and in reliance on Qualcomm's commitment to license its patents on FRAND terms. *Id.,* ¶ 43.

After the relevant SDOs adopted the UMTS standard, Qualcomm did not license its UMTS-related patents in a fair, reasonable, and non-discriminatory manner. *Id.,* ¶ 46. Qualcomm used "its monopoly power in the WCDMA market, as well as its false commitment to license its WCDMA patents on FRAND terms, to force industry participants into accepting Qualcomm's UMTS Licensing Practices." *Id.,* ¶ 47. In doing so, Qualcomm "has unnaturally prolonged high prices for UMTS chipsets and UMTS devices, and has significantly deterred non-price competition (improved products and functionality). Consequently, prices for UMTS chipsets are supracompetitive, and innovation in, e.g., enhanced functionality has been undermined." *Id.* Qualcomm's anticompetitive licensing practices include, but are not limited to discrimination against non-Qualcomm UMTS chipsets with regard to royalties, requiring unfair grant-back provisions, and requiring unfair pricing data exchange. *Id., ¶¶* 45-67.

### D.  Relevant Markets

"The relevant product market . . . is the global market for UMTS-capable devices." *Id.,* ¶ 68.

> Both UMTS chipset and UMTS device manufacturers suffer direct anticompetitive harm from Qualcomm's UMTS Licensing Practices. This anticompetitive harm includes supracompetitive prices and impaired non-price competition in innovation of UMTS functionality. Because the entire UMTS chipset and device industries are uniformly subject to the effects of UMTS Licensing, no individual competitor in those markets has any economic incentive to absorb these costs. Instead, UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the vendors ultimately pass those costs on to end consumers.

*Id.,* ¶ 70. Plaintiff is an end consumer, and has consequently suffered harm from Qualcomm's anticompetitive UMTS Licensing Practices. *Id.,* ¶¶ 69-70.

The relevant service market "is the cellular service of every carrier which bundles its cellular service with subsidized UMTS-compliant devices in the United States." *Id.,* ¶ 84. Cellular carriers provide subsidies to their subscribers, but these subsidies are not costless because "some portion of the carriers' cellular service fees is attributable to these subsidies." *Id.,* ¶ 80. Carriers pay supracompetitive prices to purchase UMTS devices that can be sold to their cellular service customers at subsidized prices. *Id.,* ¶ 81. These "supracompetitive fees

are passed on to the carriers' consumers." *Id.* Some portion of these fees are attributable to Qualcomm's anticompetitive conduct. *Id.*

### E. Causes of Action

Count I: Violation of the Sherman Act, 15 U.S.C. section 1

Qualcomm "committed to the relevant SDOs that it would license its WCDMA patents, which are essential to the UMTS standard, on FRAND terms;" this commitment was an intentional misrepresentation; and the "relevant SDOs and their members relied on Qualcomm's false commitment" in adopting and implementing the UMTS standard. *Id.,* ¶¶ 105, 106. Qualcomm's "UMTS Licensing constitutes a contract, combination in the form of trust or otherwise in restraint of trade or commerce." *Id.,* ¶ 107. Qualcomm "imposes UMTS Licensing on its licenses through deceptive and coercive conduct, and Qualcomm's licensees adhere to those restraints involuntarily." *Id.* Qualcomm's licensing practices have caused antitrust injury and threaten additional antitrust injury that consists of supracompetitive prices and impaired non-price competition in the form of deterred innovation. *Id.,* ¶ 108. Plaintiff requests "an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees." *Id.,* ¶ 134.

Count II: Violation of the Sherman Act, 15 U.S.C. section 2

Through Qualcomm's intentional misrepresentations (discussed above with regard to Count I), "Qualcomm willfully acquired monopoly power" over the relevant device markets. *Id.,* ¶ 113. "The commercial reality is that [third generation] device and chipset manufacturers must use either the UMTS standard or the [third generation] CDMA standard." *Id.,* ¶ 117. The "investment required to adopt a particular cellular standard effectively prevents cellular carriers from switching standards." *Id.,* ¶ 116. "Qualcomm's UMTS Licensing deters investment in the UMTS standard, and forces, diverts, and induces investment in the [third generation] CDMA standard." *Id.,* ¶ 121. "To the extent Qualcomm has the power to force cellular device and chipset manufacturers to adopt the [third generation] CDMA standard, it is increasing its market power over the" device market. *Id.,* ¶ 120. Qualcomm "willfully acquired monopoly power over the entire Alternative Device Market by leveraging its

monopoly power over UMTS devices and chipsets through the UMTS Licensing Practices." *Id.,* ¶ 122. Qualcomm's licensing practices have caused antitrust injury and threaten additional antitrust injury that consists of supracompetitive prices and impaired non-price competition in the form of deterred innovation. *Id.,* ¶ 123. Plaintiff requests "an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees." *Id.,* ¶ 134.

> Count III: Violation of California's Cartwright Act, sections 16720 and 16726 of the California Business and Professions Code

Qualcomm and its licensees "formed a combination of capital, skill and/or acts by two or more persons for the purpose of creating restrictions and preventing competition in manufacturing, making, sale and/or purchase of UMTS devices." *Id.,* ¶ 126. Qualcomm coerced the "unwilling cooperation of these licensees through threats and intimidation," which "therefore creates a trust prohibited by California's Cartwright Act." *Id.* Qualcomm's licensing practices constitute a trust in violation of the Cartwright Act "even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm created a trust by simply reneging on its commitment to FRAND licensing for the UMTS patents and engaging in the" unlawful licensing practices. *Id.,* ¶ 127. Qualcomm's licensing practices have caused antitrust injury and threaten additional antitrust injury in the form of supracompetitive prices and impaired non-price competition that consists of deterred innovation. *Id.,* ¶ 128. Plaintiff requests "an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees," and treble damages. *Id.,* ¶ 134.

> Count IV: Violation of California's Unfair Competition Law, section 17200 of the California Business and Professions Code

Qualcomm's UMTS licensing practices are "unfair business acts or practices." *Id.,* ¶ 131. Qualcomm's licensing practices are "unfair or deceptive business acts or practices even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm committed an unfair or deceptive business act or practice by simply reneging on its commitment to FRAND licensing for the UMTS patents." *Id.,* ¶ 132. Qualcomm's licensing practices have caused damage and threaten continued damage in the

form of supracompetitive prices and impaired non-price competition that consists of deterred innovation. *Id.,* ¶ 133.  Plaintiff requests "an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees," and equitable relief including an accounting, a constructive trust, and restitution. *Id.,* ¶ 134.

## Procedural History

On June 2, 2008, Qualcomm filed the Motion to Dismiss.  On July 14, 2008, Plaintiff filed a Response in Opposition to the Motion to Dismiss (Doc. # 26).  On July 28, 2008, Qualcomm filed a Reply (Doc. # 29).  On December 15, 2008, the Court heard oral argument on the Motion to Dismiss (Doc. # 39).

## Standard of Review

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the pleadings. *See De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).  A complaint may be dismissed for failure to state a claim under Rule 12(b)(6) where the factual allegations do not raise the right to relief above the speculative level. *See Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  Conversely, a complaint may not be dismissed for failure to state a claim where the allegations plausibly show that the pleader is entitled to relief. *See id.* (citing Fed R. Civ. P. 8(a)(2)).  In ruling on a motion pursuant to Rule 12(b)(6), a court must construe the pleadings in the light most favorable to the plaintiff, and must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn therefrom. *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003); *see also Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996).

The allegations in the complaint "may not evade [antitrust] requirements by merely alleging a bare legal conclusion." *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 736 (9th Cir. 1987). "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," especially in light of the fact that "antitrust discovery can be expensive." *Twombly,* 550 U.S. 544. Plaintiffs alleging antitrust claims must set forth enough "factual matter" to "nudge[] their claims across the line from conceivable to plausible." *Id.*  California courts similarly demand

1  a "high degree of particularity in the pleading of Cartwright Act violations." *G.H.I.I. v. MTS,*
2  *Inc.,* 147 Cal. All. 3d 256, 265 (1983); *see also Cellular Plus, Inc. v. Superior Court,* 14 Cal.
3  App. 4th 1224, 1236 (1993).

## Analysis

### I.   Standing under the Sherman Act and the Cartwright Act

Qualcomm asserts that antitrust standing is a threshold requirement that every plaintiff must satisfy to bring a private suit under the federal and state antitrust statutes. Qualcomm asserts that Plaintiff has failed to satisfy this threshold requirement under both the Sherman Act and the Cartwright Act because the Complaint does not allege "an injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendant's acts unlawful." *Mot. to Dismiss,* p. 14 (internal quotations omitted).

Qualcomm contends that "Plaintiff's theory of causation is far too attenuated to support standing." *Mot. to Dismiss,* p. 11-12. Qualcomm contends that "[o]n the face of the Complaint, there are at least three intermediaries between Plaintiff and any alleged antitrust violation," and that each device allegedly containing Qualcomm patented technology "also contains numerous other technologies, any of which might impact the final price actually paid by Plaintiff." *Id.* at 11-12. Qualcomm contends that Plaintiff "[e]ffectively conced[es] that he is not a consumer in any relevant market" because the Complaint alleges that Plaintiff is an end consumer in the market for cell phones and cellular service, and challenges Qualcomm's UMTS licensing practices, which occur in the completely different market for WCDMA-related patents and technology. *Reply,* p. 6. Qualcomm contends that Plaintiff's reliance "on a so-called 'exception to the market participant rule', under which antitrust standing can exist where a plaintiff's injuries are 'inextricably intertwined with the injuries of market participants,'" is not proper because Plaintiff "does not and cannot allege that he was a 'direct victim' or the 'necessary means' of Qualcomm's alleged conduct." *Id.* Qualcomm contends that courts "routinely dismiss complaints brought by consumers that, as here, allege anticompetitive conduct in a market in which they have not purchased a product," and that "[a]lthough Plaintiff alleges that he might benefit consequentially from an injunction against

1  Qualcomm's licensing practices, not every party with but-for injury is entitled to bring suit as
2  a private attorney general to enforce the antitrust laws." *Mot. to Dismiss,* p. 15-16.

3  Plaintiff agrees with Qualcomm that antitrust standing is a threshold requirement to
4  bringing a private action under the federal and state antitrust laws, and asserts that he has
5  satisfied the threshold requirement of adequately alleging antitrust standing with respect to his
6  claims brought pursuant to both the Sherman Act and the Cartwright Act. *Opposition,* p. 3.
7  Plaintiff contends that he need not be a direct consumer or competitor to bring his claim
8  because a indirect purchasers have standing to bring an injunctive antitrust claim under the
9  Sherman Act and the Cartwright Act. *Id.* at 9-10. Plaintiff contends that even though
10 Plaintiff's injury did not occur in the same market as Qualcomm's anticompetitive licensing
11 practices, his injury "was inextricably intertwined with the injury Qualcomm sought to cause"
12 because "UMTS components have no economic value absent demand for UMTS devices." *Id.*
13 at 9. Plaintiff contends that he has antitrust standing on grounds that the injuries alleged in the
14 Complaint - "supracomeptitive prices and impaired non-price competition for UMTS cellular
15 devices - were . . . eminently foreseeable and inextricably intertwined with the injury
16 Qualcomm sought to cause," and were "the type of injury that the antitrust laws were intended
17 to remedy." *Id.* at 5, 9 (quotations omitted).

18  A.  <u>Standing under the Sherman Act</u>

19  "Antitrust standing" is a threshold requirement that every plaintiff must satisfy to bring
20 a private suit under the federal antitrust laws. *City of Pittsburgh v. West Penn Power Co.,* 147
21 F.3d 256, 264 (3d Cir. 1998). Antitrust standing is distinct from Article III standing. "A
22 plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper
23 party to bring a private antitrust action." *Associated General Contractors of California, Inc.*
24 *("AGC") v. California State Council of Carpenters,* 459 U.S. 519, 535, n. 31 (1983).

25
26
27
28

In order to have standing to seek injunctive relief under section 16 of the Clayton Act,[1] a private plaintiff must allege that the plaintiff has "suffered loss or damage of a type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113 (1986) (internal quotations omitted); *see also Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476 (1982) (antitrust standing requires an "analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of 'proximate cause'"). "[I]t is not the status as consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *American Ad Management, Inc. v. General Telephone Company of California,* 190 F.3d 1051, 1057 (9th Cir. 1999); *In re Warfarin Sodium Antitrust Litigation,* 215 F.3d 395, 400 (3d Cir. 2000) (status as an "indirect purchaser" is not "fatal to a plaintiff's request for injunctive relief under section 16" of the Clayton Act). However, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268-69 (1992).

In order to have antitrust standing, the plaintiff must "have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *American Ad Management,* 190 F.3d at 1057*; In re Warfarin,* 215 F.3d at 400 ("it is not the status as consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff"). A "narrow exception" exists to this "market participant" requirement "for parties whose injuries are 'inextricably intertwined' with the injuries of market participants" or with

---

[1] The Clayton Act "provides a vehicle for private enforcement of the [Sherman Act]." *Cargill, Inc.,* 479 U.S. at 109. Under section 16 of the Clayton Act, "[any] person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." *Id.*

1  "the injury the conspirators sought to inflict." *American Ad Management,* 190 F.3d at 1057
2  (citing *McCready,* 457 U.S. 465). This exception applies when the claimant can be considered
3  the "direct victim" of a conspiracy or the "necessary means" by which the conspiracy was
4  carried out. *Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739, 744-47 (9th Cir. 1984) (citing
5  *McCready,* 457 U.S. at 479). "[T]he simple invocation of [the phrase 'inextricably
6  intertwined'] . . . will not allow a plaintiff to avoid the fundamental requirement for antitrust
7  standing that he or she have suffered any injury of the type - almost exclusively suffered by
8  competitors - that the antitrust laws were intended to prevent." *Steamfitters Local Union No.*
9  *420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 926, n.8 (3d Cir. 1999).

10        The conduct that is at the center of the Complaint is Qualcomm's alleged refusal to
11  license its technology on FRAND terms. The Complaint alleges that Qualcomm licenses
12  "some" of the essential technology that has ultimately been included in the UMTS standard.
13  *Complaint,* ¶ 33. The Complaint alleges that Qualcomm's licensing practices cause direct
14  anticompetitive harm to UMTS chipset manufacturers in the form of supracompetitive prices
15  and impaired non-price competition in innovation to UMTS functionality. The Complaint
16  alleges that "UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device
17  manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the
18  vendors ultimately pass those costs on to end consumers." *Id.,* ¶ 70.

19        Plaintiff brings this action as an indirect purchaser, on grounds that Qualcomm's
20  licensing practices indirectly caused Plaintiff to pay supracompetitive prices for his cell phone
21  and cellular service. As alleged in the Complaint, Plaintiff's end-consumer injury is traced
22  through three levels of the supply chain - chipset manufacturers, cell phone manufactures, and
23  vendors. Furthermore, the technology licensed by Qualcomm to chipset manufacturers is only
24  a component of the technology ultimately creates a chipset, which is then passed on through
25  the supply chain such that Plaintiff's injury also must be disaggregated from a multitude of
26  other manufacturing and component factors. Although Plaintiff's indirect purchaser status
27  alone does not preclude antitrust standing, the Court concludes that Plaintiff's injury as alleged
28  in the Complaint is too remote from Qualcomm's alleged antitrust violations to support

standing under the Sherman Act.

The Complaint alleges that Qualcomm's unlawful licensing practices occurred in the market for WCDMA-related patents and technology, and that Plaintiff is an end consumer who suffered injury in the form of anticompetitive prices in the market for cell phones and cellular service. The Court concludes that the Complaint fails to allege sufficient facts to support a finding that Plaintiff is a participant in the market where Qualcomm's unlawful conduct allegedly occurred. *See American Ad Management,* 190 F.3d at 1057. The Complaint does not allege facts to support a finding that Plaintiff and Qualcomm had a direct relationship, that Qualcomm's anticompetitive conduct proximately caused Plaintiff's injury, that Plaintiff is a direct victim of Qualcomm's anticompetitive conduct, or that Plaintiff is the "necessary means" by which Qualcomm carried out its anticompetitive licensing scheme. *See Ostrofe,* 740 F.2d at 755. The Court concludes that the Complaint fails to allege sufficient facts to support a finding that Plaintiff's alleged injury is inextricably intertwined with Qualcomm's unlawful conduct so as to fit within the "narrow exception" to the market participant requirement. *American Ad Management,* 190 F.3d at 1057

The Court concludes that the Complaint fails to allege the type of injury that the "antitrust laws were designed to prevent" and that "flows" from the conduct that makes defendants' acts unlawful. *Cargill,* 479 U.S. at 113. The Court dismisses the Complaint's first and second causes of action for violation of the Sherman Act on grounds that Plaintiff lacks standing.

B.  <u>Standing under the Cartwright Act</u>

The Cartwright Act "is California's version of the federal Sherman Act and sets forth California's antitrust laws." *Cellular Plus, Inc. v. Superior Court of San Diego County,* 14 Cal. App. 4th 1224, 1232 (1993). In order for a private plaintiff to have standing to sue under the Cartwright Act, the plaintiff must prove antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." *Id.* at 1234. The Cartwright Act "is patterned after the federal Sherman Anti-Trust Act . . . , so that decisions under the latter act are applicable to the former." *Kolling v.*

*Dow Jones & Company, Inc.,* 137 Cal. App. 3d 709, 717 (1982). However, standing under California's Cartwright Act is broader than standing under the Sherman Act insofar as the Cartwright Act explicitly permits indirect purchasers to bring suits for damages and injunctive relief, whereas an indirect purchaser may only bring suit for injunctive relief under the Sherman Act. *Cellular Plus,* 14 Cal. App. 4th at 1234. The California courts have held that a plaintiff whose injuries "were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent" has antitrust standing. *Id.* at 1233 (citing *Kolling,* 137 Cal. App. 3d at 724) ("Plaintiff's injuries were not 'secondary' or 'consequential,' since they did not result from injury to third parties; they were not 'remote,' for they were the direct result of the allegedly illegal conduct."). Although the Cartwright Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers," *Cellular Plus,* 14 Cal. App. 4th at 1233, "courts interpreting the Cartwright Act's antitrust standing requirement have consistently followed the 'market participant' rule." *In re Napster, Inc. Copyright Litig.,* 354 F. Supp. 2d 1113, 1125-26 (N.D. Cal. 2005) (citing *MGM Studios, Inc. v. Grokster, Ltd.,* 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003). The plaintiff "must show an injury within the area of the economy that is endangered by a breakdown of competitive conditions." *Kolling,* 137 Cal. App. 3d at 724; *see also Vinci v. Waste Management, Inc.,* 36 Cal. App. 4th 1811, 1816 (1995) (plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained").

Plaintiff's status as an end-user, who purchased indirectly from Qualcomm, is not fatal to Plaintiff's standing. However, Plaintiff must allege an injury that is not "secondary, consequential, or remote" in order to have standing under the Cartwright Act. *Cellular Plus,* 14 Cal. App. 4th at 1233. As alleged in this Complaint, there are at least three intermediaries - UMTS chipset manufacturers, UMTS device manufacturers, and UMTS device vendors - between Plaintiff's injury and the alleged antitrust violations, and Qualcomm supplies only "some" of the technology essential to UMTS, such that each device allegedly containing Qualcomm technology also contains other technology which impacts the final price actually paid by Plaintiff. *Complaint,* ¶ 33. The remote nature of Plaintiff's injuries in relation to the

alleged antitrust violations is further demonstrated through the allegations in the Complaint that Plaintiff's alleged injuries (payment of inflated prices in the market for cell phones and cellular service) occurred in separate market from the alleged antitrust violation (the market for WCDMA patents and technology). The Court concludes that Plaintiff's injuries as alleged in the Complaint are too remote to support standing under the Cartwright Act because Plaintiff's injuries occurred in a different market from the allegedly anticompetitive conduct, Plaintiff's injuries are separated by at least three intermediaries to the antitrust violation, and Plaintiff's injuries were not the direct result of Qualcomm's allegedly unlawful conduct.

The Court concludes the Complaint fails to allege an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." *Cellular Plus,* 24 Cal. App. 4th at 1234.   The Court dismisses the Complaint's third cause of action for violation of the Cartwright Act on grounds that Plaintiff lacks standing.

## II.     Standing under California's Unfair Competition Law

Qualcomm contends that standing for UCL lawsuits is restricted to persons "who have suffered injury-in-fact and ha[ve] lost money or property as a result of such unfair competition." *Mot. to Dismiss,* p. 16 (quotations omitted). Qualcomm contends that a "showing of causation is required as to each representative plaintiff." *Id.* Qualcomm contends that Plaintiff has no standing to bring his UCL claim because Plaintiff "cannot allege in support of his UCL claim a coherent chain of causation suggesting that any 'money or property' was somehow lost 'as a result of' Qualcomm's alleged misconduct." *Id.* at 17.

Plaintiff contends that the Complaint alleges a coherent chain of causation sufficient to satisfy the standing requirements under the UCL through allegations that "'supracompetitive prices . . are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services.'" *Opposition,* p. 18 (quoting *Complaint,* ¶¶ 50-67, 70). Plaintiff contends that "[i]f Qualcomm means that [Plaintiff's] allegation fails to establish causation under the UCL as a matter of law because he is an indirect purchaser, its argument is contrary to well-established law." *Opposition,* p. 18.

California's UCL permits civil recovery for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "A private person . . . has standing to assert a UCL claim only if he or she (1) 'has suffered injury in fact,' and (2) 'has lost money or property as a result of the unfair competition.'" *Hall v. Time, Inc.,* 158 Cal. App. 4th 847, 852 (2008) (quoting Cal. Bus. & Prof. Code § 17204). The second prong of this standing test "imposes a causation requirement. The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." *Hall,* 158 Cal. App. 4th at 855 ("We use the word 'causation' to refer both to the causation element of a negligence cause of action . . . and to the justifiable reliance element of a fraud cause of action.").

In *Hall,* the plaintiff alleged that defendant Time, Inc. offered customers a free preview period during which customers could review a book and return it to Time, Inc. with no obligation to buy, and that Time, Inc. engaged in unfair competition by sending the customer an invoice before the end of the free trial period in order to induce the customer to immediately send payment for the book. *Hall,* 158 Cal. App. 4th at 850, 857. The court held that the plaintiff lacked standing because he "did not allege he did not want the book or Time's alleged acts or unfair competition induced him to keep a book he otherwise would have returned during the free trial period." *Id.* at 857; *see also Laster v. T-Mobile USA, Inc.,* 407 F. Supp. 2d 1181, 1183 (S.D. Cal. 2005) ("Plaintiffs, however, do not include *any* allegations in their [first amended complaint] that they relied on Defendants' advertisements in entering into the transactions. . . . [N]one of the named Plaintiffs allege that they saw, read, or in any way relied on the advertisements; nor do they allege that they entered into the transaction *as a result* of those advertisements.").

The Complaint in this case alleges that Qualcomm made misrepresentations to SDOs, which relied on Qualcomm's misrepresentations in incorporating Qualcomm's technology into the UMTS standard. The Complaint alleges that Plaintiff purchased a subsidized Motorola Razr V3xx from AT&T and receives cellular phone service from AT&T. Although the Complaint alleges that SDOs relied on Qualcomm's misrepresentations when formulating the

UMTS standard, the Complaint does not allege that Plaintiff relied on representations made by Qualcomm when he purchased his cell phone or when he selected his cellular service. The Complaint does not allege that Plaintiff would not have purchased the Motorola Razr V3xx from AT&T, or would not have chosen to receive cellular phone service from AT&T had Plaintiff been aware of Qualcomm's misrepresentations. The Court concludes that Plaintiff has failed to satisfy the second prong of the test for standing under the UCL because the Complaint does not allege that Plaintiff relied on any misrepresentation made by Qualcomm. *See Hall,* 158 Cal. App. 4th at 855. The Court dismisses the fourth cause of action for violation of California's Unfair Competition Law on grounds that Plaintiff lacks standing.

## Conclusion

IT IS HEREBY ORDERED that the Motion to Dismiss (Doc. # 23) is **GRANTED.** The above-captioned action is **DISMISSED.**

DATED: March 3, 2009

*[signature]*
**WILLIAM Q. HAYES**
United States District Judge